# Exhibit A

George A. Zelcs (*pro hac vice forthcoming*)
  gzelcs@koreintillery.com
Randall P. Ewing, Jr. (*pro hac vice forthcoming*)
  rewing@koreintillery.com
Ryan Z. Cortazar (*pro hac vice forthcoming*)
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice forthcoming*)
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe (*pro hac vice forthcoming*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653       Philip C. Korologos (*pro hac vice forthcoming*)
  jischiller@bsfllp.com                       pkorologos@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**             **BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor               55 Hudson Yards, 20th Floor
San Francisco, CA 94104                     New York, NY 10001
Telephone: (415) 293-6800                   Telephone: (212) 446-2300
Facsimile: (415) 293-6899                   Facsimile: (212) 446-2350

*Attorneys for Maria Schneider and*
*Pirate Monitor LTD*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> YOUTUBE, LLC; GOOGLE LLC; and ALPHABET INC.; <br><br> Defendants. | CASE NO. 5:20-cv-4423 <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Maria Schneider and Pirate Monitor LTD, as and for their Complaint against Defendants YouTube, LLC ("YouTube"), Google LLC ("Google"), and Alphabet Inc. ("Alphabet") (collectively, "Defendants"), allege upon personal knowledge as to acts and events taking place in their presence or upon information and belief for all other acts as follows:

**INTRODUCTION**

1. This case is about copyright piracy. YouTube, the largest video-sharing website in the world, is replete with videos infringing on the rights of copyright holders. YouTube has facilitated and induced this hotbed of copyright infringement through its development and implementation of a copyright enforcement system that protects only the most powerful copyright owners such as major studios and record labels. Plaintiffs and the Class are the ordinary creators of copyrighted works. They are denied *any* meaningful opportunity to *prevent* YouTube's public display of works that infringe their copyrights—no matter how many times their works have previously been pirated on the platform. They are thus left behind by YouTube's copyright enforcement system and instead are provided no meaningful ability to police the extensive infringement of their copyrighted work. These limitations are deliberate and designed to maximize YouTube's (and its parents Google's and Alphabet's) focused but reckless drive for user volume and advertising revenue. Moreover, the Plaintiffs and the Class are not only prevented from using any meaningful enforcement tool, but the system in place actually exacerbates the harms caused to them including in a manner that bars Defendants from the protections of any safe harbors under applicable copyright laws such as the Digital Millennium Copyright Act ("DMCA").

2. The copyright management tool that YouTube provides to the behemoths of the creative industry is Content ID—a digital fingerprint tool that compares videos being uploaded on YouTube to a catalogue of copyrighted material submitted by those entities permitted to utilize Content ID. Content ID is not only unavailable to Plaintiffs and the Class, but it actually insulates the vast majority of known and repeated copyright infringers from YouTube's repeat infringer policy, thereby encouraging its users' continuing upload of infringing content.

3.       Defendants Alphabet, Google, and YouTube reap billions of dollars annually from the online hosting of videos, including millions of works that infringe on the exclusive copyrights of Plaintiffs and the Class. Defendants permit and facilitate this infringement because it furthers their growth and revenue strategies and because they have determined that Plaintiffs and the Class—unlike YouTube's preferred Content ID partners—lack the resources and leverage necessary to combat copyright infringement on the scale at which it is perpetuated on YouTube.

4.       YouTube has more than 2 billion users worldwide every month, which according to Defendants is "almost one-third of the internet." Users watch more than one billion hours of videos every single day, equating to approximately 5 billion videos viewed each day. YouTube estimates that more than 720,000 hours of videos—more than 82 years' worth—are uploaded every day, equating to more than 500 hours of content uploaded every minute.

5.       However, to become the preferred platform for both uploaders and viewers, Defendants knowingly permitted YouTube also to become a hotbed of piracy. From its start, YouTube recognized that its success was highly dependent on the rapid growth in online postings (or "uploads") of "user-generated content," to be uploaded quickly and with no prepublication diligence, making the unauthorized upload of copyrighted material unavoidable. Google purchased YouTube with full knowledge of YouTube's rampant copyright piracy, yet Google chose to foster YouTube's growth rather than protect copyright holders; it even refused to implement anti-piracy tools it had previously developed on another video sharing platform designed to curb such infringement.

6.       Given the two-sided market YouTube functions in—where it wants to drive both viewers and content providers--Defendants' motives are obvious. The ready availability of pirated content is the source of "network effects." A vast library of pirated content draws users to the site, and the growth in users incentivizes the posting of more content on YouTube, which in turn enables Defendants to reap more advertising revenue. Building extensively on the backs of copyright holders who never gave authorization for their works to be displayed on YouTube, Defendants report that they now derive $15 billion in revenue from advertising on YouTube, as well as unspecified billions

1  from subscriptions, other YouTube services, and the exploitation and monetization of personal data

2  harvested from all of its users.

3       7.      In addition to the billions of dollars of direct advertising revenue, the Google search

4  and advertising platform independently gains massive value capitalizing on the rapid upload of

5  materials, much of which infringes on class members' copyrights. Every time a viewer engages with

6  the YouTube platform, Google harvests valuable information on individual user preferences and

7  aggregate user demographics. This data is used to develop targeted advertising for YouTube, for

8  Google, and further across the internet via Google's AdSense, AdX, and AdManager products and

9  services, each of which generate additional billions of dollars for Defendants. Google is estimated

10  to control 40% of the online advertising market, with much of it built on data it gathers from

11  YouTube viewers drawn to the website by infringing material.

12       8.      Faced with litigation by major music studios and other significant rights holders,

13  Defendants have crafted distinct and disparate systems of copyright "enforcement" on their

14  platform. For those entities with vast stores of copyright material and thus the leverage to require

15  Defendants to appease their copyright management concerns, YouTube created its Content ID

16  program, which allows qualifying copyright owners automatically to identify and manage their

17  content on YouTube. Videos uploaded to YouTube are scanned against a database of files that have

18  been submitted to Defendants by those qualifying copyright owners. Such owners get to decide

19  what happens when content in a video on YouTube matches a work they own; the available options

20  are (on a country-specific basis) to block the whole infringing video from being viewed, monetize

21  the infringing video by running ads against it (in some cases sharing revenue with the uploader), or

22  track the infringing video's viewership statistics.

23       9.      Smaller rights holders, including Plaintiffs and the Class, are, however, denied

24  access to Content ID and thus are relegated to vastly inferior and time-consuming manual means

25  of trying to police and manage their copyrights such as scanning the entirety of YouTube postings,

26  searching for keywords, titles, and other potential identifiers. Plaintiffs and the Class must then file

27  individual takedown notices with YouTube via a web-form, email, or postal mail for each video

28

their searches identify. Defendants have, in effect, created a two-tiered system whereby the rights of large creators with the resources to take Defendants to court on their own are protected, while smaller and independent creators like Plaintiffs and the Class are deliberately left out in the cold.

10.     The inequities of these disparate systems are pervasive. The following table contrasts the protections offered by Content ID with those accorded ordinary copyright enforcers.

| Content ID | Ordinary Rights Enforcers |
|---|---|
| Screening is performed at the moment of upload, before a video is published on YouTube preventing public availability through YouTube of the infringing material. | Screening is performed only after a video is uploaded, published on YouTube and the infringing material is available to the general public. |
| Screening is performed automatically using the digital fingerprint system provided by YouTube that automatically compares the actual content of each uploaded video with the entire catalog of Content ID-protected works. | Screening (if any) must be performed through keyword searches in an attempt to identify infringing works via titles, authors, and keywords attached to the video by the uploader. |
| Content ID automatically imposes the rights holder's enforcement option to block the infringing video from publication on the platform, to monetize the infringing video through advertising revenue, or monitor download statistics of the infringing video. | Once the rights holder identifies infringing videos, the rights holder must file a takedown notice with YouTube for each offending video, specifying the URL location of the offending work, and providing evidence of the holder's right to enforce the copyright. After a delay of days or weeks during which the infringing material remains publicly available and the harm caused by the infringement continues, YouTube may suspend or remove the video. |

11.     The superior protections of the Content ID system are completely denied to Plaintiffs and the Class no matter how many times their copyright protected works are infringed on the YouTube platform. If a rights holder does not have the economic clout to qualify for Content ID, YouTube refuses to add their works to the Content ID catalog for prepublication protection even if those works have previously been infringed on YouTube hundreds or even thousands of times. Through its use of these systems, YouTube exerts significant control over which infringing videos may be published on its site and which infringing videos are never viewed by the public.

12.     Moreover, Defendants have completely divorced their Content ID system from their legally mandated repeat-infringer policy. The DMCA provides a safe harbor against copyright

1  infringement claims for entities such as YouTube so long as they formulate and reasonably

2  enforce a policy of terminating repeat copyright infringers from their platform. YouTube purports

3  to take advantage of this safe harbor by having a policy that assesses a "copyright strike" against

4  the uploader when an ordinary rights holder files a takedown notice and terminating uploaders

5  when they accrue three active copyright strikes within 90 days. However, when infringing content

6  is uploaded and identified by the Content ID system, no copyright strikes are issued.[1] Thus, when

7  Google brags that 98% of its "copyright issues are resolved via Content ID,"[2] what it really means

8  is that nearly all identified copyright infringing material is entirely insulated from its repeat-

9  infringer policy. This two-tiered system essentially trains YouTube's billions of uploading users

10 that there is essentially minimal risk to uploading to their hearts' content. And while YouTube's

11 Content ID partners are protected from these repeat infringers because their uploads will always

12 be screened against the Content ID catalog before publication, Plaintiffs and the Class remain at

13 risk of recurring infringement by these same repeat infringers.

14       13.     While Defendants state that Content ID eligibility is based on a variety of criteria,

15 only five percent or less of all people who apply for Content ID are approved. Plaintiffs have

16 applied and have either been rejected or received no response. In the meantime, Plaintiffs

17 continue to suffer copyright piracy. Plaintiffs have had their exclusive copyrights infringed

18 multiple times, despite having sent prior successful takedown notices for those very same works

19 and despite Defendants' having actual and constructive knowledge that YouTube is being used

20 continuously to infringe Plaintiffs' copyrights.

21       14.     Defendants have forfeited their claim to the DMCA safe harbor protections in

22 other ways as well. For example, rights holders who seek to actively enforce their copyrights by

23 filing numerous takedown notices run the risk of losing access to YouTube's rudimentary tools

24 purportedly designed to facilitate the takedown notification process. Moreover, Defendants

25 

26 [1]  YouTube's own Help page expressly states, "Content ID claims don't result in a strike."
   https://support.google.com/youtube/answer/2814000?hl=en, last visited July 1, 2020.

27 [2]  "How Google Fights Piracy," p. 30,
   https://www.blog.google/documents/27/How_Google_Fights_Piracy_2018.pdf, last visited July 1, 2020.

28

1    arbitrarily limit the number of takedown notices they will process from rights holders such as

2    Plaintiffs and the Class. YouTube also constrains the use of certain automated tools meant to help

3    locate infringing content on the platform. Defendants are liable for the copyright piracy on their

4    platform because their current approach to copyright infringement, including the operation of the

5    Content ID system, fails to satisfy the requirements mandated in order to be protected under the

6    DMCA safe harbor.

7          15.     The overall effect of Defendants' inducement of copyright infringement,

8    manipulation of search, willful blindness, data harvesting, and selective enforcement of copyright

9    screening tools is to depress the value of creators' work and destroy the free marketplace for those

10   works, where willing buyers and willing sellers can transact business. Instead, Defendants have

11   created an alternative and unlawful marketplace, where the advertising revenue and valuable data it

12   derives from publishing those works—free of charge to the consumer—bears no rational

13   relationship to the creator's real cost of producing those works; this significantly injures the

14   creators, but enormously benefits Defendants. The ready availability on YouTube of unauthorized

15   copyrighted materials and the whack-a-mole approach required for creators to remove infringing

16   material works disincentivize the creation of new works and reduce the value of all works.

17                                      **PLAINTIFFS**

18         16.     Plaintiff Maria Schneider, a citizen of the state of New York, is a multiple Grammy

19   award-winning composer and musician. Plaintiff Schneider holds exclusive copyrights to

20   numerous works, including the songs "Hang Gliding," "Green Piece," and "Journey Home."

21         17.     Plaintiff Pirate Monitor LTD is a limited company with its principal place of

22   business at Intershore Chambers, 3rd Floor, Geneva Place, Road Town, Tortola, VG1110 British

23   Virgin Islands. Pirate Monitor owns the exclusive rights to reproduce, publicly perform, publicly

24   display, and distribute the following works, among others, over the internet: *Csak szex és más semi*;

25   *Zimmer Feri 2*; and *Immigrants – Jóska menni Amerika*.

26

27

28

---
CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**DEFENDANTS**

18.     Defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066. In 2006, YouTube was purchased by Google and since that purchase YouTube has operated as a wholly owned and controlled subsidiary of Google. At all times relevant to this Complaint, the website YouTube.com was operated and controlled by either or both of YouTube, LLC and Google LLC.  From time to time, YouTube conducts business as Google. For example, YouTube's support documentation, including an explanation of how the Content ID program works, is hosted on "support.google.com."

19.     Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Since 2006, Google has wholly owned and controlled YouTube. Google is a wholly owned and controlled subsidiary of Defendant Alphabet. Google is the alter ego of YouTube and Alphabet. For example, YouTube and Google share user data from their respective websites, youtube.com and google.com, in order to create new content and personalized advertisements on both sites. Google's search engine is the largest preceding source of all visits to YouTube, more than 6 times that of any other website. YouTube and Google also combine both products for purposes of Google's AdWords advertising program, which allows an advertiser to determine that if a person searches for a specific term on Google's search engine (e.g., financial advisor), the advertiser can direct that the next time that user watches a video on YouTube that person will see an advertisement for financial advisory services. Google has also recently begun testing integrating links to its search engine within YouTube's search results.

20.     Defendant Alphabet Inc. is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Alphabet wholly owns and controls Google. Alphabet is the alter ego of Google. Alphabet is the alter ego of YouTube and Google. YouTube and Google direct all profit to, and report revenue through, Alphabet.

**JURISDICTION**

21.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

22.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

23.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the proposed Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000 and at least one proposed Class Member is a citizen or subject of a foreign state and Defendants are citizens of the State of California.

24.     This Court has personal jurisdiction over Defendants. YouTube, d/b/a Google LLC, Google, and Alphabet each maintain their headquarters in California and in this District. All Defendants have transacted business within California and contracted to supply goods or services in California in connection with the matters giving rise to this suit. Defendants have also committed copyright infringement causing injury to Plaintiffs and members of the Class in California. Defendants regularly solicit and do business in California and derive substantial revenue from goods used or services rendered. Defendants' address for takedown notices of infringing content on YouTube is in California and in this District.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a).

26.     YouTube's terms of service provide that all claims relating to the terms of service or arising out of the terms of service shall be litigated in federal or state courts in Santa Clara County, California, USA, and that YouTube consents to personal jurisdiction therein.

**NATURE OF THE ACTION**

**I.      The Importance of Copyright and Copyright Enforcement**

27.     Copyrights are the means by which creators of original content protect their moral and economic rights in that content. Respecting the financial value of creators' works is such a cornerstone of our democracy that it was enshrined in the U.S. Constitution, which expressly gave Congress the power to "promote the Progress of Science and useful Arts, by securing for limited

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."
U.S. Const. Article I, Section 8. "Copyright law encourages people to create original works and
thereby 'ultimately serves the purpose of enriching the general public through access to creative
works.'" *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994). The Supreme Court of the United States
has recognized that by "establishing a **marketable** right to the use of one's expression, copyright
supplies the economic **incentive** to create and disseminate ideas." *Harper & Row Publishers, Inc. v.
Nation Enters.*, 471 U.S. 539, 558 (1985) (emphasis added).

28.     The importance of copyright enforcement is not limited to the United States. As
far back as the early 1500s, courts in France recognized that only the creators of works, or their
assigned heirs, should have the right to publish those works. As early as 1886, more than 10
countries signed or ratified the Berne Convention for the Protection of Literary and Artistic
Works, which has a stated purpose to promote the "protection of the rights of authors in their
literary and artistic works." The Convention ensures that authors are afforded the same
protections in those signatory countries as they would enjoy within their own country, thereby
promoting the worldwide distribution of creative works while at the same time ensuring that the
rights of the author of a work created in one country will not be circumvented through the
infringement of those rights in another country. As of today, 188 countries, including the United
States, have signed the Berne Convention.

29.     The 1976 Copyright Act makes it illegal for people to publicly perform, publicly
display, distribute, or reproduce a copyrighted work except in limited instances, and provides for
statutory damages, willful statutory damages, and the right to recover attorneys' fees. 17 U.S.C. §§
501 et seq.

30.     YouTube is by far the world's largest "user-generated-content" publishing
platform, where billions of users upload and publish not only true user-generated-content, but also
works that infringe the copyrights owned by others, including on occasion by Plaintiffs and the
Class. Without adequate protection for copyright holders' rights, YouTube poses an existential
threat to copyright laws. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928

(2005) (noting "digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original [and] copying is easy"). For that reason, it is critical that YouTube not encourage or promote copyright infringement, act in a willfully blind manner to ignore identifiable copyright infringement on its site, alter or remove metadata that is protected "copyright management information," or deploy its copyright protection tools in an inadequate and selective manner.

31.     Each of the copyright-infringing acts alleged herein has diminished the moral, legal, and economic rights of Plaintiffs and Class members. The infringements have unjustly benefitted Defendants and have eroded the incentive to create new content in the same way by taking away a true marketplace, by misappropriating the revenues that should have been earned by Plaintiffs and the Class through their works, by diminishing the value of their ownership rights in such works, and/or by requiring individual rights holders to spend endless time pursuing "whack-a-mole" DMCA takedowns rather than devoting their time and energy to creating new copyrightable works.

## II.    YouTube Was Designed to Enable and Facilitate Copyright Infringement

### A.   YouTube Uses Various Methods to Drive Uploads of Videos for Display on Its Platform and to Drive Views of Such Videos From Its Platform.

32.     YouTube, now the world's most popular online video site, launched in 2005. Users can access the platform in two distinct, yet complimentary roles: as "uploaders"—who publish videos to their unique YouTube pages, known as "channels," and as "viewers"—who watch, review, and comment on the videos published by others.

33.     When a user uploads a video or song or other piece of work, YouTube has its users copy the original video file into a file type specified by YouTube; it then adds one or more copies of the newly formatted file to its servers, and may remove, replace metadata, or add new metadata to the file, all in order to make the file available for public viewing on its platform. Upon upload, the altered video file becomes part of the YouTube library for publication and display through YouTube's website, which Defendants control and directly and indirectly profit from.

34.     YouTube actively encourages viewers to find and play videos on its website in numerous ways. When a viewer enters a search request into YouTube's search bar, Defendants return a list of matching videos in its library accompanied by thumbnails and other metadata about the video, such as a title chosen by the uploader and the number of YouTube views. A YouTube viewer can then select that video to play by clicking on one of the thumbnails or the accompanying information in the list of videos supplied by Defendants in response to the user's search request. When the user does so, Defendants then display the chosen video by streaming audio and video data from YouTube's servers to the user's computer or phone so that the user can view the selected video. As a video streams, YouTube causes the user's computer or phone to download audiovisual data of the selected video.

35.     YouTube also enables any viewer to "embed" further publishing of any video in the publicly available YouTube library into another website such as Facebook, a blog, or any other website where a user can post video content. The embedding feature is available by default for every video on YouTube, and the embedded video will appear as a picture with the YouTube logo prominently displayed. When someone clicks on the embedded video, it will stream the audio and video from YouTube's servers in the context of the host website; in this way, the YouTube platform is still displaying the video by transmitting the streaming video content from YouTube's own servers to the viewer's computer. Defendants also enable YouTube viewers to "share" videos with others—for example, through email. If a viewer wants to share a video by email, the feature will generate an email with a link to the specific video. Any recipient of that email can click on the link to be brought to the YouTube website in order to view the video.

36.     YouTube's "embed" and "share" features have contributed significantly to YouTube's growth in popularity, number of users, amount of content uploaded, and the data it captures and exploits from its uploaders and viewers. Because YouTube provides its users with the ability to view and listen to copyrighted materials free of charge, when the user would otherwise have to pay for such access, billions of users are naturally drawn to YouTube. Defendants' "free" business model, built on piracy and an abuse of the DMCA safe harbors, has made YouTube the

1  primary outlet for music and video streaming and display. YouTube and Google, in combination,

2  are the predominant means by which the public searches and discovers music, film, and other

3  artistic works. As a result, artists like Plaintiffs and the Class must accede to the overwhelming

4  market power of YouTube, because if you are not on YouTube, you don't exist.

5      37.    Defendants also drive viewers to view multiple videos on YouTube by generating

6  recommendations based on a closely guarded algorithm and metadata system that recommends

7  additional videos to view next to the selected video as it is being played, and by their "AutoPlay"

8  feature that queues subsequent videos to play sequentially. Since 2016, YouTube's

9  recommendation algorithms have utilized Google Brain to refine and maximize their effectiveness

10 in increasing "user engagement" and viewing time.  Defendants recently proclaimed that YouTube

11 has been successful in controlling over 70% of the works viewed by the user through its

12 recommended video algorithm and Autoplay feature.[3] As YouTube's technical lead for YouTube

13 recommendations has put it, "[YouTube] also wanted to serve the needs of people when they

14 didn't necessarily know what they wanted to look for."[4]

15     38.    As a result of YouTube's recommended video algorithm, search engine algorithm,

16 and Autoplay feature, Defendants exert substantial control over the behavior of YouTube users

17 and content posters. Exercising this control over users has paid off significantly. From the early

18 introduction of its recommendations in 2014 to its refinements as of 2017, the aggregate time

19 users spend watching videos on YouTube increased twentyfold.

20     39.    As a result, every time an unauthorized copyrighted work is viewed without

21 authorization, it is more likely than not that Defendants' conduct directed the viewer to the

22 infringing work. Within the time period relevant to this litigation, Defendants automatically caused

23 copyright infringement through the viewing of copyright-protected material without any

24 affirmative action required by a user.

25 _____

26 [3] *See, e.g.*, https://www.theverge.com/2017/8/30/16222850/youtube-google-brain-algorithm-video-recommendation-personalized-feed.

27 [4] https://www.theverge.com/2017/8/30/16222850/youtube-google-brain-algorithm-video-recommendation-personalized-feed.

28

**B. Maximizing the Amount of Online Content—Including Infringing Content—Was, and Remains Key to the Growth in Viewers of the YouTube Platform.**

40.     Like other online platforms that don't "sell" their services, YouTube was originally designed to bring together its users: content generators who upload videos and content consumers who watch those videos. This basic business model for a platform leverages one of the most powerful forces in the online economy—"network effects"—to scale quickly and maintain momentum. Network effects occur where a service increases in value with the total number of users.[5] YouTube benefits from direct "network effects" in that, as more videos are uploaded, the entire platform becomes more attractive to the watchers of those videos. That attractiveness to those viewing the videos in turn makes the platform more attractive to uploaders who desire to have their uploaded materials viewed by the ever-increasing number of viewers. Defendants benefit economically as a result of network effects because, among other things, as the number of videos increase and the number of video watchers increases, the YouTube platform becomes more attractive to advertisers who, as described below, seek to target and reach watchers by posting advertising associated with videos that are likely to attract the advertisers' targeted audiences. As also described below, Defendants further gain from these effects by monetizing the valuable data about users that YouTube is able to gather from the viewing choices of its users.

41.     Defendants' formula for economic success is simple: more videos, leads to more viewers, leads to more advertising and more data for YouTube to sell. That is, a large number of viewers attracts uploaders who upload more videos; more videos, in turn, attracts more viewers; viewers provide personal information and YouTube collects data on viewers' watching habits. More viewers also attracts advertisers, who purchase advertisements to display before, during, and after uploading videos; and YouTube makes money by selling advertisements in addition to selling the data they gather on viewers, uploaders, and advertisers alike. YouTube requires its users to consent to YouTube collection of individualized data for numerous purposes, including the

---

[5]  Alec Stapp, "You Can't Understand Big Tech Without Understanding Network Effects. Here's a Road Map." <u>Niskanen Center</u>, Sept. 13, 2018.

1   development of new products and personalized advertisements and content. YouTube has

2   substantial incentives to maximize the amount and variety of content that is streamed on its

3   platform to maximize the advertising views and to maximize the amount of data it can harvest.

4   Ignoring copyrights for all but those most able to force YouTube to protect their copyrights—*i.e.*,

5   those who are given access to Content ID—helps Defendants to drive this economic engine to

6   higher levels by using copyright piracy as a key element of YouTube's growth strategy.

7          42.     This model is ingrained in the very foundation of YouTube. Indeed, one of

8   YouTube's founders urged it to build up its numbers "as aggressively as we can through whatever

9   tactics, however evil." That same founder argued against the company removing obviously

10  infringing videos, claiming that site traffic would drop by 80% if it did so. In February 2006, a

11  YouTube employee estimated that over 70% of the most viewed, most discussed, top-favorited,

12  and top-rated videos contained copyrighted material. That employee later estimated that 75 to

13  80% of YouTube's views came from copyrighted material posted without authorization.

14  Nevertheless, YouTube continued to enable and facilitate copyright infringement so that it could

15  attract as many users as quickly as possible.

16         43.     The desire to facilitate and enable copyright infringement did not end with

17  Google's $1.65 billion purchase of YouTube in 2006. At that time, Google operated a competing

18  website, Google Video, that, unlike YouTube, engaged in a process of reviewing and screening

19  each uploaded video to avoid infringing content before the upload was publicly performed,

20  displayed, reproduced, or distributed.

21         44.     Notably, prior to Google's acquisition of YouTube, Google characterized

22  YouTube as "a rogue enabler of content theft" that was "completely sustained by pirated content"

23  and viewed YouTube's success as due to "its liberal copyright policy." Google even found it

24  difficult to compete with YouTube at that time and considered "whether we should relax

25  enforcement of our copyright policies in an effort to stimulate traffic growth" on Google Video.

26         45.     Instead of competing, however, Google purchased YouTube in October 2006 for

27  $1.65 billion. As part of that transaction, Google's financial advisor Credit Suisse warned Google

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

that over 60% of YouTube's views were of "premium" copyrighted content and that only 10% of that content was licensed. Nonetheless, Google did not apply to YouTube the pre-upload screening process that it used on Google Video; instead, Google chose to continue YouTube's aggressive policy of allowing obviously infringing videos to be uploaded with zero "friction" and no screening, thus allowing infringing and illegally posted videos to be played and monetized by YouTube unless and until a takedown notice was received from the copyright owner.

46.     With over 500 hours of videos uploaded every minute, this "frictionless" policy without screening for the copyrights of Plaintiffs and the Class guarantees that uploaders can infringe their copyrights at a pace that is far greater than the rate at which copyright holders can try to enforce their rights or the rate at which YouTube could ever process takedown requests. One Google employee tasked with responsibility for selecting videos to be prominently displayed on the website noted that they were "running into issues finding enough videos because they have so many copyright violations." In a negotiation with one copyright holder, the Motion Picture Association of America, Google recognized that "the copyrighted content on YouTube was a major lure for their users."

**C.   With the Growth of the Platform, Google and YouTube Can Maximize Advertising Revenue Through a Combination of Available Content for Advertisement Placement, and Superior Advertisement Targeting Through Data Generation.**

47.     As discussed above, YouTube maximizes revenues by having continually more and more content available online. Sustained and ongoing growth of uploaded content provides more online space for advertising to be sold and attracts more viewers who will see such advertising. Additional viewers, in turn, attract both more advertising and more uploads—and the network effects cycle continues.

48.     Defendants have been remarkably successful in this online real estate grab. By one estimate, YouTube holds 70% of the market for online video content in the United States, as measured by the number of domains.[6]

49.     Currently, Defendants earn advertising revenue directly from YouTube's library of videos. First, Defendants earn 100% of the advertising revenue generated through the placement of advertisements on its homepage and search-results pages. The value of these ads is directly related to the number of users Defendants are able to attract and the overall size of its library. The number of users that Defendants can attract is, in turn, increased by the ready availability of unauthorized copyrighted works that can be viewed for free.

50.     In addition, if a YouTube uploader chooses to turn on account monetization, through Defendants' YouTube Partner Program or otherwise, Defendants will automatically place an advertisement within and around the video that is being publicly displayed, with Defendants keeping at least 45% of what Defendants calculate (without transparency) to be their "net income" advertising revenue. The uploading user retains no more than 55% of that "net" figure. The annual "net income" Defendants generated from YouTube in 2019 was recently revealed to include $15 billion in advertising revenue alone, and that does not include the significant value of the user data, which Defendants exploit in manifold ways, or the significant corporate expenses Defendants recover before calculating this "net" figure.

51.     Defendants also benefit from YouTube's contributions to the growth and financial success of other Google products and services as well. YouTube is now estimated to draw 2 billion regular viewers each month. As users interact with the YouTube platform, including through the posting and viewing of copyright-infringing material, they convey valuable information concerning their preferences for topics, products, and services. Defendants can use the individual and aggregate data they glean from these viewers to improve their entire product empire, ranging from advertisement exchanges, like AdSense and AdX, to Google's third-party

---

[6] https://www.datanyze.com/market-share/online-video/United%20States.

advertisement server, Double Click for Publishers. Indeed, YouTube's privacy policy as embedded in its Terms of Service links to a Google privacy policy that discusses both Google and YouTube as one, and that states that the user's data will be shared and utilized to develop new services, fine-tune search results, and create personalized advertisement. Google is now estimated to control 40% of the entire online advertising market, and the data it reaps from YouTube users, including those drawn to the site to view copyright-infringing works, plays a significant role in its growth.

**III.   Defendants' Delayed and Tiered Copyright Enforcement Mechanisms Were and Are Designed to Maximize Their Revenues and Create "Friction" for Those Seeking to Enforce Their Copyrights.**

52.   Defendants' delayed implementation of readily available screening technologies, and their decision to use such technologies in a way that maximizes their revenue from copyright infringement further demonstrates their intent to facilitate and profit from known copyright infringement. Defendants are obligated to comply with the safe harbor provisions of the DMCA in order to earn protection from liability for copyright infringement. Defendants' business model, however, instead embraces such infringement because each infringing work represents additional advertising opportunities and attracts additional viewers to YouTube. Simply put, more stringent enforcement of copyrights would be harmful to Defendants' revenue derived from YouTube—if all infringing material were subject to a pre-upload screening feature like Content ID or to being taken down, YouTube would lose valuable online real estate and viewers.

53.   Because YouTube receives a percentage of all advertising revenues, it is indifferent to whether it shares those revenues with the copyright enforcer or the infringing party. However, complete diversion of revenues away from infringing parties and towards copyright enforcers would also undermine YouTube's business model (and thus its revenue maximization). If its net income from unauthorized uploads were also to include a fair share for the content creators, many smaller YouTube channels would lose their economic incentive to continue uploading infringing material to the platform. Indeed, Defendants' opposition to the EU's recent copyright protection measures, which will likely require Defendants to pre-screen all videos for copyright infringement

1  prior to upload and/or offer Content ID to everyone who has submitted a prior takedown notice,

2  reflects these very fears.

3  54.  Instead, in order to amplify its profits, YouTube offers different levels of relief to

4  copyright enforcers that is tied to their level of engagement and activity on YouTube. These non-

5  negotiable business terms enable Defendants to maximize the amount of infringing content that

6  remains online by permitting the enforcers with the most resources to protect their rights to

7  monetize the infringing material, while relegating copyright enforcers of more limited means to the

8  issuance and prosecution of individual takedown notices.

9  55.  Since YouTube's inception, there has been readily available and relatively

10  inexpensive content-filtering software to proactively identify and prevent the public display of

11  infringing videos. Critically, however, only a site operator like YouTube can prevent copyright

12  infringement at the time the video is uploaded and before it becomes public. Despite readily

13  available standard tools, YouTube intentionally limits the availability of such content-filtering, and

14  refuses to allow Plaintiffs and the Class such access and use.

15  56.  Defendants' Content ID program is the most effective tool for any copyright

16  holders who wish to block unauthorized uploads at the time of upload. Content ID allows the

17  copyright enforcer to submit its copyrighted works (*e.g.*, copyrighted videos or copyrighted songs

18  that might be used in an infringing video) to YouTube, which uses those copyrighted videos to

19  create a digital fingerprint. All videos uploaded to YouTube are then scanned against the database

20  of these digital fingerprints. If Content ID finds material that matches one of the submitted works,

21  the copyright holder can choose to: (1) block a whole video from being viewed; (2) monetize the

22  video by running ads against it, in some cases sharing revenue with the uploader; or (3) simply

23  track the video's viewership statistics.

24  57.  Without any explanation as to why, Defendants state that Content ID is intended

25  for "those who own exclusive rights to a large amount of original content (like a record label or

26  movie studio), are submitting a high number of complete and valid takedown requests, and are

27  able to dedicate the resources needed to manage it." This program is highly automated, with

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

YouTube automatically conducting the search and match process upon any upload of a video and allowing the copyright enforcer to pre-select an enforcement mechanism.

58.     But, to the detriment of Plaintiffs and the Class, Defendants refuse to allow this tool to be made available to them, nor is any reasonable substitute provided, thus allowing Defendants to continue to benefit from the prolific infringement of Plaintiffs' and the Class's copyrighted materials. Only approximately five percent or less of all applicants who attempt to sign up for Content ID are approved for its use.

59.     As a bipartisan group of U.S. Senators and Congressional Representatives wrote to Google on September 3, 2019, there are significant "concerns that copyright holders with smaller catalogs of works cannot utilize Content ID, making it more difficult or almost impossible for them to effectively protect their copyrighted works from infringement and, ultimately, impacting their livelihoods." Indeed, these legislators noted that they had "heard from copyright holders who have been denied access to Content ID tools, and as a result, are at a significant disadvantage to prevent repeated uploading of content that they have previously identified as infringing. They are left with the choice of spending hours each week seeking out and sending notices about the same copyrighted works, or allowing their intellectual property to be misappropriated."

**IV.     Defendants' Treatment of Plaintiffs Reflects Their Intent to Permit Misappropriation of Plaintiffs' Rights Despite Actual and Constructive Knowledge.**

60.     Plaintiff Schneider holds exclusive copyrights to numerous works, including, *e.g.*, the songs "Hang Gliding," "Green Piece," and "Journey Home." "Hang Gliding" was first published in 2000 and was registered with the United States Copyright Office on May 20, 2003. "Green Piece" was created in 1987 and was registered with the United States Copyright Office on May 18, 1992. "Journey Home" was first published in 2000 and was registered with the United States Copyright Office on May 20, 2003.

61.     The aforementioned songs have, at various times, been posted in full or in part on YouTube and have been viewed by YouTube users.

62.     Plaintiff Schneider has twice applied for Content ID and has been rejected both times.

63.     Plaintiff Schneider has sent multiple takedown requests to YouTube to remove infringing videos from 2013 to the present, including videos containing each of the aforementioned songs.

64.     After submitting the takedown requests, and on numerous occasions, each of the aforementioned songs has been subsequently posted in full or in part on YouTube without Plaintiff Schneider's authorization. For instance, as of the date of this Complaint, at least twelve separate YouTube videos of "Hang Gliding" are published by YouTube, with tens of thousands of cumulative plays performed by various groups, and none of which are uploads authorized by Plaintiff Schneider. By being forced to continuously self-police uploads across YouTube's billions of uploads, as opposed to automatic and preemptive blocking, Plaintiff Schneider is forced to weigh the further financial damage caused to her by alienating performance groups, including those who purchased her music scores.

65.     As of January 24, 2020, Pirate Monitor owns the exclusive rights to reproduce, publicly perform, publicly display, and distribute the following works, among others, over the internet: *Csak szex és más semi*; *Zimmer Feri 2*; and *Immigrants – Jóska menni Amerika*.

66.     The aforementioned works are non-U.S. works exempt from the registration requirements of the Copyright Act. The works were first published in Hungary.

67.     The aforementioned works have, at various times, been posted in full or in part on YouTube and have been viewed by YouTube users.

68.     On February 18, 2020, *Immigrants – Jóska menni Amerika* was registered with the United States Copyright Office.

69.     In connection with the transfer of ownership described above, Pirate Monitor was expressly assigned, and/or became the owner of, all previously accrued claims for copyright infringement as to its exclusive right to reproduce, publicly perform, publicly display, and distribute the works over the internet.

70.     For each of these works, full videos of these feature length films have been uploaded to YouTube without authorization from Pirate Monitor, including, for *Immigrants – Jóska menni Amerika*, after it obtained registration with the U.S. Copyright Office.

71.     Pirate Monitor has applied for access to Defendants' Content ID program and Defendants have either refused its application or taken an unreasonably and arbitrarily long time to respond, with Defendants continuing to derive financial benefit from the infringing material in the meantime.

72.     For each of these aforementioned unauthorized videos, Pirate Monitor sent copyright takedown notices to YouTube. Even when the notices did result in removal of the infringing material, the infringing videos remained publicly available for several days after Pirate Monitor sent its takedown notices.

73.     *Immigrants* has been reposted in full following Pirate Monitor's first takedown notice.

74.     Pirate Monitor has been prevented from sending takedown notices for each of these works because Defendants limit the number of notices that Plaintiff and the Class can send in a day.

75.      Both before and after completing their respective Content ID application forms, users uploaded and viewed Plaintiffs' works—feature films and music recordings—in full and without Plaintiffs' authorization. In all instances, Plaintiffs' takedown notices were deemed sufficiently valid by Defendants for the video to be removed, but each time the video remained available online for an additional 4-6 days before removal.

76.     Each time Defendants removed the infringing video, the same person or another person has subsequently re-uploaded Plaintiffs' copyrighted feature-length films or music recordings in full. Despite Defendants being aware of prior infringement concerning these very same works, and despite Defendants having the software available to filter subsequent uploads of works that were subject to prior successful takedown notices, they repeatedly allowed further infringing videos (often the exact same videos) to be publicly performed, displayed, reproduced, or

1  distributed until Plaintiffs were able to search and locate the new infringing content, send another

2  takedown notice, and await YouTube's response—a further delay allowing for still more copy-cat

3  infringing works to be posted which would then have to be found and new takedown notices

4  submitted.

5       77.     Put simply, copyright holders should not be forced to *repeatedly* demand that the

6  *same* platform take down infringing uses of the *same* copyrighted work, while other rights holders

7  are provided access to standard digital fingerprinting and blocking tools. By not allowing Plaintiffs

8  to block the upload of infringing materials at the time of upload, Defendants force Plaintiffs and

9  the Class into a time consuming, cumbersome, inaccurate, and flawed "manual" process to

10 enforce their copyrights, all to the benefit of Defendants' money-making machine.  The inequities

11 of this two-tiered system ensure that, at best, unauthorized YouTube uploads will always outpace

12 the ability of Plaintiffs and the Class to take those videos down.

13      78.     Indeed, Plaintiffs' repeated, oftentimes successful takedown notices ensure that

14 Defendants' have actual or constructive knowledge that uploaded videos infringing Plaintiffs'

15 copyrights are routinely publicly performed, publicly displayed, distributed, and/or reproduced on

16 YouTube. Despite this knowledge, Defendants: a) prevent Plaintiffs and those similarly situated

17 from joining Content ID; b) do not create a digital fingerprint of materials that have triggered

18 successful takedown notices to prevent additional infringement; c) prevent Plaintiffs and the Class

19 from sending more than a limited number of takedown notices; and d) prevent Plaintiffs and the

20 Class from using automated tools to help identify infringing works that have been uploaded to

21 Defendants' platform. Again, Defendants thereby intend and ensure that copyright infringement

22 will outpace the ability to police such infringement, all to the benefit of their bottom line.

23 **V.    Defendants' Mistreatment of Copyright Management Information Has Enabled,**
   **Induced, Concealed, and Contributed to Infringement of Plaintiffs' Works.**
24

25      79.     Section 1202 of the DMCA defines "copyright management information" ("CMI")

26 to include information conveyed in connection with digital copies of a work, including the title,

27

28

1  author, copyright owner of the work, performers on the work, lyricist, producer, and other similar
2  information providing attribution for, and reflecting the moral rights of, creators.

3       80.    The recognition and preservation of CMI is vital to the lawful distribution of
4  digital works. The digital versions of files containing musical or video works that are lawfully sold
5  and distributed in the United States routinely contain associated metadata that includes CMI. For
6  example, International Standard Musical Word Codes ("ISWC"), which are a globally recognized
7  standard for the recognition of musical works, can provide the basis for royalty payments to the
8  copyright owners when those works are distributed by streaming platforms, such as Spotify. MP3
9  files, a common format for the digital distribution of audio works, routinely include a metadata
10  container, namely an ID3 file, which ordinarily holds CMI. So too, the MP4 file format, which is
11  commonly used for some digital videos, includes copyright information as a standard metadata
12  field. However, despite the prevalence of CMI metadata associated with the original protected
13  audio and video works, Defendants and their business model and systems routinely ignore that
14  CMI. When Plaintiffs have found infringing copies of their works on YouTube, the original CMI
15  associated with the digital file is missing, either stripped or concealed.

16       81.    YouTube neither encourages nor protects the original CMI metadata during the
17  upload process, even though YouTube knows it exists and its value for protecting the rights of
18  creators. As just one example, where an MP3 may include the internationally recognized
19  International Standard Recording Code ("ISRC") for that recording in its ID3 file, YouTube does
20  not require that its users who are uploading content to transfer the ISRC in the original file to the
21  unauthorized converted video file. Moreover, Google declines to provide users with audio file
22  conversion software that would automatically retain and encode the CMI associated with
23  protected works. Instead, YouTube simply directs users to a general Wikipedia page listing video
24  editing software, knowing that the terms of most video-editing conversion software do not allow
25  the resulting "videos" to be used for Defendants' commercial purposes. Indeed, a search for the
26  phrase "copyright management information" on the YouTube Help page returns precisely zero
27  results.

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

82.     Thus, despite having clear knowledge of the pervasive presence of CMI associated with protected works, and the vital role played by CMI in the lawful distribution and economic protection of copyrighted musical and video works, Defendants have created a system that not only disregards, but eliminates or conceals, and/or encourages uploaders to eliminate or conceal, CMI from the video files published on the YouTube platform. Of course, if YouTube required its users to include valuable metadata (like the ISRC) with an upload, it would add considerable "friction," and might also deter a user from uploading if the user were to realize the importance of this statutorily protected metadata.

83.     As a result of the removal and/or alteration of CMI, the purposes of section 1202 have been frustrated. YouTube viewers cannot determine key attribution for many infringing works and cannot determine that Plaintiffs are the copyright owners of their works. The absence of CMI leads YouTube viewers to believe that Plaintiffs' works can be copied, displayed, "shared," embedded, and distributed at will. Defendants are aware that their display and distribution of Plaintiffs' works with missing, incomplete, and/or inaccurate CMI, has induced, enabled, facilitated, and concealed the ongoing and additional infringement of Plaintiffs' rights under the Copyright Act. Defendants have built an entire commercial publication business based on the value of their own metadata and algorithms but have denied Plaintiffs and the Class the value of the original metadata included in the copyrighted works, even though much of that original metadata is protected under § 1202.

**VI.    Defendants Are Not Entitled to the Safe Harbor Protections of the Digital Millennium Copyright Act, 17 U.S.C. § 512.**

84.     The DMCA shields online platform service providers from damages and certain injunctive relief for copyright infringement arising from the storage, at the direction of a user, of infringing material on the service provider's platform provided that the service provider complies with certain threshold requirements. Because YouTube fails to comply with these requirements, it is not entitled to protections of the DMCA safe harbor.

85.    As a condition of qualification for the DMCA safe harbor, YouTube must designate an agent to receive takedown notifications in a form proscribed by § 512. Pursuant to this section, the takedown notice must identify the copyrighted work claimed to have been infringed, identify the infringing material, and provide "information sufficient to permit the service provider to locate the material." 17 U.S.C. § 512(c)(3)(iii).

86.    YouTube imposes arbitrary limitations on the number and frequency of takedown notifications it will process from rights holders. This limits the ability of Plaintiffs and the Class to enforce their copyrights and imposes additional burdens and delay on them. Where these limits are exceeded, rights holders risk losing access to YouTube's copyright protection tools or having their Content Management System Account terminated, both of which assist the protection of copyrights. By imposing these arbitrary limitations on its notification and takedown procedures, YouTube has violated the requirements of the DMCA and forfeited its safe harbor protections.

87.    YouTube has also recently begun requiring some rights holders to identify the specific start and stop moments within the infringing work where the protected material is embedded. These new requirements also add considerable "friction" on the takedown process, thereby increasing Defendants' profits. For example, while this is an automated process within Content ID, this new requirement places an additional burden on Plaintiffs and the Class. By conditioning these notification and takedown procedures on the provision of additional information—information not required under the DMCA—YouTube has violated the requirements of the DMCA and forfeited its safe harbor protections.

88.    In order to qualify for the DMCA safe harbor, YouTube must further establish that it has adopted and reasonably implemented a policy providing for the termination, in appropriate circumstances, of the accounts of repeat infringers. YouTube has implemented a repeat-infringer policy that provides for the termination of users who receive three copyright strikes. A copyright strike is assessed when YouTube receives a complete and valid takedown notice issued against the user's channel. Copyright strikes expire after 90 days. Thus, any user can

1  safely upload eight copyright infringing works annually, so long as they are appropriately timed,

2  without any risk of termination. This three-strike policy, as applied, allows for repeat infringement.

3  YouTube has effectively abrogated its repeat-infringer policy and has failed to reasonably

4  implement a policy providing for the termination, in appropriate circumstances, of the accounts of

5  repeat infringers. By erasing copyright strikes after 90 days, YouTube has not satisfied the safe

6  harbor requirements of the DMCA and forfeited its safe harbor protections. Further, even where

7  YouTube has deleted a user's account because of its three-strike policy, nothing prevents that user

8  from creating a new account and YouTube takes no steps to check whether newly created

9  accounts are on behalf of previously terminated users.

10        89.     Moreover, Defendants have completely divorced their Content ID system from

11  their legally mandated repeat-infringer policy. When infringing content is uploaded and identified

12  by the Content ID system, no copyright strikes are issued—the infringing content is either

13  published and monetized by the rights holder, or blocked. Because the Content ID system is

14  entirely separate from the copyright strike system, YouTube has effectively insulated the vast

15  majority of all copyright infringements from consideration under its repeat-infringer policy. It also

16  creates a general sense of animosity within its ecosystem against those who are forced to serve

17  "take down" notices and thereby generate "strikes" against its users, which intimidates Plaintiff

18  Schneider and similar artists from attempting to enforce their constitutionally protected rights.

19  Even though those permitted to use Content ID block billions of uploads, they "get to play the

20  good guy," as blocking is done behind the scenes; but because Plaintiffs and the Class need to

21  manually block in a very visible and punitive way, they are forced to "play the bad guy."

22        90.     The only repercussions a repeat infringer faces when he uploads Content ID-

23  protected materials are the blocking of his upload, or the rights holder's diversion and retention of

24  the advertising revenues associated with the work. Moreover, while YouTube's Content ID

25  partners are protected from these repeat infringers because their uploads will always be screened

26  against the Content ID catalog before publication, Plaintiffs and the Class remain at risk of

27  infringement by YouTube uploaders with numerous Content ID claims—the quintessential repeat

28

infringers. By segregating nearly all copyright-infringing material from consideration under its repeat-infringer policy while leaving Plaintiffs and the Class subject to violations from those same repeat infringers, YouTube has failed to satisfy the safe harbor requirements of the DMCA and forfeited its safe harbor protections.

91.     As an additional requirement of the DMCA safe harbor protection, YouTube must establish that it has neither actual nor constructive knowledge of the infringements. Constructive knowledge turns on whether a reasonable person would objectively know of the infringements. The protected works of Plaintiffs and the Class have been infringed by repeat infringers who are sheltered by the Content ID system. YouTube has actual knowledge of these repeat infringers but fails to administer copyright strikes to them and fails to keep track of their activities under its repeat-infringer policy; YouTube therefore should objectively know of these infringements. Because YouTube has at least constructive knowledge of infringing material on its site, YouTube has failed to satisfy the safe harbor requirements of the DMCA and thus forfeited its safe harbor protections.

92.     YouTube must also, in order to qualify for DMCA safe harbor protection, establish that it does not financially benefit from infringements that it has the right and ability to control. YouTube financially benefits by receiving 45% of all advertising "net income" generated by infringing works (and 100% of advertising revenue on its home and search pages when users are drawn to those pages in part because of the ready availability of copyright-infringing material), whether that advertising is placed by the uploader or the rights holder through the Content ID program. In addition, Defendants derive significant value from the data acquired from YouTube users, including those users who post and view copyright infringement and those users drawn to the site by the ready availability of pirated material. Further, even where YouTube has profited from unauthorized uploads until a rights holder discovers it and completes the cumbersome takedown process, YouTube keeps all of the revenue it generated during that period of infringement, and does not share any portion with the rights holder.

93.     Moreover, YouTube has the ability to control this content, and has in fact exerted such control, by screening every single video uploaded to its site for Content ID-protected material prior to publication but not doing so for others even when it has previously received a valid takedown notice. YouTube undertakes to control user behavior when such users are directed to copyright videos through its suggested video algorithms, search algorithms, and Google's search page, which now influence more than 70% of the content viewed by users.

94.     YouTube must also, in order to qualify for continuing DMCA safe harbor protection, establish that it is a passive internet platform, and that it does not undertake to substantially influence user behavior. YouTube's Content ID program, and its partner programs, are indeed specifically designed, however, in myriad ways to substantially influence user behavior. As just one example, YouTube offers its uploading community tutorials on how users can create new metadata to maximize views and revenues. As another example, YouTube imposes upon its viewing community personalized viewing curation, Autoplay, and suggested and recommended videos, all of which are calculated to influence what its users view, and to increase both the viewing community's use of the YouTube platform, and the resulting advertising revenue. Finally, the data Defendants harvest from its users is exploited in myriad ways to influence the behaviors and actions of those users through marketing and advertising. All of these programs and functions directly and substantially influence its users. Thus, YouTube has violated judicially established standards regarding the safe harbor, and as a result, it has forfeited its safe harbor protections.

95.     Because Plaintiffs and the Class have filed takedown notices with YouTube regarding their protected works, YouTube is on notice of these infringements and has access to copies of the protected works for scanning purposes. Further, because YouTube currently scans every uploaded video prior to publication as part of the Content ID program, it has the capacity to screen for the protected works of Plaintiff and the Class as well. By refusing to provide pre-publication screening of previously infringed works belonging to Plaintiff and the Class, YouTube has financially benefitted from infringements that is has the right and ability to control, has violated the requirements of the DMCA, and has therefore forfeited its safe harbor protections.

96.     As a further condition of qualification for the DMCA safe harbor, YouTube must establish that it accommodates, and does not interfere with, standard technical measures used to protect copyrighted works. Pex and similar companies offer services to copyright holders that enable them to find infringing works on YouTube and other platforms. Similar to Content ID, these companies' services utilize proprietary media-fingerprinting technology combined with access to the online platform's content via either an API or data scraping techniques. Given the long-standing and widespread use of media-fingerprinting technology for the identification of infringing material online, such technologies constitute standard technical measures.

97.     Defendants also interfere with standard technical measures designed to protect § 1202 CMI. Defendants know that the ID3 metadata container is an ISO-approved technical measure used primarily to protect copyrighted works and inform listeners of the rights associated with the works. However, rather than build a system that ensure this information stays with any file that is uploaded by a YouTube user, Defendants have developed systems and processes that automatically strip, conceal, and/or alter the information contained in the ID3 or other similar metadata containers.

98.     YouTube has failed to accommodate, and has affirmatively interfered with, Pex and other companies offering standard technical measures to protect copyrighted works. YouTube has denied Pex and other such companies access to its API and has actively interfered with their data-scraping of the YouTube platform by blocking or otherwise impeding their access through a variety of measures. YouTube further prohibits the use of automated tools to access its platform. By interfering with and refusing to accommodate these standard technical measures, YouTube has failed to satisfy the safe harbor requirements of the DMCA and forfeited its safe harbor protections.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed classes:

A. All persons holding the exclusive right to publicly perform, reproduce, publicly display, or distribute film, audiovisual, or musical works over the internet for works first going into the public domain after December 31, 1977 whose copyrighted works have been uploaded to YouTube within the relevant statute of limitations, whether in their entirety as part of one single upload or where a portion of the copyrighted work has been uploaded to YouTube, where such person has had to submit a successful takedown notice with respect to such work, and where such person's work has subsequently been infringed or uploaded without permission and where such person has not benefited from the YouTube Content ID program which would have automatically and without unilateral action allowed such person to monetize or prohibit that upload from being displayed, copied, distributed and performed on the YouTube site; and

B. All persons holding the exclusive right to publicly perform, reproduce, publicly display, or distribute film, audiovisual, or musical works over the internet for works first published after 1976 and whose works have been uploaded to YouTube without the associated copyright management information within the relevant statute of limitations.

100. Excluded from the first class, but not the second class, are United States works not registered with the United States Copyright Office and any person who has authorized the Defendants to exploit their works;

101. Excluded from both classes are: (a) Defendants; (b) the subsidiaries and affiliates of Defendants; (c) any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; (d) any entity in which Defendant has a controlling interest; (e) any rights holder to whom Defendants have directly granted  access to YouTube's Content ID program for acts of infringement occurring after such access began; and (f) the legal representatives, heirs, successors, and assigns of any excluded party.

102.     Numerosity. The members of the Class are so numerous that joinder of all members is impracticable. YouTube has more than 2 billion users every month, which according to Defendants is "almost one-third of the internet." Defendants have launched local versions of YouTube in more than 100 countries, and users can navigate YouTube in more than 80 languages. Users watch more than one billion hours of videos every single day, equating to approximately 5 billion videos viewed each day. YouTube estimates that more than 720,000 hours of content are uploaded every day. In 2007, the New York Times, Credit Suisse, and YouTube employees estimated that 60-70% of content uploaded on YouTube was copyrighted material uploaded without the owners' consent. Notwithstanding whether that percentage has dropped significantly in the ensuing timeframe, even a 5% infringement rate on 5 billion videos a day would result in more than 250 million individual claims every day.

103.     Typicality. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs hold exclusive rights to copyrighted works that have been posted on YouTube without Plaintiffs' consent and have been publicly performed, displayed, reproduced, or distributed in violation of Plaintiffs' rights. Plaintiffs' claims are also typical in that Plaintiffs have issued takedown notices, have had their works subsequently uploaded to YouTube, and have not been provided access to Content ID. Plaintiffs' claims are also typical of other Class members in that they require injunctive relief to prevent Defendants from continuing to infringe their exclusive rights and in that they reflect that Plaintiffs, like Class members, have sustained damages as a result of Defendants' conduct, including, at their election, statutory damages.

104.     Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation and copyright litigation. Plaintiffs are committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class.

105.     Superiority. A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class. The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of

1 individual prosecution of the complex and extensive litigation required to recover from Defendants. It

2 would be virtually impossible or impractical for most, if not all, Class members to redress the wrongs

3 done to them on an individual basis. Furthermore, individual litigation would be unmanageable for

4 the Court system as it would result in hundreds of millions, if not billions, of individual lawsuits

5 creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all

6 parties and the court system. In contrast, a class action would present far fewer management

7 difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale,

8 and supervision by a single court. The members of the Class are reasonably ascertainable through

9 methods typical of class action practice and procedure, including through Defendants' own records.

10        106.    Existence and Predominance of Common Questions of Law and Fact. Numerous

11 questions of law and/or fact are common to Plaintiffs and all members of the Class. These common

12 questions derive common answers for all Class members that impact the resolution of the claims on

13 grounds equally applicable to all Class members. The common questions of law and fact for the Class

14 include, but are not limited to:

15        A.    Whether Defendants' conduct as alleged constitutes direct infringement of

16 the copyrights held by Plaintiffs and the Class.

17        B.    Whether Defendants' conduct as alleged constitutes contributory copyright

18 infringement of the copyrights held by Plaintiffs and the Class.

19        C.    Whether Defendants' conduct as alleged constitutes inducement of copyright

20 infringement of the copyrights held by Plaintiffs and the Class.

21        D.    Whether Defendants' conduct as alleged constitutes vicarious infringement

22 of the copyrights held by Plaintiffs and the Class.

23        E.    Whether Defendants acted willfully with respect to the copyright

24 infringements alleged.

25        F.    Whether Defendants have deliberately avoided taking reasonable precautions

26 to deter copyright infringement on YouTube.

27

28

G.   Whether Defendants have reasonably implemented a policy and procedure to prevent repeat infringement of the copyrights held by Plaintiffs and the Class on YouTube.

H.   Whether YouTube was originally designed and/or continues to be maintained for the purpose of facilitating the infringement of copyrights held by Plaintiffs and the Class.

I.   Whether YouTube has actual or constructive knowledge of the infringements of copyrights held by Plaintiffs and the Class.

J.   Whether Defendants have the right and ability to control the infringing activities taking place on YouTube.

K.   Whether Defendants derive financial benefits from the infringement of the copyrights held by Plaintiffs and the Class on YouTube.

L.   Whether technology exists to identify and remove copyrighted material.

M.   If technology exists to identify and remove infringing materials, whether Defendants provide selective access to that technology to increase revenues rather than to prevent acts of infringement.

N.   Whether Defendants refuse to make their copyright-monitoring tools available to all copyright holders.

O.   Whether Defendants' refusal to extend the use of Content ID to all copyright holders permits Defendants to earn more revenue from infringing material than they would have earned had those videos not been uploaded at all or had YouTube immediately removed those uploads that would have triggered Content ID.

P.   Whether Defendants' copyright tools, including Content ID, Content Verification Program, and Copyright Match Tool, scan materials before they are uploaded and not after, and, if after, whether Defendants are capable of screening the material before being uploaded.

Q.     Whether, upon notification of infringement as set forth in 17 U.S.C. § 512(c)(3), Defendants acted expeditiously to remove or disable access to the material that is claimed to be infringing.

R.     Whether Defendants restrict the number of takedown notifications that Plaintiffs and the Class can submit on a daily basis regardless of how many acts of infringement occur.

S.     Whether Defendants restrict the number of takedown notifications that Defendants will process from Plaintiffs and the Class on a daily basis regardless of how many acts of infringement occur.

T.     Whether the defenses set forth in 17 U.S.C. § 512 or elsewhere in the Copyright Act are available to Defendants.

U.     Whether YouTube maintains an archive of uploads from within the last three years that have been removed by either Defendants or the uploader.

V.     Whether injunctive relief is appropriate.

W.    The amount of statutory damages available for each act of infringement based on YouTube's common practices, procedures, intent, and/or willfulness.

X.     The percentage of revenue earned by YouTube and the infringer for each act of infringement to which the copyright holder is entitled.

Y.     Whether Defendants have knowledge of and/or contribute to the removal or alteration of copyright management information covered by § 1202.

Z.     Whether Defendants distributed or publicly performed works knowing that copyright management information has been removed or altered without the authority of the copyright owner.

AA.  Whether Defendants engage in actions and implement policies that substantially influence the behavior of YouTube users.

107.   Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

A.      The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

B.      The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

C.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

## CAUSE OF ACTION I

### (Direct Copyright Infringement)

108.     Plaintiffs reincorporate by reference paragraphs 1-107 as if set forth herein.

109.     Plaintiffs are the exclusive copyright owners of the works identified in paragraphs 16-17. These works as well as millions of other works by Plaintiffs and the Class have been reproduced, distributed, displayed, and publicly performed on YouTube without Plaintiffs' and the Class's authorization.

110.     By engaging in acts causing these infringing works to be reproduced, distributed, displayed, and publicly performed on the internet, Defendants are violating Plaintiffs' and the Class's exclusive rights in violation of 17 U.S.C. § 106, including sections 106(1), 106(3), 106(5), 106(6), and 17 U.S.C. § 501.

111.      Defendants' infringements have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

112.     As a direct and proximate result of Defendants' infringement of Plaintiffs' and the Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits from the acts of infringement, to be proven at trial.

113.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

114.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated. Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class's copyrights.

## CAUSE OF ACTION II

### (Inducement of Copyright Infringement)

115.     Plaintiffs reincorporate by reference paragraphs 1-114 as if set forth herein.

116.     YouTube users have infringed and are infringing Plaintiffs' and the Class's rights in their registered copyrighted musical and audiovisual works by, *inter alia*, uploading and downloading infringing copies of Plaintiffs' and the Class's copyrighted works onto and from YouTube's website and publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted works or infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiffs' and the Class's exclusive rights of reproduction, distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

117.     Defendants are liable under the Copyright Act for inducing the infringing acts of YouTube users. Defendants exercise control of and/or influence which videos their users view and which infringing material gets removed or does not get removed. Defendants operate YouTube with the objective of promoting its use to infringe Plaintiffs' and the Class's copyrights and are unlawfully fostering copyright infringement by YouTube users.

118.     Defendants are fully aware, or at least should be aware, that Plaintiffs' and the Class's audiovisual and musical works are copyrighted and authorized for purchase through various outlets, including numerous lawfully authorized online digital download services. Defendants are equally aware, or at least should be aware, that YouTube users are employing

1   YouTube to unlawfully reproduce, distribute, publicly perform, and publicly display Plaintiffs' and

2   the Class's copyrighted works. Defendants intend for, encourage, and induce YouTube users to

3   employ YouTube in this regard.

4        119.    Defendants' infringements have been willful, intentional, purposeful, and in

5   disregard of and indifferent to the rights of Plaintiffs and the Class.

6        120.    As a direct and proximate result of Defendants' infringement of Plaintiffs' and the

7   Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory

8   damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class

9   and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits

10  from the acts of infringement, to be proven at trial.

11       121.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant

12  to 17 U.S.C. § 505.

13       122.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to

14  cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated.

15  Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction

16  requiring Defendants to employ reasonable methodologies to prevent or limit infringement of

17  Plaintiffs' and the Class's copyrights.

18                              **CAUSE OF ACTION III**

19                        **(Contributory Copyright Infringement)**

20       123.    Plaintiffs reincorporate by reference paragraphs 1-122 as if set forth herein.

21       124.    YouTube users have infringed and are infringing Plaintiffs' and the Class's rights in

22  their registered copyrighted musical and audiovisual works by, *inter alia*, uploading and

23  downloading infringing copies of Plaintiffs' and the Class's copyrighted works onto and from

24  YouTube's website and publicly performing, displaying, distributing, and reproducing, or

25  purporting to authorize the public performance, display, distribution, or reproduction of such

26  copyrighted works or infringing videos, all without authorization. YouTube users are therefore

27

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  directly infringing Plaintiffs' and the Class's exclusive rights of reproduction, distribution, public

2  performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

3       125.    Defendants are liable as contributory copyright infringers for the infringing acts of

4  YouTube users. Defendants enable, induce, facilitate, and materially contribute to each act of

5  infringement by YouTube users.

6       126.    Defendants have actual and constructive knowledge that YouTube users are

7  employing YouTube to copy, distribute, publicly perform, and publicly display Plaintiffs' and the

8  Class's copyrighted works. Acting with actual and constructive knowledge, Defendants enable,

9  facilitate, and materially contribute to YouTube users' copyright infringement, which could not

10  occur without Defendants' enablement.

11       127.    Defendants' infringements have been willful, intentional, purposeful, and in

12  disregard of and indifferent to the rights of Plaintiffs and the Class.

13       128.    As a direct and proximate result of Defendants' infringement of Plaintiffs' and the

14  Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory

15  damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class

16  and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits

17  from the acts of infringement, to be proven at trial.

18       129.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant

19  to 17 U.S.C. § 505.

20       130.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to

21  cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated.

22  Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction

23  requiring Defendants to employ reasonable methodologies to prevent or limit infringement of

24  Plaintiffs' and the Class's copyrights.

25                                    **CAUSE OF ACTION IV**

26                               **(Vicarious Copyright Infringement)**

27       131.    Plaintiffs reincorporate by reference paragraphs 1-130 as if set forth herein.

28

132. YouTube users have infringed and are infringing Plaintiffs' and the Class's rights in their registered copyrighted musical and audiovisual works by, *inter alia*, uploading and downloading infringing copies of Plaintiffs' and the Class's copyrighted works onto and from YouTube's website and publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted works or infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiffs' and the Class's exclusive rights of reproduction, distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

133. Defendants are vicariously liable for the infringing acts of YouTube users. Defendants have both the right and the ability to supervise YouTube users' infringing conduct and to prevent YouTube users from infringing Plaintiffs' and the Class's copyrighted works.

134. YouTube significantly and directly benefits from widespread infringement by its users. The availability of a vast collection of infringing copyrighted works on YouTube acts as a substantial draw, attracting users to the website and increasing the amount of time they spend there when they visit. Defendants derive substantial advertising revenue tied directly to the volume of traffic they are able to attract to YouTube.

135. Defendants' infringements have been willful, intentional, purposeful, and in disregard of an indifferent to the rights of Plaintiffs and the Class.

136. As a direct and proximate result of Defendants' infringement of Plaintiffs' and the Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits from the acts of infringement, to be proven at trial.

137. Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

138. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated.

1  Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction

2  requiring Defendants to employ reasonable methodologies to prevent or limit infringement of

3  Plaintiffs' and the Class's copyrights.

4  **CAUSE OF ACTION V**

5  **(Removal of Copyright Management Information and Distribution of Altered or Missing**

6  **Copyright Management Information)**

7  139.   Plaintiffs reincorporate by reference paragraphs 1-138 as if set forth herein.

8  140.   Each copy of Plaintiffs' and the Class's musical and audiovisual works that has

9  been lawfully distributed contains copyright management information on the work, included in the

10  metadata of the digital file of the work, and/or on the packaging of the work. This copyright

11  management information includes, inter alia, the identification of Plaintiffs and the Class as the

12  creators of the works and/or as the copyright owners of the works, the producer, performers on

13  the album, engineers, recording dates, and more. This copyright management information is

14  conveyed in connection with each musical and audiovisual work and is protected under 17

15  U.S.C.A. § 1202(b).

16  141.   On information and belief, in the process of uploading the digital file of Plaintiffs'

17  and the Class's musical or audiovisual work for unlawful and unauthorized copying, display, and

18  distribution on YouTube, Defendants intentionally and knowingly removed, or caused to be

19  removed, Plaintiffs' and the Class's copyright management information from the digital file of

20  Plaintiffs' and the Class's works.

21  142.   Defendants thereafter displayed and distributed unauthorized and infringing copies

22  of Plaintiffs' and the Class's works with the intent and knowledge that copyright management

23  information had been intentionally removed therefrom.

24  143.   Defendants intentionally removed Plaintiffs' and the Class's copyright management

25  information, added additional metadata to be exploited by their own systems, and displayed and

26  distributed the infringing work in those systems with the knowledge that doing so would induce,

27

28

1    enable, facilitate, or conceal the ongoing and additional infringement of Plaintiffs' and the Class's

2    rights under the Copyright Act.

3        144.    Plaintiffs and the Class have previously filed takedown notices with YouTube,

4    providing Defendants with knowledge that Plaintiffs' and the Class's works contain copyright

5    management information identifying Plaintiffs and the Class as the creators of the works and/or

6    as the copyright owners of the works.

7        145.    Defendants thereafter displayed and distributed unauthorized and infringing copies

8    of Plaintiffs' and the Class's works with the intent and knowledge that copyright management

9    information had been removed therefrom without the permission of Plaintiffs and the Class, the

10   copyright owners.

11       146.    Defendants intentionally displayed and distributed the copies of Plaintiffs' and the

12   Class's works that were missing copyright management information, to which they added

13   additional metadata to be exploited by their own systems, with the knowledge that doing so would

14   induce, enable, facilitate, or conceal the ongoing and additional infringement on its systems of

15   Plaintiffs' and the Class's rights under the Copyright Act.

16       147.    Defendants engaged in these activities without the consent or authorization of

17   Plaintiffs and the Class.

18       148.    Plaintiffs and the Class have been injured as a result of these violations of 17

19   U.S.C.A. § 1202(b) and are entitled to injunctive relief, removal and takedown of the infringing

20   works, damages, costs, and attorneys' fees. Pursuant to 17 U.S.C.A. § 1203(c)(3), Plaintiffs and the

21   Class are entitled to the maximum statutory damages for each violation of 17 U.S.C.A. § 1202(b).

22                                **PRAYER FOR RELIEF**

23       Wherefore, Plaintiffs, on behalf of themselves and the Class, pray for judgment against

24   Defendants as follows:

25       149.    Determining that this action may be maintained as a class action pursuant to

26   Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided

27   to the Class pursuant to Rule 23(c)(2).

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

150.     Granting Plaintiffs and the Class injunctive and other equitable relief enjoining Defendants, their officers, agents, servants, and employees, and all those acting in concert with the aforementioned parties:

      A.     From directly or indirectly reproducing, publicly performing, publicly displaying, or distributing the copyrighted works to which Plaintiffs and the Class have exclusive rights.

      B.     From causing, contributing to, inducing, enabling, facilitating, or participating in the infringement of any of the works referred to in Paragraph A, above.

      C.     To affirmatively adopt, implement, and offer to all persons the technological measures available now, including Content ID, and those that shall become available in the future to identify and protect copyrighted content uploaded without consent and prevent it from being posted or otherwise made available through the facilities owned, operated, or controlled by Defendants.

151.     Awarding Plaintiffs' and the Class's damages and Defendants' profits derived from the infringing acts, and/or statutory damages, in the amount permitted by law with respect to each work infringed, including statutory damages for willful misconduct.

152.     Disgorging Defendants of all profits, direct or indirect, illegally obtained as a result of the conduct alleged herein.

153.     Finding Defendants jointly and severally liable for all monetary damages awarded.

154.     Awarding prejudgment interest to the maximum extent permitted by law.

155.     Awarding Plaintiffs' attorneys' fees, costs, and expenses in this action.

156.     Awarding such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

157.     In accordance with Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 2, 2020                              Respectfully submitted,

                                                 /s/ Steven M. Berezney
                                                 George A. Zelcs (*pro hac vice forthcoming*)
                                                 Randall P. Ewing, Jr. (*pro hac vice forthcoming*)
                                                 Ryan Z. Cortazar (*pro hac vice forthcoming*)
                                                 **KOREIN TILLERY, LLC**
                                                 205 North Michigan, Suite 1950
                                                 Chicago, IL  60601
                                                 Telephone: (312) 641-9750
                                                 Facsimile: (312) 641-9751

                                                 Stephen M. Tillery (*pro hac vice forthcoming*)
                                                 Steven M. Berezney, CA Bar #329923
                                                 Michael E. Klenov, CA Bar #277028
                                                 Carol O'Keefe (*pro hac vice forthcoming*)
                                                 **KOREIN TILLERY, LLC**
                                                 505 North 7th Street, Suite 3600
                                                 St. Louis, MO  63101
                                                 Telephone: (314) 241-4844
                                                 Facsimile: (314) 241-3525

                                                 Joshua Irwin Schiller, CA Bar #330653
                                                 **BOIES SCHILLER FLEXNER LLP**
                                                 44 Montgomery St., 41st Floor
                                                 San Francisco, CA  94104
                                                 Phone: (415) 293-6800
                                                 Fax: (415) 293-6899

                                                 Philip C. Korologos (*pro hac vice forthcoming*)
                                                 **BOIES SCHILLER FLEXNER LLP**
                                                 55 Hudson Yards, 20th Floor
                                                 New York, NY  10001
                                                 Phone: (212) 446-2300
                                                 Fax: (212) 446-2350

                                                 *Attorneys for Maria Schneider and*
                                                 *Pirate Monitor LTD*

# Exhibit B

DAVID H. KRAMER, State Bar No. 168452
MAURA L. REES, State Bar No. 191698
LAUREN GALLO WHITE, State Bar No.
309075
WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
        mrees@wsgr.com
        lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants.<br>_____<br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC and GÁBOR CSUPÓ,<br><br>Counterclaim Defendants. | CASE NO.: 3:20-cv-04423-JD<br><br>**DEFENDANTS AND COUNTERCLAIMANTS YOUTUBE, LLC AND GOOGLE LLC'S AMENDED COUNTERCLAIMS** |

**COUNTERCLAIMS**

Counterclaimants Google LLC and YouTube, LLC (collectively "YouTube") assert the following Counterclaims against Pirate Monitor LTD, Pirate Monitor LLC (except where otherwise indicated, Pirate Monitor LTD and Pirate Monitor LLC are referred herein together as "Pirate Monitor") and Gábor Csupó ("Csupó"), on personal knowledge as to YouTube's own actions and on information and belief as to the actions of others, as follows:

1.      Working together, Pirate Monitor and Csupó misused the YouTube service and engaged in a fraudulent scheme to obtain access to YouTube's copyright management systems. Using false identities and/or agents in an attempt to hide their involvement, Pirate Monitor and Csupó uploaded roughly two thousand videos to YouTube, each time representing that they had the rights to upload that content and that the content did not infringe any third party copyrights. Shortly thereafter, Pirate Monitor and Csupó invoked the notice-and-takedown provisions of the Digital Millennium Copyright Act ("DMCA") to demand that YouTube remove the very same videos that Pirate Monitor and Csupó had uploaded. In those notices, Pirate Monitor and Csupó represented that the videos were infringing their copyrights or those of copyright owners they claimed to represent.

2.      Pirate Monitor and Csupó violated the law. Either they lied to YouTube when they uploaded the videos in the first place, or lied when they demanded their removal. Their misrepresentations were intended to fool YouTube into believing that they could be trusted not to abuse YouTube's powerful copyright management tools, including Content ID. And their machinations render them liable to YouTube for breach of contract and fraud or, alternatively, violations of Section 512(f) of the DMCA.

**THE PARTIES**

3.      **Counterclaim Plaintiff Google** is a Delaware limited liability company with its principal place of business in Mountain View, California. YouTube, a Google subsidiary, is a Delaware limited liability company with its principal place of business in San Bruno, California.

YouTube offers an online platform, including a website and mobile applications, that, among other things, enables users to share videos they post with a global audience at no charge.

4. **Counterclaim Defendant Pirate Monitor LTD**, a Plaintiff in this action, is a limited company claiming a principal place of business at Intershore Chambers, 3rd Floor, Geneva Place, Road Town, Tortola, VG1110 British Virgin Islands. Pirate Monitor LTD itself, or through agents and related entities, has operations in Hungary and California, but has not registered to do business in California. Pirate Monitor LTD claims in the Complaint to own the copyrights to certain works through assignment from Hungarian movie producer Mega Film Kft ("Mega Film"). Pirate Monitor LTD is a shell corporation set up principally if not exclusively for purposes of pursuing this action and furthering the unlawful scheme described below.

5. At the time of the filing of this pleading, despite filing this lawsuit against YouTube more than seven months ago, Pirate Monitor LTD has failed to produce a single document in response to YouTube's discovery requests that were served on October 12, 2020. YouTube's requests seek, among other things, information regarding Pirate Monitor LTD's corporate structure, identification of its agents and affiliates, its operations, its capitalization, and its observance of corporate formalities. Pirate Monitor LTD has not even indicated if or when document production will start. Pirate Monitor LTD is withholding the requested documentation in a further effort to conceal the facts regarding the misconduct about which YouTube complains, along with the identity of the individuals and entities involved.

6. **Counterclaim Defendant Gábor Csupó** is an individual, a Hungarian film director and a resident of California. Csupó is the managing director, sole stockholder, sole decision maker, and alter ego of Pirate Monitor LTD. From what YouTube has been able to piece together given Pirate Monitor LTD's refusal to provide any discovery, Pirate Monitor LTD has no principals or employees other than Csupó. It is inadequately capitalized, disregards corporate formalities, and commingles funds and other assets with Csupó. Csupó dominates and controls Pirate Monitor LTD to such an extent that it has no separate corporate personality. So thorough is Csupó's dominance of Pirate Monitor LTD that, if the actions of Pirate Monitor LTD

alleged herein were treated as those of Pirate Monitor LTD alone, and not those of Csupó, it would lead to an inequitable result. Csupó created Pirate Monitor LTD after his personal liability for the acts alleged herein first arose, and his misuse of the corporate form is continuing. As a result, Csupó is responsible, and personally liable for, not only his own actions, but the acts of Pirate Monitor LTD as well.

7.      **Counterclaim Defendant Pirate Monitor LLC** represented itself to YouTube as a business entity, but YouTube has not found corporate registration information for a "Pirate Monitor LLC" anywhere in the world, and Pirate Monitor LTD has not provided any discovery on the question. Instead, it appears that Pirate Monitor LLC is merely an unincorporated d/b/a of Csupó. If Pirate Monitor LLC actually exists as a corporate entity at all, it is indistinguishable from Pirate Monitor LTD. Pirate Monitor LTD does not view Pirate Monitor LLC as an entity distinct from itself. In Paragraph 13 of its Complaint in this action, Pirate Monitor LTD alleges that it has applied for and been denied access to Content ID and that it has sent "successful takedown requests" to YouTube. But, according to YouTube's records, the only Pirate Monitor entity that has applied for Content ID or sent "successful takedown notices" to YouTube is the entity calling itself "Pirate Monitor LLC." By claiming Pirate Monitor LLC's actions as its own in the Complaint (in allegations that are central to its claim to represent a putative class), Pirate Monitor LTD has demonstrated that it believes itself to be, and holds itself out as, functionally the same entity as Pirate Monitor LLC.

8.      No matter what Pirate Monitor LLC's corporate status, Csupó is responsible for the acts of Pirate Monitor LLC. Insofar as Pirate Monitor LLC is an unincorporated d/b/a of Csupó, Pirate Monitor LLC's actions are Csupó's actions, and Csupó is personally liable for them. Alternatively, insofar as Pirate Monitor LLC actually exists as a corporate entity, Csupó is the alter ego of Pirate Monitor LLC. From what YouTube has been able to piece together given Pirate Monitor LTD's refusal to provide any discovery, Pirate Monitor LLC has no other principals, employees, or even operations. It is a shell corporation set up for purposes of furthering the scheme described herein. Under Csupó's sole control, Pirate Monitor LLC is

1   inadequately capitalized, disregards corporate formalities, and commingles funds and other

2   assets with Csupó. Csupó dominates and controls Pirate Monitor LLC to such an extent that it

3   has no separate corporate personality. So thorough is Csupó's dominance of Pirate Monitor LLC

4   that if its actions alleged herein were treated as those of Pirate Monitor LLC alone, and not those

5   of Csupó, it would lead to an inequitable result. As a result, Csupó is responsible and personally

6   liable for the acts of Pirate Monitor LLC.

7                               **JURISDICTION AND VENUE**

8           9.      This Court has subject matter jurisdiction over the counterclaims pursuant to 28

9   U.S.C. §§ 1331, 1338, 1367.

10          10.     Pirate Monitor LTD is subject to this Court's personal jurisdiction because it has

11  availed itself of the jurisdiction of this Court by filing the Complaint in this action and because it

12  has minimum contacts with the State of California. The Court also has personal jurisdiction over

13  Pirate Monitor LTD because it consented to such jurisdiction in the Terms of Service Agreement

14  it entered into with YouTube and because it purposefully directed the misconduct described

15  herein against YouTube in this District.

16          11.     Csupó is subject to this Court's personal jurisdiction because he is a resident of

17  California and because he has minimum contacts with this State. The Court also has personal

18  jurisdiction over Csupó because he is the alter ego of Plaintiff Pirate Monitor LTD and thus

19  availed himself of this Court's jurisdiction by filing the Complaint in this action. The Court also

20  has personal jurisdiction over Csupó because he consented to such jurisdiction in the Terms of

21  Service Agreement he entered into with YouTube and because he purposefully directed the

22  misconduct described herein against YouTube in this District.

23          12.     To the extent it is a corporate entity separate from Pirate Monitor LTD or Csupó,

24  Pirate Monitor LLC is subject to this Court's personal jurisdiction because it has availed itself of

25  the jurisdiction of this Court because it consented to such jurisdiction in the Terms of Service

26  Agreement it entered into with YouTube, and because it purposefully directed the misconduct

27  described herein against YouTube in this District.

28

13. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(a) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, because this Court has personal jurisdiction over Counterclaim Defendants, because Pirate Monitor LTD filed the Complaint in this district, and because Pirate Monitor LTD, Pirate Monitor LLC, and Csupó consented to venue in this District via the Terms of Service Agreements that they entered into with YouTube.

**The YouTube Service**

14. Since its founding in 2005, YouTube has pursued the goal of providing a platform for users to share their video creations with the world. YouTube serves as an unparalleled medium for free marketing, exposure, and visibility for everyone from individuals to established corporate brands.

15. YouTube also offers a worldwide audience the opportunity to access and watch an extraordinarily diverse library of original, creative expression.

16. YouTube has never been a service devoted to promoting piracy or illegitimate uses of copyrighted works. Rather, YouTube is strongly committed to helping copyright owners protect against the unauthorized use of their works on the service, and it has implemented numerous industry-leading initiatives toward this end.

17. While YouTube complies in all respects with safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), YouTube's efforts in helping copyright owners and content creators protect against unwanted use of their works goes far beyond what the law requires.

18. For example, YouTube has invested over $100 million to develop Content ID, a best-in-class content identification system that uses digital fingerprinting technology to help identify copyrighted materials. Using Content ID, rightsholders and/or their agents can be automatically notified of user-uploaded videos that "match" what they claim are their copyrighted works and can choose in advance what they want to happen when those videos are

1  detected, including options to "monetize" the videos, (i.e. earn advertising revenue when users

2  watch the videos) or to "block" the videos from appearing altogether.

3       19.    Content ID and YouTube's other scaled copyright management tools empower

4  users to automatically, or at the touch of a button, remove content from YouTube or block it

5  from appearing in the first place. The tools thus have the potential to be used improperly to

6  censor videos that others have every right to post and share through YouTube. Further, the tools

7  enable users to claim ownership rights in others' content, and to siphon to themselves revenue

8  that rightly belongs to others.

9       20.    Because of the potential for abuse of these scaled tools, YouTube limits access to

10  them, seeking to ensure that those who use them will do so responsibly, and will not cause harm

11  to YouTube, its users, or to other copyright owners.

12                  **Users' Promises And Representations To YouTube**

13       21.    To create an account and post content on the YouTube service, users must

14  affirmatively accept the YouTube Terms of Service Agreement (the "ToS Agreement"). Parties

15  to the ToS Agreement consent to personal jurisdiction and exclusive venue for disputes arising

16  out of or relating to the YouTube service in the Courts of Santa Clara County, California.

17       22.    Under the applicable ToS Agreement in effect during all times relevant to these

18  counterclaims, a user creating a YouTube account promised to provide "accurate and complete"

19  identification information for the account to YouTube.

20       23.    Under the ToS Agreement in effect during all times relevant to these

21  counterclaims, users represent and warrant to YouTube that if they upload any content to the

22  YouTube service, they will "own or have the necessary licenses, rights, consents, and

23  permissions to publish Content [they] submit." Users also promise that any "content [they]

24  submit to the Service [will] not contain third party copyrighted material, or material that is

25  subject to other third party proprietary rights, unless [they have] permission from the rightful

26  owner of the material or [they are] otherwise legally entitled to post the material." And users

27

28

agree to grant YouTube a copyright license in and to any content they submit, representing that they have the required rights to do so.

24.    In addition to accepting the ToS Agreement and making the representations and promises it contains when creating an account, users must reaffirm their agreement to the ToS each time they upload material to the service. In that upload process, users are again expressly warned against submitting content that violates others' copyrights.

**Pirate Monitor And Csupó Uploaded Nearly 2000 Video Clips To YouTube
Through "Ransom Nova" Accounts And Represented That
They Did Not Infringe Anyone's Copyright**

25.    From August through November 2019, Pirate Monitor and Csupó created, or authorized and directed their agents to create, at least 23 accounts on YouTube. Each time they caused a new account to be created, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, affirmatively agreed to the YouTube ToS Agreement, and made the representations and promises to YouTube that are set out in the ToS Agreement.

26.    Among other things, Pirate Monitor and Csupó promised to provide YouTube with "accurate and complete" identification information for their YouTube accounts. They represented and warranted to YouTube that if they uploaded any content to the YouTube service, they would "own or have the necessary licenses, rights, consents, and permissions to publish Content [they] submit." They also promised that any "content [they] submit to the Service [will] not contain third party copyrighted material, or material that is subject to other third party proprietary rights, unless [they have] permission from the rightful owner of the material or [they are] otherwise legally entitled to post the material." And they granted YouTube a copyright license to the videos they submitted, representing that they had the required rights to do so.

27.    To deceive YouTube, and in violation of the ToS Agreement, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, provided bogus account registration information. Rather than properly identifying themselves as the account creator, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction

and control, used alternative account names and contact information designed to mask the relationship of the account creators and the accounts to Pirate Monitor and Csupó.

28.     Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, created and used at least the following YouTube accounts (or "channels") between August 23 and November 13, 2019:

| Account Name | Associated Email Address | Account Creation Date |
|---|---|---|
| ransom nova2 | ransomnova2@gmail.com | August 23, 2019 |
| ransom nova3 | ransomnova3@gmail.com | September 3, 2019 |
| ransom nova | ransomnova4@gmail.com | September 25, 2019 |
| ransom nova6 | ransomnova6@gmail.com | September 28, 2019 |
| ransom nova | ransomnova7@gmail.com | September 28, 2019 |
| ransom nova | ransomnova8@gmail.com | October 7, 2019 |
| ransom nova9 | ransomnova9@gmail.com | October 7, 2019 |
| ransom nova10 | ransomnova10@gmail.com | October 7, 2019 |
| ransom nova11 | ransomnova11@gmail.com | October 7, 2019 |
| ransom nova12 | ransomnova12@gmail.com | October 7, 2019 |
| ransom nova13 | ransomnova13@gmail.com | October 8, 2019 |
| ransom nova14 | ransomnova14@gmail.com | October 8, 2019 |
| ransom nova15 | ransomnova15@gmail.com | October 8, 2019 |
| Massive Films | ransomnova18@gmail.com | November 4, 2019 |
| Movie Mania | ransomnova19@gmail.com | November 5, 2019 |
| Movie Fun | ransomnova20@gmail.com | November 6, 2019 |
| Movie Festival | ransomnova21@gmail.com | November 8, 2019 |
| Entertainment Movie Channel | ransomnova22@gmail.com | November 8, 2019 |
| Ultimate Entertainment | ransomnova23@gmail.com | November 9, 2019 |

| Avengers | ransomnova25@gmail.com | November 10, 2019 |
| Fantastic | ransomnova26@gmail.com | November 10, 2019 |
| Amazing Channel | ransomnova27@gmail.com | November 10, 2019 |
| Avenger film | ransomnova29@gmail.com | November 13, 2019 |

29.     Most of the account names that Pirate Monitor or its agents selected for these accounts were variants on the name "Ransom Nova." Variations of the name "Ransom Nova" also appear in the email addresses that Pirate Monitor or its agents supplied in the account registration process. YouTube refers to these accounts hereafter as the "Ransom Nova accounts."

30.     The person(s) who created the Ransom Nova accounts did so using a computing device connected to the YouTube service via Internet Protocol ("IP") addresses indicating that they were in Pakistan at the time the accounts were created.

31.     From at least August 24, 2019 through at least November 13, 2019, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, used the Ransom Nova accounts to upload at least 1,960 videos to YouTube. At the time of the uploads, the Ransom Nova accounts were connected to the YouTube service from a computing device using IP addresses again indicating that they were in Pakistan.

32.     Using the Ransom Nova accounts, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control uploaded hundreds of video clips from the Hungarian film *Csak szex és más semi* ("*Csak szex*"), one of the copyrighted works that Pirate Monitor LTD claimed to own in the Complaint and accused YouTube of infringing in this action.

33.     Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, also used the Ransom Nova accounts to upload hundreds of video clips from the Hungarian film *Zimmer Feri* to YouTube. *Zimmer Feri* is a prequel to *Zimmer Feri 2*, another work that Pirate Monitor claimed to own in the Complaint and accused YouTube of infringing in this action.

34.     Each time Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, uploaded a video to the YouTube service through the Ransom Nova accounts, they were required to and did reconfirm that they were abiding by the ToS Agreement; in relevant part, they represented and warranted to YouTube each time that they owned or had the rights to upload and license the material contained in the videos and that the videos they uploaded did not infringe any third party's copyrights.

**Pirate Monitor Demanded Removal Of The Nearly 2000 Video Clips It Had Previously Uploaded Through the Ransom Nova Accounts, Charging That They Infringed Copyrights**

35.     Between October 29 and November 15, 2019, Pirate Monitor and Csupó sent YouTube hundreds of takedown notices under the DMCA for the same videos they had uploaded or had directed to be uploaded through the Ransom Nova accounts. The DMCA takedown notices were sent in the name of an entity calling itself "Pirate Monitor LLC," using a Google account opened in the name of Gábor Csupó with the email address usintellectualpropertyllc@gmail.com. Csupó electronically signed each of the takedown notices.

36.     In those DMCA takedown notices, Pirate Monitor and Csupó represented to YouTube under penalty of perjury that "Mega Film" was the copyright owner of the videos that were the subject of the notices, and that they were Mega Film's authorized representatives. Pirate Monitor and Csupó also represented in the notices that the targeted video clips included material from the films *Czak Szex* and *Zimmer Feri* that infringed Mega Film's copyrights—i.e., that the use was not "authorized by Mega Film, its agents or the law." The notices were all virtually identical save for targeting different video clips uploaded through varying Ransom Nova accounts.

37.     At the time YouTube received these DMCA takedown notices from Pirate Monitor and Csupó, it was not aware of the connection between Pirate Monitor and Csupó on the one hand and the Ransom Nova accounts on the other. YouTube did not know that the parties insisting that the videos were infringing and should be removed were the same parties that had

1  uploaded or directed the upload of the videos in the first place and who had represented in that

2  process that the videos were not infringing.

3      38.    In reliance on the representations from Pirate Monitor and Csupó in the takedown

4  notices that were made to YouTube via the DMCA's statutorily prescribed mechanism, YouTube

5  processed approximately 1,800 separate notices from Pirate Monitor and Csupó and

6  expeditiously removed the targeted videos.

7         **Pirate Monitor And Csupó's Scheme Amounts Either To Fraud And**
          **Breach Of Contract Or A Violation Of Section 512(f) Of The DMCA**
8

9      39.    As set forth above, Pirate Monitor and Csupó uploaded, or authorized and

10  directed their agents to upload, nearly two thousand videos to YouTube, representing to

11  YouTube that the videos did not infringe copyrights, and then promptly sent DMCA takedown

12  notices for the same videos, representing to YouTube that the videos did infringe copyrights.

13  Without the benefit of discovery, it is unclear which of these conflicting representations about

14  the videos were truthful. But either way, Pirate Monitor and Csupó made material

15  misrepresentations on which YouTube relied.

16      40.    On the one hand, if Pirate Monitor and Csupó falsely represented to YouTube that

17  they had the authority to post the videos and that the videos did not infringe anyone's copyrights,

18  then Pirate Monitor and Csupó breached the ToS Agreement and perpetrated a fraud on

19  YouTube. Had Pirate Monitor and Csupó not made the representations to YouTube that they did,

20  YouTube would not have allowed them to create accounts on the service, and it would not have

21  allowed them to upload content to the service.

22      41.    On the other hand, if Pirate Monitor and Csupó accurately represented to

23  YouTube that they had the authority to post the videos and that the videos did not infringe any

24  third party's copyrights, then Pirate Monitor and Csupó made knowingly false statements when

25  they subsequently represented to YouTube in their DMCA takedown notices that those same

26  videos were infringing.

27

28

42.     These conflicting representations from Pirate Monitor and Csupó were no accident. Their serial uploads and DMCA takedown notices for the same videos were central to a scheme through which they hoped to gain access to YouTube's powerful copyright management tools, in particular Content ID.

43.     In May 2019, an entity calling itself Pirate Monitor LLC applied for access to use YouTube's copyright management tools. The application was made by Gabor Csupó, who supplied the email address usintellectualpropertyllc@gmail.com.

44.     YouTube denied this application in June 2019, explaining to Pirate Monitor and Csupó that access to YouTube's copyright management tools was predicated in part on demonstrating both a need for such access and a history of properly using the DMCA takedown notice process.

45.     Pirate Monitor and Csupó believed that they could demonstrate both the need for access, and a track record of valid DMCA takedown notices, by surreptitiously uploading a substantial volume of content through accounts seemingly unconnected to them, and then sending DMCA takedown notices for that same content. Three months after YouTube declined their copyright management tools application, Pirate Monitor and Csupó began the process of creating the Ransom Nova accounts and uploading videos through those accounts, in furtherance of their scheme.

**The Evidence To Date Without Discovery Of The Connection**
**Between Pirate Monitor, Csupó, And The Ransom Nova Accounts**

46.     Pirate Monitor and Csupó are in sole possession of the full information regarding their unlawful scheme, and have refused to provide any of it to YouTube in response to YouTube's specific discovery requests. By way of example, attached as Exhibit A is a true and correct copy of Pirate Monitor LTD's objections and responses to YouTube's Second Set of Document Requests in which it objects in full to every request, including those seeking information regarding *inter alia*, Ransom Nova and Pirate Monitor LLC.

47.     While withholding from YouTube all relevant information they possess, Pirate Monitor and Csupó have never denied that they and/or their agents were responsible for creating the Ransom Nova accounts. They have never denied that they and/or their agents uploaded through those accounts the very same videos that they then promptly claimed in DMCA takedown notices were infringing.

48.     YouTube already has overwhelming evidence that reveals Pirate Monitor and Csupó's deceptions and demonstrates that Pirate Monitor and Csupó either operated the Ransom Nova accounts directly or that the person(s) operating the Ransom Nova accounts were agents of Pirate Monitor and Csupó, acting at their direction and control and for their benefit.

49.     First, the video uploading activity conducted through the Ransom Nova accounts was not consistent with the behavior of users actually seeking to share videos with others through the YouTube service. Though the videos contained clips from the Hungarian movies *Csak szex* and *Zimmer Feri*, the user(s) uploading those videos selected nondescript titles for the clips, such as "Test1" or "Hot Clip." An uploader genuinely seeking an audience on YouTube for clips from those films would have selected titles that enabled users looking for clips from the films to find them. Additionally, almost all of the nearly two thousand video clips uploaded via the Ransom Nova accounts were the same length, 31 seconds, and they did not correspond to particular moments or scenes from the films. Further, the clips were not uploaded in any recognizable order, such as to track the films sequentially. It is evident from this unusual pattern that the person(s) who uploaded these clips to YouTube through the Ransom Nova accounts did not expect anyone to actually find and watch them. That is because the videos were not uploaded by a genuine YouTube user, but instead by or at the direction of Pirate Monitor and Csupó for the purpose of sending DMCA takedown notices for those clips.

50.     Second, Pirate Monitor and Csupó regularly sent DMCA takedown notices for videos uploaded through the Ransom Nova accounts within a very short time—no more than a few days—after the videos were uploaded. For example, 99 clips were uploaded through the "Ransom Nova" account, "Amazing Channel," on November 10, 2019. All 99 clips were the

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED          -14-          CASE NO. 3:20-cv-04423-JD
COUNTERCLAIMS

subject of DMCA takedown notices four days later. When Pirate Monitor and Csupó sent their takedown notices, none of the videos targeted in those notices had an appreciable number of views on YouTube. In many cases, *the videos targeted in Pirate Monitor and Csupó's takedown notices had not recorded even a single view on YouTube.* In other words, Pirate Monitor and Csupó knew that the videos for which they sent takedown notices were on the YouTube service without having to actually view them. That is because Pirate Monitor and Csupó were responsible for having uploaded those videos in the first place.

51.     Third, there is powerful forensic evidence tying Pirate Monitor and Csupó to the Ransom Nova accounts. When Pirate Monitor and Csupó sent their takedown notices to YouTube—on behalf of Hungarian film company Mega Film—for videos uploaded through the Ransom Nova accounts, they had no reason to conceal their identities. They correctly identified themselves and invariably sent their takedown notices from a computer connected to the Internet via a unique Hungarian IP address: 217.65.XXX.XXX. On November 12, 2019, Pirate Monitor and Csupó were sending takedown notices to YouTube from that Hungarian IP address. At roughly the same time, someone logged into one of the Ransom Nova accounts—specifically the account created by RansomNova7@gmail.com—not from a Pakistani IP address, but from the same IP address in Hungary (217.65.XXX.XXX) that Pirate Monitor and Csupó were concurrently using to send the takedown notices. **In other words, RansomNova7 was sharing a computer and/or unique Internet connection with Pirate Monitor and Csupó in Hungary on the same day (and in fact, at almost the same time) that Pirate Monitor and Csupó were using that same computer and/or Internet connection to send takedown notices to YouTube**. That is because the person operating and responsible for the RansomNova7@gmail.com account either was Pirate Monitor or Csupó, or someone acting on their behalf.

52.     YouTube's investigation following the filing of this lawsuit has further revealed that the person or persons who created several of the Ransom Nova accounts on YouTube supplied the email address sarfrazjbd@gmail.com in connection with the accounts. That address

is registered to a person named Sarfraz Arshad Khan. Mr. Khan represents himself on the Internet as a Pakistani resident and computer services freelancer and advertises having expertise in data entry and promotion of content on YouTube. Mr. Khan also has a LinkedIn profile, posted under the name "Ransom Nova," which states that he is a computer science student in Pakistan. These facts make it extremely unlikely that Mr. Khan was acting on his own in setting up and using the Ransom Nova accounts, but instead suggest that he was hired by Pirate Monitor and Csupó to perform that work.

53.     Although Pirate Monitor has withheld all evidence, based on what YouTube knows today, the only plausible conclusion is that the Ransom Nova accounts were created and operated directly by Pirate Monitor and Csupó as part of the scheme alleged herein, or that they were created and operated by agents, including Mr. Khan, acting at the direction and control of Pirate Monitor and Csupó and for their benefit. Either way, Pirate Monitor and Csupó are responsible for the acts performed through the Ransom Nova accounts.

**COUNTERCLAIM I: Against Pirate Monitor LTD,**
**Pirate Monitor LLC, And Gábor Csupó**
**Breach Of Contract**

54.     YouTube restates and realleges the preceding allegations of its Counterclaims.

55.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents who created the "Ransom Nova" accounts, agreed to be bound by the ToS Agreement.

56.     The ToS Agreement constitutes a valid, binding contract between each of Pirate Monitor LTD, Pirate Monitor LLC, and Csupó, and YouTube.

57.     YouTube has performed its obligations under the ToS Agreement, save for any that have been excused, including by providing YouTube services to the parties who created the "Ransom Nova" YouTube accounts.

58.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents who created the "Ransom Nova" accounts, breached the ToS Agreement by, among other things:

i.       failing to provide complete and accurate identification information in the account creation process; and

ii.       uploading videos to YouTube that infringed third-party copyrights.

59.     These breaches have proximately caused damage to YouTube, including among other things, the cost of investigating and processing the subsequent DMCA takedown notices sent by Pirate Monitor and Csupó claiming that the content they uploaded was infringing.

60.     To the extent that Pirate Monitor LTD's claims in this action implicate content that Pirate Monitor itself uploaded (or is responsible for causing to be uploaded) to the YouTube service, the costs of defending the action as well as any liability also constitute damages proximately caused by Pirate Monitor's breaches of contract.

61.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó are additionally obligated under their ToS Agreements with YouTube to indemnify YouTube for claims arising out of or relating to their use of the YouTube service. In seeking defense costs and any potential liability in this action as damages for these contract breaches, YouTube expressly preserves its separate entitlement to contractual indemnity and is entitled to that indemnity to the extent Pirate Monitor LTD, Pirate Monitor LLC, and Csupó refuse to honor their indemnity obligation.

### COUNTERCLAIM II: Against Pirate Monitor LTD, Pirate Monitor LLC, And Gábor Csupó
### Fraud

62.     YouTube restates and realleges the preceding allegations of its Counterclaims.

63.      Between at least August 23 and at least November 13, 2019, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents, created at least 23 "Ransom Nova" YouTube accounts. Each time they created a new account, they made the representations and promises to YouTube that are set out in the ToS Agreement.

64.     Among other things, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents, promised to provide YouTube with "accurate and complete" identification information for their YouTube accounts. They promised YouTube that if they uploaded any content to the YouTube service, they would "own or have the

necessary licenses, rights, consents, and permissions to publish Content [they] submit." They also promised that any "content [they] submit to the Service [will] not contain third party copyrighted material, or material that is subject to other third party proprietary rights, unless [they have] permission from the rightful owner of the material or [they are] otherwise legally entitled to post the material." And they granted YouTube a copyright license to any videos they submitted, representing that they had the required rights to do so.

65.    Each time Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents uploaded a video to the YouTube service, they reaffirmed their agreement to the ToS Agreement, and made those same promises and representations.

66.    But Pirate Monitor LTD, Pirate Monitor LLC, and Csupó had no intention of honoring the promises in the ToS Agreement either at the time they created their accounts or when they uploaded videos to the service. Rather, they intended to use the service to upload material that infringed third-party copyrights.

67.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó themselves or through their authorized agents also represented to YouTube through the ToS Agreement at the time they created the Ransom Nova accounts and again in the video upload process that they had the authority to post the videos that they did, and that the videos did not infringe any third party's copyrights. These representations were made, in materially identical form, each time videos were uploaded through the Ransom Nova accounts. The representations were false, and Pirate Monitor LTD, Pirate Monitor LLC, and Csupó knew that the representations were false.

68.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó made those representations or caused their authorized agents to make them with the intention of inducing YouTube to accept and allow to be uploaded the content that Pirate Monitor LTD, Pirate Monitor LLC, and Csupó wanted uploaded to the YouTube service.

69.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó made the false promises and misrepresentations they did because they knew that YouTube would not allow them to create

accounts or allow them to upload content through those accounts if they did not make those false promises and misrepresentations. That, in turn, would have frustrated their scheme to send mass takedown notices and establish the track record they hoped would gain them access to YouTube's copyright management tools.

70.    YouTube relied on Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's false promises and misrepresentations by allowing them to create accounts and by accepting content uploaded through those accounts to the YouTube service. YouTube would not have allowed the creation of the accounts or accepted the content but for Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's false promises and misrepresentations.

71.    YouTube's reliance was justifiable. It had no reason to believe Pirate Monitor LTD, Pirate Monitor LLC, and Csupó would make promises they had no intention of performing or misrepresent the nature of the content they were uploading.

72.    Because they hid their intention not to honor their promises in the ToS Agreement, and because of the misrepresentations they made in the ToS Agreement, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó were able to create at least 23 accounts and upload at least 1,960 videos to YouTube, and soon thereafter sent DMCA takedown notices for those same videos.

73.    As a proximate result of Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's promises made without intention to perform and misrepresentations, YouTube has been damaged in an amount to be proven at trial, but including among other things, the cost of processing at least 1,800 DMCA takedown notices for the content Pirate Monitor LTD, Pirate Monitor LLC, and Csupó uploaded, and the cost of investigating and remediating their misconduct.

74.    To the extent that Pirate Monitor LTD's claims in this action implicate content that Pirate Monitor LTD itself uploaded to the YouTube service, the costs of defending the action as well as any liability also constitute damages proximately caused by Pirate Monitor LTD's promises without intention to perform and false representations.

75.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's conduct was undertaken with the intent to injure YouTube, and with a willful and conscious disregard of YouTube's rights, and constitutes fraud and malice under California Civil Code Section 3294. As a result, YouTube is entitled to an award of punitive damages against Pirate Monitor LTD, Pirate Monitor LLC, and Csupó in an amount sufficient to punish them and deter them from future misconduct.

**COUNTERCLAIM III: Against Pirate Monitor LTD,**
**Pirate Monitor LLC, And Gábor Csupó**
**(In the alternative to Counterclaims I & II)**
**Violation of 17 U.S.C § 512(f)**

76.     YouTube pleads Counterclaim III as an alternative to Counterclaims I & II, and incorporates the preceding allegations of Paragraphs 1 to 53 herein.

77.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents who created the "Ransom Nova" accounts, repeatedly represented to YouTube in the ToS Agreement and in the upload process that they had the authority to post the videos that they did, and that the videos did not infringe any third party's copyrights. Those representations were true.

78.     From October 29, 2019 through November 15, 2019, Pirate Monitor and Csupó sent approximately 1,800 DMCA takedown notices to YouTube for content that they themselves had uploaded to YouTube. Each of those notices was sent by "Pirate Monitor LLC" signed by Csupó.

79.     In their DMCA takedown notices, Pirate Monitor and Csupó expressly represented to YouTube that the videos identified in the notices infringed the copyrights of a party they were authorized to represent (Mega Film). They further declared that the information in the takedown notices was accurate, and declared under penalty of perjury that they were the owner, or an agent authorized to act on behalf of the owner, of an exclusive right that was allegedly infringed.

80.     Pirate Monitor and Csupó's representations in those DMCA takedown notices regarding infringement were knowingly false. As Pirate Monitor and Csupó knew, the videos

they identified as infringing in their DMCA takedown notices were not infringing their copyrights or those of copyright owners that they represented. In fact, through their authorized agents who created the "Ransom Nova" accounts, Pirate Monitor and Csupó themselves had uploaded those same videos.

81.     Each time they sent DMCA takedown notices to YouTube for videos they had uploaded, Pirate Monitor and Csupó knowingly and materially misrepresented that material or activity on YouTube was infringing.

82.     YouTube, the service provider that received these DMCA takedown notices, relied upon the misrepresentations made by Pirate Monitor LLC and Csupó therein by removing or disabling access to the material they falsely claimed was infringing. YouTube's reliance was reasonable, given that the notices at issue were made in the form prescribed by the DMCA, 17 U.S.C. § 512(c)(3).

83.     YouTube was injured by Pirate Monitor and Csupó's misrepresentations in their DMCA notices. But for those misrepresentations, YouTube would not have had to incur the costs of processing approximately 1,800 DMCA notices and removing the videos identified in those notices. Further, as a result of Pirate Monitor and Csupó's misrepresentations, YouTube had to expend substantial additional sums on an investigation in an effort to detect and thwart their deceptive behavior.

84.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó have yet to admit their role in the scheme detailed herein, much less forsworn similar misconduct in the future. The sheer number of material misrepresentations they made in DMCA takedown notices demonstrates that they have little fear of the threat of monetary liability under Section 512(f). Further, as the Complaint in this action demonstrates, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó still harbor the same motive to obtain access to Content ID as they did when they first hatched their plan.

85.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó have demonstrated their willingness to conceal their identities in furtherance of their goals. Having been caught by

1  YouTube, they now can learn from their mistakes to evade detection in the future by, *inter alia*,

2  selecting new account names, masking their IP addresses, using new and different agents to

3  upload videos, and sending new false DMCA takedown notices for different videos that their

4  new agents upload. Because YouTube relies on the sworn representations made by those that

5  send facially valid copyright removal requests, there is no guarantee it can detect and prevent

6  such fraudulent behavior in the future, nor should it be forced to expend substantial sums to try

7  to do so. Further, YouTube has no ready means of calculating the harm that such

8  misrepresentations would cause to YouTube or its users in terms of lost goodwill, lost audiences,

9  and lost opportunities. To prevent such irreparable harm, injunctive relief barring Pirate Monitor

10  LTD, Pirate Monitor LLC, and Csupó from future misrepresentations in DMCA takedown

11  notices is warranted.

12                                    **PRAYER FOR RELIEF**

13        Wherefore, YouTube respectfully requests that the Court:

14              a.      Award damages against Pirate Monitor LTD, Pirate Monitor LLC, and

15              Gábor Csupó sufficient to compensate YouTube for the harm caused by their

16              conduct;

17              b.      Award punitive damages against Pirate Monitor LTD, Pirate Monitor

18              LLC, and Gábor Csupó for their fraudulent conduct;

19              c.      Issue an injunction barring Pirate Monitor LTD, Pirate Monitor LLC, and

20              Gábor Csupó and all those in active concert with them from submitting notices of

21              alleged infringement to YouTube that misrepresent that material on the YouTube

22              service is infringing copyrights held or claimed to be held by Pirate Monitor LTD,

23              Pirate Monitor LLC, and Gábor Csupó or anyone they claim to represent.

24              d.      Award YouTube the costs of this action along with attorneys' fees

25              pursuant to 17 U.S.C. § 512(f) against Pirate Monitor LTD, Pirate Monitor LLC,

26              and Gábor Csupó; and

27

28

1            e.     Award YouTube such other and further relief as the Court may deem just

2    and proper.

3

Dated:  February 19, 2021                         Respectfully submitted

4

5                                         WILSON SONSINI GOODRICH & ROSATI
                                     Professional Corporation

6

                                     By:  _____ */s/ David H. Kramer*_____

7

8                                         Attorneys for Defendants and Counterclaimants
                                     YOUTUBE, LLC and GOOGLE LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

George A. Zelcs (*pro hac vice*)
  gzelcs@koreintillery.com
Randall P. Ewing, Jr. (*pro hac vice*)
  rewing@koreintillery.com
Ryan Z. Cortazar (*pro hac vice*)
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe (*pro hac vice*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
  jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone: (415) 293-6800
Facsimile: (415) 293-6899

*Attorneys for Maria Schneider and
Pirate Monitor, LTD*

Philip C. Korologos (*pro hac vice*)
  pkorologos@bsfllp.com
Joanna C. Wright (*pro hac vice*)
  jwright@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> YOUTUBE, LLC; and GOOGLE LLC; <br><br> Defendants. | CASE NO. 5:20-cv-4423 <br><br> **PLAINTIFF PIRATE MONITOR LTD'S OBJECTIONS AND RESPONSES TO YOUTUBE AND GOOGLE'S SECOND SET OF DOCUMENT REQUESTS TO PLAINTIFF AND COUNTERCLAIM DEFENDANT PIRATE MONITOR LTD** |

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Pirate Monitor LTD (together "Plaintiff" or "Pirate Monitor") submits the following responses and objections to Defendants YouTube, LLC ("YouTube") and Google LLC ("Google") (collectively "Defendants") Second Set of Document Requests to Plaintiff Pirate Monitor LTD, dated January 13, 2020 (the "Requests"), in the above-captioned action (the "Action").

By these Responses, Pirate Monitor does not intend to, and does not, (1) waive any objection as to the admissibility of evidence or the competency of, relevancy of, materiality of, or privilege attaching to any information disclosed in these responses, or (2) waive the right to object to other discovery requests or undertaking involving or reflecting the subject matter of the Requests or these Responses. These Responses do not constitute, nor should they be construed as, admissions with respect to the relevancy or admissibility of any evidence or document identified herein or the truth or accuracy of any statement, characterization, or other information contained in such document. Pirate Monitor expressly does not concede the relevance or materiality of any of these Responses or the subject matter they refer to.

Pirate Monitor's discovery and preparation for trial of this matter is not complete as of the date of these Responses and are continuing. Pirate Monitor anticipates that discovery and preparation for trial will reveal additional information not presently known to it, but upon which it may rely. These Responses to the Requests are based upon information currently known to or believed to be true by Pirate Monitor. Pirate Monitor reserves the right to modify or supplement these Responses upon completion of discovery and preparation for trial of this matter, and to use at trial, or in any motion or deposition, any documents, facts, or supporting evidence of any sort later developed or discovered.

Pirate Monitor reserves the right to amend or revise these Responses, including based on any responses or objections submitted by Defendants to any of Pirate Monitor's discovery requests. Pirate Monitor also asserts that any discovery obligations should be mutual between parties, so that if any of Pirate Monitor's objections are overridden, Defendants should be subject to the same scope of discovery, including definitions and instructions for discovery compliance.

1    Pirate Monitor expects that the parties will negotiate a "search term protocol," which will

2  govern the search for documents in this litigation, including the search terms and parameters,

3  custodians, repositories and relevant time frame. Pirate Monitor will locate documents consistent with

4  this protocol, which will be subject to further review for responsiveness.

5                                            **GENERAL OBJECTIONS**

6    1.    Pirate Monitor objects to the Requests to the extent they impose obligations in

7  addition to those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, any

8  court governing discovery in this case, or any discovery protocol agreed upon by the parties.

9    2.    Pirate Monitor objects to the extent that Defendants' Requests purport to seek

10 discovery of every conceivable document, or "any" or "all" documents, relating to a particular request.

11 Pirate Monitor intends to negotiate reasonable document search parameters with Defendants.

12   3.    Pirate Monitor objects to each Request to the extent it purports to seek information

13 protected by the attorney-client privilege or the work-product doctrine, and Pirate Monitor will not

14 provide any privileged and/or protected information. Any disclosure of privileged information would

15 be inadvertent and should not be deemed a waiver of any applicable privileges.

16   4.    Pirate Monitor objects to each Request to the extent that it contains words and/or

17 phrases that are not defined, thereby rendering the Request overboard, vague, and ambiguous.

18   5.    Pirate Monitor objects to the Requests to the extent that they seek information not

19 within Pirate Monitor's possession, custody, or control.

20   6.    Pirate Monitor objects to the Requests to the extent that they purport to impose a

21 burden on Pirate Monitor to provide documents or information already in Defendants' possession,

22 custody, or control, and/or which are publicly available, otherwise equally available to all parties, or

23 available to Defendants from a less burdensome, more efficient, more convenient, or less expensive

24 source than they are available to Pirate Monitor, or through a more convenient, more efficient, less

25 burdensome, or less expensive means than the Requests.

26

27

28
PIRATE MONITOR'S OBJECTIONS &                     3                    CASE NO. 5:20-CV-4423
RESPONSES TO DEFENDANTS'
SECOND SET OF DOCUMENT REQUESTS

7.     Any objection to any of the Requests is not an admission that Pirate Monitor has any information or documents responsive to a particular Request.

8.     If a response indicates that Pirate Monitor will produce documents, Pirate Monitor does not represent that any responsive documents are in its possession, custody, or control, but rather that production will be made if any such documents are located after a reasonable search.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Pirate Monitor objects to the extent that Defendants' Definitions and Instructions seek information covered by privilege(s), including the attorney-client and attorney work product privileges. *See, e.g.*, Defendants' Definition No. 1.

2.     Pirate Monitor objects to the definition of "Pirate Monitor," "You," and "Your," as vague, overbroad, unduly burdensome, disproportionate to the needs of this litigation. Pirate Monitor will construe these terms to refer to Pirate Monitor LTD and any agent or principal acting on behalf of Pirate Monitor LTD.

3.     Pirate Monitor objects to the instruction to provide all documents in the possession, custody, or control of anyone other than Pirate Monitor. Consistent with its obligations under the Federal Rules and applicable law, Pirate Monitor will undertake reasonable efforts to produce responsive documents within its possession, custody, or control.

4.     Pirate Monitor objects to the failure to include an instruction as to the relevant time period for the Requests. Pirate Monitor will apply reasonable date restrictions to its searches for responsive documents, consistent with its obligations under the Federal Rules and applicable law.

## SPECIFIC OBJECTIONS AND RESPONSES

The General Objections and Objections to Definitions and Instructions set forth above are incorporated into the Specific Objections below, as if incorporated therein. Pirate Monitor reserves the right to amend or revise its Specific Objections, including after meeting and conferring with Defendants regarding any Request. A response to any request indicating that Pirate Monitor agrees to produce

1  documents is not an admission that documents responsive to the Request exist and does not waive any

2  objections to the use of any discovery produced in response to the Request.

3  **DOCUMENT REQUEST NO. 51:**

4      All documents and communications relating to Intellectual Property LLC.

5  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 51 on the grounds that it

6  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

7  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

8  parties' relative access to relevant information, the parties' resources, and because the burden and

9  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

10  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

11  herein.

12  **DOCUMENT REQUEST NO. 52:**

13      All communications between You and Intellectual Property LLC concerning YouTube or

14  Google, any matter set forth in the complaint, or any matter related to the conduct of this litigation.

15  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 52 on the grounds that it

16  is overbroad, duplicative of Request No. 51, seeks irrelevant information that is not reasonably calculated

17  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

18  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

19  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

20  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

21  of the objections stated herein.

22  **DOCUMENT REQUEST NO. 53:**

23      All documents and communications relating to Pex.

24  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 53 on the grounds that it

25  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

26  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

27

28  PIRATE MONITOR'S OBJECTIONS &          5          CASE NO. 5:20-CV-4423
   RESPONSES TO DEFENDANTS'
   SECOND SET OF DOCUMENT REQUESTS

1   parties' relative access to relevant information, the parties' resources, and because the burden and

2   expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

3   Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

4   herein.

5   **DOCUMENT REQUEST NO. 54:**

6       All communications between You and Pex concerning YouTube or Google, any matter set

7   forth in the complaint, or any matter related to the conduct of this litigation.

8   **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 54 on the grounds that it

9   is overbroad, duplicative of Request No. 53, seeks irrelevant information that is not reasonably calculated

10   to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

11   amount in controversy, the parties' relative access to relevant information, the parties' resources, and

12   because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

13   states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

14   of the objections stated herein.

15   **DOCUMENT REQUEST NO. 55:**

16       All documents and communications relating to Pirate Monitor LLC.

17   **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 55 on the grounds that it

18   is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

19   admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

20   parties' relative access to relevant information, the parties' resources, and because the burden and

21   expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

22   Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

23   herein.

24   **DOCUMENT REQUEST NO. 56:**

25       All communications between You and Pirate Monitor LLC concerning YouTube or Google,

26   any matter set forth in the complaint, or any matter related to the conduct of this litigation.

27

28

1  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 56 on the grounds that it

2  is overbroad, duplicative of Request No. 55, seeks irrelevant information that is not reasonably calculated

3  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

4  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

5  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

6  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

7  of the objections stated herein.

8  **DOCUMENT REQUEST NO. 57:**

9      All documents and communications relating to Sarfraz Arshad Khan.

10  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 57 on the grounds that it

11  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

12  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

13  parties' relative access to relevant information, the parties' resources, and because the burden and

14  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

15  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

16  herein.

17  **DOCUMENT REQUEST NO. 58:**

18      All communications between You and Sarfraz Arshad Khan concerning YouTube or Google,

19  any matter set forth in the complaint, or any matter related to the conduct of this litigation.

20  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 58 on the grounds that it

21  is overbroad, duplicative of Request No. 57, seeks irrelevant information that is not reasonably calculated

22  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

23  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

24  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

25  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

26  of the objections stated herein.

27

**DOCUMENT REQUEST NO. 59:**

All documents and communications relating to Zoltan Buzas.

**OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 59 on the grounds that it is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated herein.

**DOCUMENT REQUEST NO. 60:**

All communications between You and Zoltan Buzas concerning YouTube or Google, any matter set forth in the complaint, or any matter related to the conduct of this litigation.

**OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 60 on the grounds that it is overbroad, duplicative of Request No. 59, seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated herein.

**DOCUMENT REQUEST NO. 61:**

All documents and communications concerning Ransom Nova.

**OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 61 on the grounds that it is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

1   Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

2   herein.

3   **DOCUMENT REQUEST NO. 62:**

4       All documents and communications concerning YouTube accounts created or used by

5   Ransom Nova.

6   **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 62 on the grounds that it

7   is overbroad, duplicative of Request No. 61, seeks irrelevant information that is not reasonably calculated

8   to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

9   amount in controversy, the parties' relative access to relevant information, the parties' resources, and

10  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

11  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

12  of the objections stated herein.

13  **DOCUMENT REQUEST NO. 63:**

14      All documents concerning Your selection of works to be included as Works in Suit.

15  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 63 on the grounds that it

16  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

17  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

18  parties' relative access to relevant information, the parties' resources, and because the burden and

19  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

20  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

21  herein.

22

23  Dated: February 12, 2021                          Respectfully submitted,

24
                                                       /s/ Steven M. Berezney
25                                                     George A. Zelcs *(pro hac vice)*
                                                       Randall P. Ewing, Jr. *(pro hac vice)*
26                                                     Ryan Z. Cortazar *(pro hac vice)*

27

**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
Steven M. Berezney, CA Bar #329923
Michael E. Klenov, CA Bar #277028
Carol O'Keefe (*pro hac vice*)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Phone: (415) 293-6800
Fax: (415) 293-6899

Philip C. Korologos (*pro hac vice*)
Joanna C. Wright (*pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Maria Schneider and*
*Pirate Monitor LTD*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2021, I caused the foregoing Plaintiff Pirate Monitor LTD's Objections and Responses to YOUTUBE and GOOGLE'S Second Set of Document Requests to Plaintiff Pirate Monitor LTD to be served on all opposing counsel of record by email at the addresses listed below:

Schneidervyoutube@wsgr.com

_____/s/ Steven M. Berezney_____

PIRATE MONITOR'S OBJECTIONS &            10            CASE NO. 5:20-CV-4423
RESPONSES TO DEFENDANTS'
SECOND SET OF DOCUMENT REQUESTS

# Exhibit C

George A. Zelcs (pro hac vice)
gzelcs@koreintillery.com
Randall P. Ewing, Jr. (pro hac vice)
rewing@koreintillery.com
Ryan Z. Cortazar (pro hac vice)
rcortazar@koreintillery.com
KOREIN TILLERY, LLC
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (pro hac vice)
stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
sberezney@koreintillery.com
Carol O'Keefe (pro hac vice)
cokeefe@koreintillery.com
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
jischiller@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone:     (415) 293-6800
Facsimile: (415) 293-6899

Philip C. Korologos (pro hac vice)
pkorologos@bsfllp.com
Joanna Wright
jwright@bsfllp.com
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Maria Schneider,*
*Pirate Monitor Ltd., and Gábor Csupó*

1

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER, individually and on behalf of all others similarly situated; | |
| Plaintiff, | CASE NO.  3:20-cv-4423-JD |
| vs. | **GÁBOR CSUPÓ'S ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIMS** |
| YOUTUBE, LLC; and GOOGLE LLC; | |
| Defendants. | **JURY TRIAL DEMANDED** |
| YOUTUBE, LLC and GOOGLE LLC; | |
| Counter-Plaintiffs, | |
| v. | |
| PIRATE MONITOR LTD., GÁBOR CSUPÓ, and PIRATE MONITOR LLC, | |
| Counter-Defendants. | |

**PRELIMINARY STATEMENT**

Counterclaim Defendant Gábor Csupó (hereafter "Csupó") is an American and Hungarian citizen, residing in California since 1979.  Csupó is a television and film producer and director and is a 5-time Emmy Award winner, 4-time Cable Ace Award winner, and a recipient of a Children's Choice Award. He is responsible for award-winning and revered television shows like "The Simpsons" and "Rugrats."

YouTube, LLC's and Google LLC's counterclaims against Gábor Csupó are blatant attempts to distract from Defendants' conduct permitting and enabling the content-sharing website YouTube.com to become a hotbed of piracy by injecting issues into this litigation that bear no relation to the class claims brought by Plaintiff. YouTube's and Google's counterclaims are both legally deficient and factually misguided.

YouTube and Google claim this alleged misconduct occurred exclusively in 2019, ignoring the fact that Pirate Monitor Ltd. (hereinafter "Pirate Monitor") did not obtain copyrights for the works

1 identified in its complaint until January 2020 and that another entity not named in their counterclaim

2 was responsible for MegaFilm's copyright enforcement at the time this alleged conduct occurred.

3 YouTube's and Google's counterclaims against Csupó are even more misplaced, and Csupó did not

4 obtain an interest in Pirate Monitor Ltd. or undertake any activities in connection with Pirate Monitor

5 Ltd. until January 2020. As for claims against Csupó for the alleged activities of Pirate Monitor LLC,

6 Pirate Monitor LLC has never been registered as a legal entity with any state or nation.

7    Discovery will reveal that YouTube's and Google's counterclaims are misguided, untrue, and

8 legally insufficient attempts to divert attention from their widespread misconduct and their destruction

9 of the market for the lawful distribution of copyrighted content.

10                    **GÁBOR CSUPÓ'S ANSWER**

11    Gábor Csupó hereby answers the Amended Counterclaim asserted against it by YouTube, LLC

12 and Google LLC. Except as expressly admitted herein, Csupó denies any and all allegations as set forth

13 in the Counterclaim. Csupó expressly reserves his right to amend and/or supplement his Answer as

14 may be necessary. Csupó further answers the numbered Paragraphs in the Counterclaim as follows:

15    1.    Paragraph 1 contains legal conclusions to which no response is required. Csupó

16 otherwise denies the allegation in Paragraph 1.

17    2.    Paragraph 2 contains legal conclusions to which no response is required. Csupó

18 otherwise denies the allegation in Paragraph 2.

19                       **THE PARTIES**

20    3.    Csupó admits the allegation in Paragraph 3 except that Csupó lacks sufficient knowledge

21 or information to form a belief about whether all users are able "to share videos they post with a global

22 audience at no charge."

23    4.    Csupó admits the allegation in Paragraph 4 that Pirate Monitor is a limited company

24 claiming a principal place of business at Intershore Chambers, 3rd Floor, Geneva Place, Road Town,

25 Tortola, VG1110 British Virgin Islands. Csupó admits the allegation in Paragraph 4 that Pirate Monitor

26 has not registered to do business in California. Csupó admits that Pirate Monitor claims to own

27 copyrights to certain works through an assignment from Mega Film Kft. The remaining allegations in

28

Paragraph 4 contain legal conclusions to which no response is required. To the extent a response is required to the remaining allegations, Csupó denies them.

5.      Csupó admits the allegation in Paragraph 5 that Pirate Monitor has not yet produced any documents in this litigation. Csupó denies the allegation in Paragraph 5 that Pirate Monitor is withholding documents in an effort to conceal facts regarding the alleged misconduct about which YouTube complains.

6.      Csupó admits the allegation in Paragraph 6 that he is a Hungarian film director and resident of California. Csupó admits that he is the sole stockholder of Pirate Monitor. The remaining allegations in Paragraph 6 are legal conclusions to which no response is required. To the extent a response is required to the remaining allegations, Csupó denies them.

7.      Csupó lacks sufficient knowledge or information to form a belief about the allegations in Paragraph 7. Paragraph 7 also contains legal conclusions to which no response is required.

8.      Csupó lacks sufficient knowledge or information to form a belief about the allegations in Paragraph 8. Paragraph 8 also contains legal conclusions to which no response is required. To the extent a response is required to the remaining allegations, Csupó denies them.

**JURISDICTION AND VENUE**

9.      Paragraph 9 contains a legal conclusion to which no response is required.

10.     Paragraph 10 contains a legal conclusion to which no response is required.

11.     Csupó admits he is a resident of California. Paragraph 11 also contains legal conclusions to which no response is required. To the extent a response is required to the remaining allegations, Csupó denies them.

12.     Csupó lacks sufficient knowledge or information to form a belief about the allegations in Paragraph 12. Paragraph 12 also contains legal conclusions to which no response is required.

13.     Paragraph 13 contains a legal conclusion to which no response is required.

**The YouTube Service**

14.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 14.

4

15.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 15. To the extent an answer is required, Csupó admits that YouTube offers a worldwide audience the opportunity to access and watch a library of videos, but denies that the library consists entirely of original, creative expression. All allegations not expressly admitted are denied.

16.     Csupó denies the allegations in Paragraph 16.

17.     Csupó denies the allegations in Paragraph 17.

18.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 18.

19.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 19.

20.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 20.

**Users' Promises and Representations to YouTube**

21.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 21. Paragraph 21 also contains legal conclusions to which no response is required.

22.     Paragraph 22 contains a legal conclusion to which no response is required. Csupó otherwise admits that YouTube and Google have quoted the excerpted language from at least one ToS Agreement with substantial accuracy, but lacks sufficient knowledge or information to answer whether this ToS Agreement was in effect during all relevant times. Csupó lacks sufficient knowledge or information to answer the remaining allegations in Paragraph 22.

23.     Paragraph 23 contains a legal conclusion to which no response is required. To the extent a response is required, Csupó lacks sufficient knowledge or information to answer the allegations in Paragraph 23.

24.     Paragraph 24 contains a legal conclusion to which no response is required. To the extent a response is required, Csupó lacks sufficient knowledge or information to answer the allegations in Paragraph 24.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

**Pirate Monitor and Csupó Uploaded Nearly 2000 Video Clips to YouTube Through "Ransom Nova" Accounts and Represented That They Did Not Infringe Anyone's Copyrights**

25.     Paragraph 25 contains legal conclusions to which no response is required. Csupó otherwise denies the allegations in Paragraph 25.

26.     Paragraph 26 contains legal conclusions to which no response is required. Csupó otherwise denies the allegations in Paragraph 26.

27.     Paragraph 27 contains legal conclusions to which no response is required. Csupó otherwise denies the allegations in Paragraph 27.

28.     Paragraph 28 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 28.

29.     Paragraph 29 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 29.

30.     Csupó lacks sufficient information or knowledge to form a belief about the allegation in Paragraph 30.

31.     Paragraph 31 contains a legal conclusion to which no response is required. Csupó lacks sufficient information or knowledge to answer the allegations as to the number of videos uploaded or the IP address used by the uploader. Csupó otherwise denies the allegations in Paragraph 31.

32.     Paragraph 32 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 32.

33.     Paragraph 33 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 33.

34.     Paragraph 34 contains legal conclusions to which no response is required. Csupó otherwise denies the allegations in Paragraph 34.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

**Pirate Monitor Demanded Removal Of The Nearly 2000 Video Clips It Had Previously Uploaded Through The Ransom Nova Accounts, Claiming That They Infringed Copyrights**

35.     Csupó admits that an entity sent DMCA takedown notices using a Google account with the email address usintellectualpropertyllc.com and that Csupó's electronic signature appears on the takedown notices.

36.     Csupó admits that an entity sent takedown notices representing that MegaFilm was the copyright owner of the videos that were the subject of the takedown notices and that the entity sending the takedown notices were MegaFilm's authorized representatives. Csupó admits that the entity sending the takedown notices represented that the publishing on YouTube of the videos that were the subject of the takedown notices was not authorized by MegaFilm, its agents or the law. Csupó otherwise denies the allegations in Paragraph 36.

37.     Csupó lacks sufficient information or knowledge to form a belief about the allegation in Paragraph 37.

38.     Csupó lacks sufficient information or knowledge to form a belief about the allegation in Paragraph 38.

**Pirate Monitor's and Csupó's Scheme Amounts Either to Fraud And Breach of Contract Or A Violation Of Section 512(f) Of The DMCA**

39.     Paragraph 39 contains legal conclusions to which no response is required. Csupó admits that takedown notices were sent to YouTube by some entity and that his electronic signature appears on the takedown notices. Csupó otherwise denies the allegations in Paragraph 39. Csupó lacks sufficient information or knowledge to form a belief about YouTube's reliance.

40.     Paragraph 40 contains legal conclusions to which no response is required. Csupó otherwise lacks sufficient information or knowledge to form a belief about the allegations in Paragraph 40.

41.     Paragraph 41 contains legal conclusions to which no response is required. Csupó otherwise lacks sufficient information or knowledge to form a belief about the allegations in Paragraph 40.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

42.     Csupó denies the allegations in Paragraph 42.

43.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 43.

44.     Csupó lacks sufficient knowledge or information to form a belief about the allegation in Paragraph 44.

45.     Paragraph 45 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegation in Paragraph 45.

**The Evidence To Date Without Discovery Of The Connection Between Pirate Monitor, Csupó, And The Ransom Nova Accounts**

46.     Csupó denies that he is in sole possession of the full information regarding the alleged unlawful scheme. Csupó admits that Exhibit A is a true and correct copy of Pirate Monitor's objections and responses to YouTube's Second Set of Document Requests.

47.     Csupó denies the allegations in Paragraph 47. This Answer, which contains Csupó's first legally obligated response to YouTube's allegations, speaks for itself.

48.     Csupó lacks sufficient knowledge or information to form a belief about the allegations in Paragraph 48.

49.     Csupó lacks sufficient knowledge or information to form a belief about the allegations in Paragraph 49 as to the length and nature of the uploads, or as to how an uploader "genuinely seeking an audience" would behave. Csupó otherwise denies the allegation in Paragraph 49.

50.     Csupó lacks sufficient knowledge or information to form a belief about the allegations in Paragraph 50 as to the number of views of videos that were the subject of takedown notices or the length of time between when the videos were uploaded and when takedown notices were sent. Csupó admits that an entity sent takedown notices for the videos described in Paragraph 50 and that Gábor Csupó's electronic signature appears on the takedown notices. Csupó otherwise denies the allegations in Paragraph 50.

51.     Csupó admits that takedown notices were sent by an entity, and Gábor Csupó's electronic signature was on the takedown notices, using a Hungarian IP address. Csupó denies that the

1  person operating and responsible for the RansomNova7@gmail.com account was himself or someone

2  acting on his behalf. Csupó lacks sufficient information and knowledge to form a belief about the

3  remaining allegations in Paragraph 51.

4      52.    Csupó lacks sufficient information or knowledge to form a belief about the allegations

5  in Paragraph 52. Csupó denies that he hired Mr. Khan to perform any work.

6      53.    Paragraph 53 contains legal conclusions to which no response is required. Csupó

7  otherwise denies the allegations in Paragraph 53.

8  **COUNTERCLAIM I: Against Pirate Monitor LTD, Pirate Monitor LLC and Gábor Csupó**

9  **Breach of Contract**

10     54.    Csupó reiterates his responses to the preceding paragraphs of this Answer to the

11 Counterclaims as if fully set forth herein.

12     55.    Paragraph 55 contains a legal conclusion to which no response is required. Csupó

13 otherwise denies the allegations in Paragraph 55.

14     56.    Paragraph 56 contains a legal conclusion to which no response is required.

15     57.    Paragraph 57 contains a legal conclusion to which no response is required. Csupó lacks

16 sufficient knowledge or information to form a belief about what obligations, if any, YouTube performed

17 under the ToS Agreement. Csupó otherwise denies the allegations in Paragraph 57.

18     58.    Paragraph 58 contains a legal conclusion to which no response is required. Csupó

19 otherwise denies the allegations in Paragraph 58.

20     59.    Paragraph 59 contains a legal conclusion to which no response is required. Csupó lacks

21 sufficient knowledge or information to form a belief about the costs, if any, YouTube expended

22 investigating any claims of infringement with respect to the takedown notices that are the subject of

23 YouTube's counterclaims. Csupó otherwise denies the allegations in Paragraph 59.

24     60.    Paragraph 60 contains a legal conclusion to which no response is required. Csupó

25 otherwise denies the allegations in Paragraph 60.

26     61.    Paragraph 61 contains a legal conclusion to which no response is required. Csupó

27 otherwise denies the allegations in Paragraph 61.

28

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

**COUNTERCLAIM II: Against Pirate Monitor LTD, Pirate Monitor LLC, and Gábor Csupó**

**Fraud**

62.     Csupó reiterates his responses to the preceding paragraphs of this Answer to the Counterclaims as if fully set forth herein.

63.     Csupó denies the allegations in Paragraph 63.

64.     Paragraph 64 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 64.

65.     Paragraph 65 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegation in Paragraph 65.

66.     Csupó denies the allegations in Paragraph 66.

67.     Paragraph 67 contains legal conclusions to which no response is required. Csupó otherwise denies the allegations in Paragraph 67.

68.     Csupó denies the allegations in Paragraph 68.

69.     Csupó lacks sufficient knowledge or information to form a belief about what YouTube would or would not allow. Csupó otherwise denies the allegations in Paragraph 69.

70.     Csupó lacks sufficient knowledge or information to form a belief about YouTube's reliance or what YouTube would have allowed.

71.     Paragraph 71 contains a legal conclusion to which no response is required. Csupó lacks sufficient information or knowledge to form a belief about what YouTube had a reason to believe.

72.     Csupó denies the allegations in Paragraph 72.

73.     Csupó lacks sufficient information or knowledge to form a belief about the allegations in Paragraph 73 as to how or whether YouTube has been damaged. Paragraph 73 also contains a legal conclusion about the proper measure of damages to which no response is required. Csupó otherwise denies the allegations in Paragraph 73.

74.     Paragraph 74 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 74.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                                    3:20-cv-4423

75.     Paragraph 75 contains legal conclusions to which no response is required. Csupó otherwise denies the allegations in Paragraph 75.

**COUNTERCLAIM III: Against Pirate Monitor LTD, Pirate Monitor LLC, And Gábor Csupó**

**(In the Alternative to Counterclaims I & II)**

**Violation of 17 U.S.C. § 512(f)**

76.     Csupó reiterates his responses to the preceding paragraphs of this Answer to the Counterclaims as if fully set forth herein.

77.     Paragraph 77 contains a legal conclusion to which no response is required. Csupó otherwise denies the allegations in Paragraph 77.

78.     Paragraph 78 contains a legal conclusion to which no response is required. Csupó admits that takedown notices were sent by some entity and that Gábor Csupó's electronic signature appears on the takedown notices. Csupó otherwise denies the allegations in Paragraph 78.

79.     Paragraph 79 contains a legal conclusion to which no response is required. Csupó admits that takedown notices were sent by some entity, that his electronic signature appears on the takedown notices, that the takedown notices represented that the entity sending taking the takedown notices was authorized to represent MegaFilm, and that the videos that were the subject of the takedown notice infringed copyrights.

80.     Csupó denies the allegations in Paragraph 80.

81.     Csupó denies the allegations in Paragraph 81.

82.     Paragraph 82 contains a legal conclusion to which no response is required. Csupó lacks sufficient information or knowledge to form a belief about YouTube's reliance or the reasonableness of its reliance. Csupó otherwise denies the allegations in Paragraph 82.

83.     Csupó lacks sufficient information or knowledge to form a belief about YouTube's costs of processing takedown notices or costs expended to investigate and disrupt alleged deceptive behavior. Csupó otherwise denies the allegations in Paragraph 83.

84.     Csupó admits that Pirate Monitor wishes to obtain access to Content ID. Csupó otherwise denies the allegations in Paragraph 84.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

85.     Paragraph 85 contains legal conclusions to which no response is required. Csupó lacks sufficient information or knowledge to form a belief about YouTube's reliance, its ability to detect fraudulent behavior, or whether it has any ready means to calculate harm to YouTube. Csupó otherwise denies the allegations in Paragraph 85.

**PRAYER FOR RELIEF**

YouTube, LLC's and Google LLC's Prayer for Relief contains legal conclusions to which no response is required. To the extent a response is required, Csupó denies that there are sufficient factual or legal predicates in the Counterclaim for the relief requested in subparagraphs (a)-(e).

**AFFIRMATIVE DEFENSES**

**Unclean Hands**

1.      YouTube's website has been repeatedly used for the upload of videos infringing on copyrights. YouTube is aware that its website is repeatedly used to infringe copyrights, and YouTube knowingly encourages, permits, and assists this behavior, including by not offering Content ID to everyone with valid copyrights, not pre-screening uploads for potential copyright infringement prior to the videos becoming publicly available, not responding appropriately and in a timely manner to valid takedown notices, making it easy for users to share copyright infringing videos with others, implementing search and Autoplay algorithms that influence the videos watched by others regardless whether the videos that are being promoted or automatically played without user input are infringing videos, and by removing Copyright Management Information that would enable copyright holders to more accurately identify infringement or receive credit for their works and by distributing, reproducing, and publicly displaying and performing infringing videos with knowledge that the uploaders have removed Copyright Management Information.

2.      Specifically, YouTube's website has been used to reproduce, distribute, publicly display, and publicly perform videos infringing on copyrighted works owned by Pirate Monitor. YouTube's website has continued to reproduce, distribute, publicly display, and publicly perform Pirate Monitor's copyrighted works even after receiving valid takedown notices from Pirate Monitor in connection with one or more of its copyrighted works, which gave YouTube actual and constructive knowledge that its website was being used to infringe Pirate Monitor's copyrighted works.

3.      Pirate Monitor has sent YouTube valid takedown notices with respect to videos on its website that infringe Pirate Monitor's copyrighted works, which YouTube has refused to accept and upon receipt of which YouTube did not remove the infringing video.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                                    3:20-cv-4423

4.      YouTube has a tool called Content ID which, if extended to Pirate Monitor's copyrighted works, would prevent most, if not all, subsequent use of its website to infringe Pirate Monitor's copyrighted works. Pirate Monitor applied for Content ID. Despite Pirate Monitor having copyrighted works, despite YouTube being on notice that its website has been used to infringe Pirate Monitor's copyrighted works, despite Pirate Monitor having applied for Content ID, and despite YouTube having the capability through Content ID to prevent most or all subsequent infringement of Pirate Monitor's copyrighted works, YouTube has refused to grant Pirate Monitor access to Content ID. As a result, Pirate Monitor's works have continued to be infringed.

5.      YouTube's conduct in permitting, knowing of, and/or encouraging the continued infringement of Pirate Monitor's copyrighted works despite having the ability to remove present infringement and to prevent most, if not all, future infringement is inequitable.

6.      YouTube's inequitable conduct, which concerns the knowing facilitation of infringements of Pirate Monitor's copyrighted works, is directly related to its claims against Pirate Monitor and Csupó, which allegedly concern Pirate Monitor's efforts to obtain access to Content ID to prevent infringement of its copyrighted works.

7.      YouTube's conduct described in allegations 1-6 of Csupó's affirmative defenses injured Pirate Monitor and Csupó by permitting videos infringing Pirate Monitor's works to be publicly viewable worldwide free of charge.

**In Pari Delicto**

8.      YouTube realleges and incorporates by reference the allegations in paragraphs 1 through 5 above.

9.      YouTube's actions described in paragraphs 1 through 5 of permitting, knowing of, and/or encouraging infringement are related to and at least substantially equal to Csupó's alleged wrongdoing.

10.     Because YouTube's wrongdoing is at least substantially equal to Csupó's alleged wrongdoing, this Court should not lend its good offices to mediating this dispute.

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

1       11.     Denying judicial relief to YouTube because of the actions described in paragraphs 1

2  through 5 is an effective means of deterring illegality.

3                                    **Failure to Mitigate Damages**

4       12.     YouTube had an obligation to use reasonable efforts to mitigate any damages caused by

5  the allegations against Csupó.

6       13.     YouTube failed to use reasonable efforts to mitigate any damages caused by the

7  allegations against Csupó. Meet and confer discussions regarding discovery has confirmed that

8  YouTube purports to have incurred and continues to incur more costs than were reasonably necessary

9  to remedy the alleged misconduct.

10                                  **DEMAND FOR JURY TRIAL**

11      Csupó demands a trial by jury on all issues so triable.

12

13      Dated: March 17, 2021                          Respectfully submitted,

14                                                      /s/ Randall P. Ewing, Jr.
                                                        George A. Zelcs (pro hac vice)
15                                                      Randall P. Ewing, Jr. (pro hac vice)
                                                        Ryan Z. Cortazar (pro hac vice)
16                                                      KOREIN TILLERY, LLC
                                                        205 North Michigan, Suite 1950
17                                                      Chicago, IL 60601
                                                        Telephone: (312) 641-9750
18                                                      Facsimile: (312) 641-9751

19                                                      Stephen M. Tillery (pro hac vice)
                                                        Steven M. Berezney, CA Bar #329923
20                                                      Carol O'Keefe (pro hac vice)
                                                        KOREIN TILLERY, LLC
21                                                      505 North 7th Street, Suite 3600
                                                        St. Louis, MO 63101
22                                                      Telephone: (314) 241-4844
                                                        Facsimile: (314) 241-3525
23

24                                                      Joshua Irwin Schiller, CA Bar #330653
                                                        BOIES SCHILLER FLEXNER LLP
25                                                      44 Montgomery St., 41st Floor
                                                        San Francisco, CA 94104
26                                                      Phone: (415) 293-6800
                                                        Fax: (415) 293-6899

27                                                      Philip C. Korologos (pro hac vice)
28                                                      Joanna Wright

                                                15

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Maria Schneider,*
*Pirate Monitor Ltd., and Gábor Csupó*

Gábor Csupó's Answer to Defendants' Amended Counterclaims                    3:20-cv-4423

# Exhibit D

George A. Zelcs *(pro hac vice)*
  gzelcs@koreintillery.com
Randall P. Ewing, Jr. *(pro hac vice)*
  rewing@koreintillery.com
Ryan Z. Cortazar *(pro hac vice)*
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery *(pro hac vice)*
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe *(pro hac vice)*
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
  jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone:  (415) 293-6800
Facsimile: (415) 293-6899

*Attorneys for Gábor Csupó*

Philip C. Korologos *(pro hac vice)*
  pkorologos@bsfllp.com
Joanna C. Wright *(pro hac vice)*
  jwright@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Telephone:  (212) 446-2300
Facsimile: (212) 446-2350

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER, individually and on behalf of all others similarly situated; | |
| Plaintiff, | CASE NO.  3:20-cv-4423-JD |
| vs. | **COUNTER-DEFENDANT GÁBOR CSUPÓ'S OBJECTIONS AND RESPONSES TO YOUTUBE AND GOOGLE'S FIRST SET OF INTERROGATORIES** |
| YOUTUBE, LLC; and GOOGLE LLC; | |
| Defendants. | |
| YOUTUBE, LLC and GOOGLE LLC; | |
| Counter-Plaintiffs, | |
| v. | |
| PIRATE MONITOR LTD., GÁBOR CSUPÓ, and PIRATE MONITOR LLC, | |
| Counter-Defendants. | |

Pursuant to Federal Rules of Civil Procedure 26 and 33, Counterclaim Defendant Gábor Csupó ("Counter-Defendant" or "Csupó") submits the following responses and objections to Defendants YouTube, LLC's ("YouTube") and Google LLC's ("Google") (collectively "Defendants") First Set of Interrogatories to Counterclaim Defendant Gábor Csupó, dated May 20, 2021 (the "Requests"), in the above-captioned action (the "Action").

By submitting these Responses, Csupó does not intend to concede or waive any arguments regarding the scope, relevance, and timing of any discovery in the Action.

Csupó's discovery and preparation for trial of this matter are not complete as of the date of these Responses and are continuing. Csupó anticipates that discovery and preparation for trial will reveal additional information not presently known to him, but upon which he may rely. These Responses to the Requests are based upon information currently known or believed to be true by

Csupó. Csupó reserves the right to modify or supplement these Responses upon completion of discovery and preparation for trial of this matter, and to use at trial, or in any motion or deposition, any documents, facts, or supporting evidence of any sort later developed or discovered.

Csupó reserves the right to amend or revise these Responses, including based on any responses or objections submitted by Defendants to any of Csupó's discovery requests. Csupó also asserts that any discovery obligations should be mutual between parties, so that if any of Csupó's objections are overridden, Defendants should be subject to the same scope of discovery, including definitions and instructions for discovery compliance.

### GENERAL OBJECTIONS

1. Csupó objects to the Interrogatories to the extent they impose obligations in addition to those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, any court governing discovery in this case, or any discovery protocol agreed upon by the parties.

2. Csupó objects to the Interrogatories, and to each Definition and specific Request contained therein, insofar as they seek information not in Csupó's possession, custody, or control. Csupó further objects to the Requests to the extent they seek documents and information that Csupó does not have the practical ability to obtain or which would be unreasonably burdensome to identify or to obtain.

3. Csupó objects to the extent the Interrogatories seek information that is already in Defendants' possession, is equally accessible to Defendants, or is readily accessible to Defendants.

4. Csupó further objects to the Interrogatories to the extent that the burden of deriving an answer from other sources of discovery will be substantially the same for Defendants as it is for Csupó.

5. Csupó objects to the Interrogatories to the extent they seek information that Defendants can obtain from sources that are more convenient, less burdensome, or less expensive.

6. Csupó objects to the Interrogatories to the extent they seek information protected by the attorney/client privilege, the work-product doctrine, Rule 408 of the Federal Rules of Evidence, any common interest privilege, any joint defense agreement, or any other applicable privilege.

7. Csupó further objects to the Interrogatories to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity or unreasonable, or otherwise seek the discovery of information that is neither relevant to the claims or defenses of any party to this action nor reasonably calculated to lead to the discovery of admissible evidence.

8. Csupó objects to the Interrogatories to the extent they are propounded for the improper purpose of annoying or harassing Csupó.

Csupó's responses are based solely on facts reasonably known to Csupó at the time of responding to these Interrogatories. Csupó reserves the right to supplement, amend, or otherwise modify these responses.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Csupó objects to the extent that Defendants' Definitions and Instructions seek information covered by privilege(s), including the attorney-client and attorney work product privileges. *See, e.g.*, Defendants' Definition No. 1.

2. Csupó objects to the extent that Defendants' Definitions and Instructions require him to respond based on information or knowledge possessed by someone else or another entity, or actions taken by someone else or another entity. *See, e.g.*, Defendants' Definition No. 1. Csupó responds based on his personal knowledge and actions only.

## SPECIFIC OBJECTIONS AND RESPONSES

The General Objections and Objections to Definitions and Instructions set forth above are incorporated into the Specific Objections below, as if incorporated therein. Csupó reserves the right to amend or revise his Specific Objections and Responses, including after meeting and conferring with Defendants regarding any Request.

1   **INTERROGATORY NO. 1: Identify each individual or entity who has performed services on**

2   **Your behalf in connection with any matter set forth in the Amended Counterclaims, including**

3   **but not limited to employees, officers, directors, managers, agents, independent contractors,**

4   **and shareholders.**

5   **OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks

6   information irrelevant to the claims and defenses in this lawsuit. Csupó also objects to the term "services"

7   and the phrase "any matter set forth in the Amended Counterclaims" as vague and ambiguous. Subject

8   to and without waiving these objections, the General Objections, and the Objections to Definitions and

9   Instructions, Csupó responds that no other individual or entity performed services on his behalf in his

10  personal capacity in connection with matters set forth in the Amended Counterclaims.

11  **INTERROGATORY NO. 2: Describe the nature of the services provided by any individual or**

12  **entity who has performed services on Your behalf in connection with any matter set forth in the**

13  **Amended Counterclaims, including but not limited to employees, officers, directors, managers,**

14  **agents, independent contractors, and shareholders.**

15  **OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks

16  information irrelevant to the claims and defenses in this lawsuit. Csupó also objects to the term

17  "services" and the phrase "any matter set forth in the Amended Counterclaims" as vague and

18  ambiguous. Subject to and without waiving these objections, the General Objections, and the

19  Objections to Definitions and Instructions, Csupó responds that no other individual or entity

20  performed services on his behalf in his personal capacity in connection with matters set forth in the

21  Amended Counterclaims.

22  **INTERROGATORY NO. 3: Identify the name of the "entity" referenced in paragraphs 35-36**

23  **of Your Answer to the Amended Counterclaims and the "entity not named in [YouTube's]**

24  **counterclaim [that] was responsible for MegaFilm's copyright enforcement" referenced in the**

25  **Preliminary Statement of Your Answer.**

26

27

28

**OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory seeks information irrelevant to the claims and defenses in this lawsuit. Subject to and without waiving these objections, the General Objections, and the Objections to Definitions and Instructions, Csupó responds that the "entity" referenced is Intellectual Property LLC.

**INTERROGATORY NO. 4: Describe in detail the circumstances under which You first became aware of the videos uploaded to YouTube that were the subject of the DMCA "Takedown Notices" that have Your authorized signature and were provided to YouTube pursuant to 17 U.S.C. § 512(c)(3) in 2019, including any and all methods (including software or computer programs) used to detect those programs.**

**OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks information irrelevant to the claims and defenses in this lawsuit. Subject to and without waiving these objections, the General Objections, and the Objections to Definitions and Instructions, Csupó responds that he did not become aware of the videos uploaded to YouTube that were the subject of the DMCA "Takedown Notices" referenced in the Amended Counterclaims before they were sent.

**INTERROGATORY NO. 5: Identify each individual and/or entity involved in the preparation and/or sending of all DMCA "Takedown Notices" that have Your authorized signature and were provided to YouTube pursuant to 17 U.S.C. § 512(c)(3).**

**OBJECTIONS AND RESPONSE:** Subject to and without waiving the General Objections and the Objections to Definitions and Instructions, Csupó responds that Zoltán Búzás was involved in preparing and/or sending all DMCA "Takedown Notices" to YouTube that have his authorized signature and that are referenced in the Amended Counterclaims.

**INTERROGATORY NO. 6: Explain the nature of Your relationship to Pirate Monitor LLC.**

**OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks information irrelevant to the claims and defenses in this lawsuit. Csupó also objects to the term "relationship" and the phrase "explain the nature of Your relationship" as vague and ambiguous. Subject to and without waiving these objections, the General Objections, and the Objections to Definitions and

Instructions, Csupó responds that he has no relationship with any business entity bearing the name Pirate Monitor LLC.

**INTERROGATORY NO. 7: Explain Your basis for using the name "Pirate Monitor LLC" in DMCA "Takedown Notices" that have Your authorized signature and were provided to YouTube pursuant to 17 U.S.C. § 512(c)(3).**

**OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks information irrelevant to the claims and defenses in this lawsuit. Csupó also objects to the phrase "Explain Your basis for using" as vague and ambiguous. Subject to and without waiving these objections, the General Objections, and the Objections to Definitions and Instructions, Csupó responds that YouTube's Copyright Complaint Submission requires the sender to identify the YouTube channel username through which the request was sent, and in such instances the relevant YouTube channel username was Pirate Monitor LLC.

**INTERROGATORY NO. 8: Explain the nature of Your relationship to Intellectual Property LLC.**

**OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks information irrelevant to the claims and defenses in this lawsuit. Csupó also objects to the term "relationship" and the phrase "Explain the nature of Your relationship" as vague and ambiguous. Subject to and without waiving these objections, the General Objections, and the Objections to Definitions and Instructions, Csupó responds that he is a Director and Shareholder of Intellectual Property LLC.

**INTERROGATORY NO. 9: Explain the nature of Your relationship to Start Corporate Services PTE. LTD.**

**OBJECTIONS AND RESPONSE:** Csupó objects that this interrogatory is vague and seeks information irrelevant to the claims and defenses in this lawsuit. Csupó also objects to the term "relationship" as vague and ambiguous. Subject to and without waiving these objections, the General Objections, and the Objections to Definitions and Instructions, Csupó responds that he has no relationship to Start Corporate Services PTE. LTD.

**VERIFICATION**

Gábor Csupó has read the foregoing responses to Defendants' Interrogatories, and the answers contained therein are true to the best of his knowledge, information, and belief.

Signed:     /s/ Gábor Csupó

Dated:     June 24, 2021

Dated: June 24, 2021

Respectfully submitted,

/s/ Randall P. Ewing, Jr.
George A. Zelcs *(pro hac vice)*
Randall P. Ewing, Jr. *(pro hac vice)*
Ryan Z. Cortazar *(pro hac vice)*
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery *(pro hac vice)*
Steven M. Berezney, CA Bar #329923
Michael E. Klenov, CA Bar #277028
Carol O'Keefe *(pro hac vice)*
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Phone: (415) 293-6800
Fax: (415) 293-6899

Philip C. Korologos *(pro hac vice)*
Joanna C. Wright *(pro hac vice)*
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Gábor Csupó*

**1**

### CERTIFICATE OF SERVICE

**2**

I hereby certify that on June 24, 2021, I caused the foregoing Counter-Defendant Gábor

**3**

Csupó's Objections and Responses to YOUTUBE's and GOOGLE'S First Set of
Interrogatories to Gábor Csupó to be served on all opposing counsel of record by  email

**4**

at the  address listed below:

**5**

Schneidervyoutube@wsgr.com

**6**

 /s/ Randall P. Ewing, Jr.

**7**

**8**

**9**

**10**

**11**

**12**

**13**

**14**

**15**

**16**

**17**

**18**

**19**

**20**

**21**

**22**

**23**

**24**

**25**

**26**

**27**

**28**

# Exhibit E

*Wilson Sonsini Goodrich & Rosati - New York, NY 1301 Avenue Of The Americas - 40th Floor New York, NY 10019*

## AFFIDAVIT OF SERVICE

Client's File No.: _____

Civil Action #: __3:20-cv-04423-JD__

Date Filed: _____

: _____

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF CALIFORNIA



*MARIA SCHNEIDER, et al.,*

*Plaintiff*

*vs*

*YOUTUBE, LLC, et al.,*

*Defendant*

STATE OF  DELAWARE COUNTY OF   NEW CASTLE  SS.:

The undersigned being duly sworn deposes and says: that deponent is not a party to this action, is over 18 years of age and resides in the State of  Delaware

That on the following date:   June 2, 2021   , at the following time:   3:33 PM   ,

at   16192 COASTAL HIGHWAY, LEWES, DE 19958   deponent served the within

Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13) and Attachment A and Exhibits

[X]  Papers so served were properly endorsed with the Civil Action #.

**Upon:**   INTELLECTUAL PROPERTY LLC, C/O HARVARD BUSINESS SERVICES, INC., REGISTERED AGENT

[ ] **Individual**    By delivering a true copy thereof to said recipient personally; deponent knew the person so served to be the individual described

[ ] **Responsible Person**    By delivering to and leaving with _____ , _____
a true copy thereof, a person of suitable age and discretion. Said premises being the defendant / respondent's    **Relationship**
[ ] dwelling place    [ ] place of business/employment    [ ] last known address within the State.    [ ] usual place of abode

[ ] **Mail**    A copy thereof was deposited in a postpaid, properly addressed envelope, marked "Personal and Confidential" in a depository maintained by the U. S. P. S. and mailed First Class mail to the above address _____
on

[X] **Corporation LLC / LLP**    By delivering to and leaving with   Gary Damini   said individual to be   Managing Agent
who specifically stated he/she was authorized to accept service on behalf of the Corporation/Government Agency/Entity.

[ ] **Affixing To Door**    By affixing a true copy thereof to the door, being the defendant/respondent's   [ ] dwelling place    [ ] place of business/employment
[ ] last known address within the State. [ ] usual place of abode

[ ] **Previous Attempts**    Deponent previously attempted to serve the above named defendant/respondent on:

**Description of Recipient**   Sex:  Male    Color of skin   White    Color of hair:   Bald    Age:   36 - 50 Yrs.    Height:   5ft 4inch - 5ft 8inch
Weight:   161-200 Lbs.    Other Features: _____

[ ] **WITNESS FEES**    Subpoena Fee Tendered in the amount of  $.

[ ] **MILITARY SERVICE**    I asked the person spoken to whether defendant was in active military service of the United States in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

[ ] **Other**

Sworn to before me on    June 3, 2021 _____

_KIMBERLY J. Ryan_

*6/3/2021*

PROCESS SERVER - PRINT NAME BELOW SIGNATURE
Sharlene Brooks

PROCESS SERVER LICENSE #  No #s in DE

**KIMBERLY J. RYAN**
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires March 31, 2024

**Work Order #  1452041**

# Exhibit F

1   DAVID H. KRAMER, State Bar No. 168452
    MAURA L. REES, State Bar No. 191698
2   LAUREN GALLO WHITE, State Bar No.
    309075
3   WILSON SONSINI GOODRICH &
    ROSATI
4   Professional Corporation
    650 Page Mill Road
5   Palo Alto, CA 94304-1050
    Telephone: (650) 493-9300
6   Facsimile: (650) 565-5100
    Email: dkramer@wsgr.com
7          mrees@wsgr.com
           lwhite@wsgr.com
8

BRIAN M. WILLEN (admitted *Pro Hac
Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com

9   Attorneys for Defendants and Counterclaimants
    YOUTUBE, LLC and GOOGLE LLC

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13  MARIA SCHNEIDER, individually and on          )   CASE NO.: 3:20-cv-04423-JD
    behalf of all others similarly situated,      )
14                                                )   **NOTICE OF DEFENDANTS AND
                                                  )   COUNTERCLAIMANTS
15              Plaintiff,                         )   YOUTUBE, LLC AND GOOGLE
                                                  )   LLC'S NON-PARTY DOCUMENT
16         v.                                     )   SUBPOENA TO INTELLECTUAL
                                                  )   PROPERTY LLC**
17  YOUTUBE, LLC and GOOGLE LLC,                  )
                                                  )
18              Defendants.                       )   Judge: Hon. James Donato
                                                  )
19                                                )
                                                  )
20  _____             )
                                                  )
21  YOUTUBE, LLC and GOOGLE LLC,                  )
                                                  )
22              Counterclaimants,                 )
                                                  )
23         v.                                     )
                                                  )
24  PIRATE MONITOR LTD, PIRATE MONITOR            )
    LLC, and GÁBOR CSUPÓ,                         )
25                                                )
                Counterclaim Defendants.          )
26  _____             )

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 45, Defendants and Counterclaimants YouTube, LLC and Google LLC, by and through their counsel, hereby serve a subpoena for the production of documents on non-party Intellectual Property LLC. Consistent with the subpoena, the production of documents must be completed by June 24, 2021, at the offices of Wilson Sonsini Goodrich & Rosati P.C., 222 Delaware Avenue, Suite 800, Wilmington, DE 19801; or by electronic mail to Maura L. Rees at mrees@wsgr.com; or at such other time and place as may be agreed.

Dated:  June 1, 2021                    WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation

                                        By:_____/s/ Maura L. Rees_____
                                                Maura L. Rees

                                        Attorneys for Defendants and Counterclaimants
                                        YOUTUBE, LLC and GOOGLE LLC

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

### Northern District of California

| | |
|---|---|
| Maria Schneider, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 3:20-cv-04423-JD |
| YouTube, LLC, et al. | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Intellectual Property LLC, c/o Agent for Service of Process
Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, DE 19958

_(Name of person to whom this subpoena is directed)_

☛ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment A

| Place: Wilson Sonsini Goodrich & Rosati, P.C. | Date and Time: |
|---|---|
| 222 Delaware Avenue, Suite 800 | |
| Wilmington, DE 19801-5225 | 06/24/2021 10:00 am |

❏ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/01/2021

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | |
| _Signature of Clerk or Deputy Clerk_ | | /s/ Maura L. Rees |
| | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Defendants and Counterclaimants YouTube, LLC and Google LLC , who issues or requests this subpoena, are:
Maura L. Rees; WSGR, 650 Page Mill Road, Palo Alto, CA 94304; (650) 493-9300; mrees@wsgr.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  3:20-cv-04423-JD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

Pursuant to Federal Rule of Civil Procedure 45, Defendants and Counterclaimants YouTube, LLC ("YouTube") and Google LLC ("Google") (collectively, "Counterclaimants") request that Intellectual Property LLC produce the following documents and things for inspection and copying by June 24, 2021 at the offices of Wilson Sonsini Goodrich & Rosati P.C., 222 Delaware Avenue, Suite 800, Wilmington, DE 19801; or by electronic mail to Maura L. Rees at mrees@wsgr.com; or at such other time and place as may be agreed.

**DEFINITIONS**

1.      "IPLLC," "You," or "Your" means Intellectual Property LLC; USIPLLC; and their employees, agents, officers, representatives, contractors, lawyers, affiliates, or any person or entity acting on their behalf or direction or under their control.

2.      "Counterclaim Defendants" means and includes Pirate Monitor LTD, Pirate Monitor LLC, and/or Gábor Csupó.

3.      "DMCA" means the Digital Millennium Copyright Act, 17 U.S.C. §§ 101 *et seq*.

4.      "Takedown Notice" means a notice sent pursuant to 17 U.S.C. § 512(c)(3) notifying the recipient of asserted infringement.

5.      "Pirate Monitor LTD" means and includes Pirate Monitor LTD and/or (i) all of its affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations, and assigns; (ii) all of its present and former officers, directors, managers, employees, representatives, agents, accountants, investigators, independent contractors, and attorneys; (iii) any other person acting or purporting to act on its behalf or acting at its direction; or (iv) any other person otherwise subject to its control, which controls it, or is under common control with it.

6. "Pirate Monitor LLC" means and includes Pirate Monitor LLC and/or (i) all of its affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations, and assigns; (ii) all of its present and former officers, directors, managers, employees, representatives, agents, accountants, investigators, independent contractors, and attorneys; (iii) any other person acting or purporting to act on its behalf or acting at its direction; or (iv) any other person otherwise subject to its control, which controls it, or is under common control with it.

7. "Gábor Csupó" means and includes Gábor Csupó as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

8. "Endre Holman" means and includes Endre Holman as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

9. "Zoltán Búzás" means and includes Zoltán Búzás as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

10. "PirateMonitor" means the software system that IPLLC uses to detect and/or monitor copyrighted works that appear on the internet.

11. "Megafilm" means and includes Megafilm Kft. and/or (i) all of its affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations, and assigns; (ii) all of its present and former officers, directors, managers, employees, representatives, agents, accountants, investigators, independent contractors, and attorneys, including without limitation Gábor Kálomista; (iii) any other person acting or purporting to act on

its behalf or acting at its direction; or (iv) any other person otherwise subject to its control, which controls it, or is under common control with it.

12.    "Sarfraz Arshad Khan" or "Khan" means and includes Sarfraz Arshad Khan as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

13.    "Ransom Nova" means any person or persons who uploaded videos to YouTube or otherwise used YouTube's service using (i) the YouTube account or username "ransom nova"; (ii) a YouTube account or username consisting of variants of "ransom nova," including but not limited to "ransom nova11" and "ransomnova12"; and/or (iii) a YouTube account associated with one or more email addresses consisting of variants of ransomnova@gmail.com.

14.    "YouTube Copyright Protection Service" means any tool, software, program, or service offered by YouTube to enable copyright owners to identify or prevent the presence of their copyrighted content on the YouTube service, whether by employing descriptive search, audio fingerprinting, video fingerprinting, filtering, hashing, or other copyright protection technology, including without limitation all versions of the following tools and programs offered by YouTube: "Content Verification Program," "Copyright Match Tool," "Copyright Verification Tool," and "Content ID System."

15.    "Communications" means and includes communications in any form, including without limitation communications via Facebook Messenger or any other messaging service, application, or website.

16.    "Lawsuit" means *Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.).

17.    "Amended Counterclaims" means the amended counterclaims asserted in this Lawsuit, a copy of which is annexed hereto as **Exhibit 1**.

**INSTRUCTIONS**

1.      All responsive nonprivileged documents in the possession, custody, or control of IPLLC or its employees or contractors are to be produced. If, after exercising due diligence to secure the documents requested, you cannot produce all responsive documents, so state, produce to the extent possible, specify the reasons why you were unable to provide a full and complete response, and state what information and knowledge You do have concerning the unproduced portion.

2.      If You decline to produce any document or part thereof based on a claim of privilege or any other claim, please provide a privilege log in accordance with Federal Rule of Civil Procedure 26(b)(5).

3.      Pursuant to Federal Rule of Civil Procedure 45(e)(1)(B), you are obligated to produce all documents made available for inspection pursuant to this Subpoena as those documents are kept in the usual course of business, including their original form and sequence.

**DOCUMENT REQUESTS**

**DOCUMENT REQUEST NO. 1:**

Documents sufficient to identify IPLLC's current and former members, owners, shareholders, officers, directors, managers, employees, agents, and independent contractors and their positions.

**DOCUMENT REQUEST NO. 2:**

Documents reflecting IPLLC's observance of corporate formalities, including without limitation its Certificate of Formation, Operating Agreement, filings with the Delaware Department of State, capitalization, financial statements, and minutes of member meetings.

**DOCUMENT REQUEST NO. 3:**

All documents constituting, referring or relating to any agreements between You and any Counterclaim Defendant or between You and Megafilm.

**DOCUMENT REQUEST NO. 4:**

All documents that refer or relate to any Counterclaim Defendant, Megafilm and/or YouTube's Copyright Protection Services.

**DOCUMENT REQUEST NO. 5:**

All documents and Communications relating to DMCA Takedown Notices sent by You to YouTube, including without limitation Takedown Notices listing the email address usintellectualpropertyllc@gmail.com.

**DOCUMENT REQUEST NO. 6:**

All documents and Communications, relating to the videos that were the subject of DMCA Takedown Notices sent to YouTube listing the email address usintellectualpropertyllc@gmail.com.

**DOCUMENT REQUEST NO. 7:**

All Communications between You and Sarfraz Arshad Khan and/or Ransom Nova including but not limited to those regarding YouTube or Google, any matter set forth in the Amended Counterclaims, any matter related to this Lawsuit, any agreements between You and Khan and/or Ransom Nova, or any payments made by You to Khan and/or Ransom Nova.

**DOCUMENT REQUEST NO. 8:**

All documents and Communications concerning YouTube accounts created or used by Sarfraz Arshad Khan and/or Ransom Nova and any videos uploaded to such accounts.

**DOCUMENT REQUEST NO. 9:**

All Communications between You and Endre Holman and/or Zoltán Búzás concerning YouTube or Google, any matter set forth in the Amended Counterclaims, or any matter related to this Lawsuit.

**DOCUMENT REQUEST NO. 10:**

All documents and Communications concerning PirateMonitor and YouTube or Google, including but not limited to those regarding any matter set forth in the Amended Counterclaims, or any matter related to this Lawsuit.

# Exhibit 1

DAVID H. KRAMER, State Bar No. 168452
MAURA L. REES, State Bar No. 191698
LAUREN GALLO WHITE, State Bar No.
309075
WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
        mrees@wsgr.com
        lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants.<br>_____<br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC and GÁBOR CSUPÓ,<br><br>Counterclaim Defendants. | CASE NO.: 3:20-cv-04423-JD<br><br>**DEFENDANTS AND COUNTERCLAIMANTS YOUTUBE, LLC AND GOOGLE LLC'S AMENDED COUNTERCLAIMS** |

1

**COUNTERCLAIMS**

2     Counterclaimants Google LLC and YouTube, LLC (collectively "YouTube") assert the

3 following Counterclaims against Pirate Monitor LTD, Pirate Monitor LLC (except where

4 otherwise indicated, Pirate Monitor LTD and Pirate Monitor LLC are referred herein together as

5 "Pirate Monitor") and Gábor Csupó ("Csupó"), on personal knowledge as to YouTube's own

6 actions and on information and belief as to the actions of others, as follows:

7     1.     Working together, Pirate Monitor and Csupó misused the YouTube service and

8 engaged in a fraudulent scheme to obtain access to YouTube's copyright management systems.

9 Using false identities and/or agents in an attempt to hide their involvement, Pirate Monitor and

10 Csupó uploaded roughly two thousand videos to YouTube, each time representing that they had

11 the rights to upload that content and that the content did not infringe any third party copyrights.

12 Shortly thereafter, Pirate Monitor and Csupó invoked the notice-and-takedown provisions of the

13 Digital Millennium Copyright Act ("DMCA") to demand that YouTube remove the very same

14 videos that Pirate Monitor and Csupó had uploaded. In those notices, Pirate Monitor and Csupó

15 represented that the videos were infringing their copyrights or those of copyright owners they

16 claimed to represent.

17     2.     Pirate Monitor and Csupó violated the law. Either they lied to YouTube when

18 they uploaded the videos in the first place, or lied when they demanded their removal. Their

19 misrepresentations were intended to fool YouTube into believing that they could be trusted not to

20 abuse YouTube's powerful copyright management tools, including Content ID. And their

21 machinations render them liable to YouTube for breach of contract and fraud or, alternatively,

22 violations of Section 512(f) of the DMCA.

23

**THE PARTIES**

24     3.     **Counterclaim Plaintiff Google** is a Delaware limited liability company with its

25 principal place of business in Mountain View, California. YouTube, a Google subsidiary, is a

26 Delaware limited liability company with its principal place of business in San Bruno, California.

27

28

YouTube offers an online platform, including a website and mobile applications, that, among other things, enables users to share videos they post with a global audience at no charge.

4.      **Counterclaim Defendant Pirate Monitor LTD**, a Plaintiff in this action, is a limited company claiming a principal place of business at Intershore Chambers, 3rd Floor, Geneva Place, Road Town, Tortola, VG1110 British Virgin Islands. Pirate Monitor LTD itself, or through agents and related entities, has operations in Hungary and California, but has not registered to do business in California. Pirate Monitor LTD claims in the Complaint to own the copyrights to certain works through assignment from Hungarian movie producer Mega Film Kft ("Mega Film"). Pirate Monitor LTD is a shell corporation set up principally if not exclusively for purposes of pursuing this action and furthering the unlawful scheme described below.

5.      At the time of the filing of this pleading, despite filing this lawsuit against YouTube more than seven months ago, Pirate Monitor LTD has failed to produce a single document in response to YouTube's discovery requests that were served on October 12, 2020. YouTube's requests seek, among other things, information regarding Pirate Monitor LTD's corporate structure, identification of its agents and affiliates, its operations, its capitalization, and its observance of corporate formalities. Pirate Monitor LTD has not even indicated if or when document production will start. Pirate Monitor LTD is withholding the requested documentation in a further effort to conceal the facts regarding the misconduct about which YouTube complains, along with the identity of the individuals and entities involved.

6.      **Counterclaim Defendant Gábor Csupó** is an individual, a Hungarian film director and a resident of California. Csupó is the managing director, sole stockholder, sole decision maker, and alter ego of Pirate Monitor LTD. From what YouTube has been able to piece together given Pirate Monitor LTD's refusal to provide any discovery, Pirate Monitor LTD has no principals or employees other than Csupó. It is inadequately capitalized, disregards corporate formalities, and commingles funds and other assets with Csupó. Csupó dominates and controls Pirate Monitor LTD to such an extent that it has no separate corporate personality. So thorough is Csupó's dominance of Pirate Monitor LTD that, if the actions of Pirate Monitor LTD

1  alleged herein were treated as those of Pirate Monitor LTD alone, and not those of Csupó, it

2  would lead to an inequitable result. Csupó created Pirate Monitor LTD after his personal liability

3  for the acts alleged herein first arose, and his misuse of the corporate form is continuing. As a

4  result, Csupó is responsible, and personally liable for, not only his own actions, but the acts of

5  Pirate Monitor LTD as well.

6          7.      **Counterclaim Defendant Pirate Monitor LLC** represented itself to YouTube as

7  a business entity, but YouTube has not found corporate registration information for a "Pirate

8  Monitor LLC" anywhere in the world, and Pirate Monitor LTD has not provided any discovery

9  on the question. Instead, it appears that Pirate Monitor LLC is merely an unincorporated d/b/a of

10  Csupó. If Pirate Monitor LLC actually exists as a corporate entity at all, it is indistinguishable

11  from Pirate Monitor LTD. Pirate Monitor LTD does not view Pirate Monitor LLC as an entity

12  distinct from itself. In Paragraph 13 of its Complaint in this action, Pirate Monitor LTD alleges

13  that it has applied for and been denied access to Content ID and that it has sent "successful

14  takedown requests" to YouTube. But, according to YouTube's records, the only Pirate Monitor

15  entity that has applied for Content ID or sent "successful takedown notices" to YouTube is the

16  entity calling itself "Pirate Monitor LLC." By claiming Pirate Monitor LLC's actions as its own

17  in the Complaint (in allegations that are central to its claim to represent a putative class), Pirate

18  Monitor LTD has demonstrated that it believes itself to be, and holds itself out as, functionally

19  the same entity as Pirate Monitor LLC.

20          8.      No matter what Pirate Monitor LLC's corporate status, Csupó is responsible for

21  the acts of Pirate Monitor LLC. Insofar as Pirate Monitor LLC is an unincorporated d/b/a of

22  Csupó, Pirate Monitor LLC's actions are Csupó's actions, and Csupó is personally liable for

23  them. Alternatively, insofar as Pirate Monitor LLC actually exists as a corporate entity, Csupó is

24  the alter ego of Pirate Monitor LLC. From what YouTube has been able to piece together given

25  Pirate Monitor LTD's refusal to provide any discovery, Pirate Monitor LLC has no other

26  principals, employees, or even operations. It is a shell corporation set up for purposes of

27  furthering the scheme described herein. Under Csupó's sole control, Pirate Monitor LLC is

28

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED          -4-          CASE NO. 3:20-CV-04423-JD
COUNTERCLAIMS

1  inadequately capitalized, disregards corporate formalities, and commingles funds and other

2  assets with Csupó. Csupó dominates and controls Pirate Monitor LLC to such an extent that it

3  has no separate corporate personality. So thorough is Csupó's dominance of Pirate Monitor LLC

4  that if its actions alleged herein were treated as those of Pirate Monitor LLC alone, and not those

5  of Csupó, it would lead to an inequitable result. As a result, Csupó is responsible and personally

6  liable for the acts of Pirate Monitor LLC.

7                              **JURISDICTION AND VENUE**

8          9.      This Court has subject matter jurisdiction over the counterclaims pursuant to 28

9  U.S.C. §§ 1331, 1338, 1367.

10         10.     Pirate Monitor LTD is subject to this Court's personal jurisdiction because it has

11  availed itself of the jurisdiction of this Court by filing the Complaint in this action and because it

12  has minimum contacts with the State of California. The Court also has personal jurisdiction over

13  Pirate Monitor LTD because it consented to such jurisdiction in the Terms of Service Agreement

14  it entered into with YouTube and because it purposefully directed the misconduct described

15  herein against YouTube in this District.

16         11.     Csupó is subject to this Court's personal jurisdiction because he is a resident of

17  California and because he has minimum contacts with this State. The Court also has personal

18  jurisdiction over Csupó because he is the alter ego of Plaintiff Pirate Monitor LTD and thus

19  availed himself of this Court's jurisdiction by filing the Complaint in this action. The Court also

20  has personal jurisdiction over Csupó because he consented to such jurisdiction in the Terms of

21  Service Agreement he entered into with YouTube and because he purposefully directed the

22  misconduct described herein against YouTube in this District.

23         12.     To the extent it is a corporate entity separate from Pirate Monitor LTD or Csupó,

24  Pirate Monitor LLC is subject to this Court's personal jurisdiction because it has availed itself of

25  the jurisdiction of this Court because it consented to such jurisdiction in the Terms of Service

26  Agreement with YouTube, and because it purposefully directed the misconduct

27  described herein against YouTube in this District.

28

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED         -5-            CASE NO. 3:20-cv-04423-JD
COUNTERCLAIMS

1    13.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(a)

2  because this is a judicial district in which a substantial part of the events or omissions giving rise

3  to the claim occurred, because this Court has personal jurisdiction over Counterclaim

4  Defendants, because Pirate Monitor LTD filed the Complaint in this district, and because Pirate

5  Monitor LTD, Pirate Monitor LLC, and Csupó consented to venue in this District via the Terms

6  of Service Agreements that they entered into with YouTube.

7                              **The YouTube Service**

8    14.    Since its founding in 2005, YouTube has pursued the goal of providing a platform

9  for users to share their video creations with the world. YouTube serves as an unparalleled

10  medium for free marketing, exposure, and visibility for everyone from individuals to established

11  corporate brands.

12    15.    YouTube also offers a worldwide audience the opportunity to access and watch an

13  extraordinarily diverse library of original, creative expression.

14    16.    YouTube has never been a service devoted to promoting piracy or illegitimate

15  uses of copyrighted works. Rather, YouTube is strongly committed to helping copyright owners

16  protect against the unauthorized use of their works on the service, and it has implemented

17  numerous industry-leading initiatives toward this end.

18    17.    While YouTube complies in all respects with safe harbor provisions of the Digital

19  Millennium Copyright Act ("DMCA"), YouTube's efforts in helping copyright owners and

20  content creators protect against unwanted use of their works goes far beyond what the law

21  requires.

22    18.    For example, YouTube has invested over $100 million to develop Content ID, a

23  best-in-class content identification system that uses digital fingerprinting technology to help

24  identify copyrighted materials. Using Content ID, rightsholders and/or their agents can be

25  automatically notified of user-uploaded videos that "match" what they claim are their

26  copyrighted works and can choose in advance what they want to happen when those videos are

27

28

1  detected, including options to "monetize" the videos, (i.e. earn advertising revenue when users

2  watch the videos) or to "block" the videos from appearing altogether.

3      19.     Content ID and YouTube's other scaled copyright management tools empower

4  users to automatically, or at the touch of a button, remove content from YouTube or block it

5  from appearing in the first place. The tools thus have the potential to be used improperly to

6  censor videos that others have every right to post and share through YouTube. Further, the tools

7  enable users to claim ownership rights in others' content, and to siphon to themselves revenue

8  that rightly belongs to others.

9      20.     Because of the potential for abuse of these scaled tools, YouTube limits access to

10  them, seeking to ensure that those who use them will do so responsibly, and will not cause harm

11  to YouTube, its users, or to other copyright owners.

12                  **Users' Promises And Representations To YouTube**

13      21.     To create an account and post content on the YouTube service, users must

14  affirmatively accept the YouTube Terms of Service Agreement (the "ToS Agreement"). Parties

15  to the ToS Agreement consent to personal jurisdiction and exclusive venue for disputes arising

16  out of or relating to the YouTube service in the Courts of Santa Clara County, California.

17      22.     Under the applicable ToS Agreement in effect during all times relevant to these

18  counterclaims, a user creating a YouTube account promised to provide "accurate and complete"

19  identification information for the account to YouTube.

20      23.     Under the ToS Agreement in effect during all times relevant to these

21  counterclaims, users represent and warrant to YouTube that if they upload any content to the

22  YouTube service, they will "own or have the necessary licenses, rights, consents, and

23  permissions to publish Content [they] submit." Users also promise that any "content [they]

24  submit to the Service [will] not contain third party copyrighted material, or material that is

25  subject to other third party proprietary rights, unless [they have] permission from the rightful

26  owner of the material or [they are] otherwise legally entitled to post the material." And users

27

28

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED          -7-          CASE NO. 3:20-cv-04423-JD
COUNTERCLAIMS

1  agree to grant YouTube a copyright license in and to any content they submit, representing that

2  they have the required rights to do so.

3       24.     In addition to accepting the ToS Agreement and making the representations and

4  promises it contains when creating an account, users must reaffirm their agreement to the ToS

5  each time they upload material to the service. In that upload process, users are again expressly

6  warned against submitting content that violates others' copyrights.

**Pirate Monitor And Csupó Uploaded Nearly 2000 Video Clips To YouTube**
7
**Through "Ransom Nova" Accounts And Represented That**
8
**They Did Not Infringe Anyone's Copyright**

9       25.     From August through November 2019, Pirate Monitor and Csupó created, or

10  authorized and directed their agents to create, at least 23 accounts on YouTube. Each time they

11  caused a new account to be created, Pirate Monitor and Csupó, or the agents acting on their

12  behalf and under their direction and control, affirmatively agreed to the YouTube ToS

13  Agreement, and made the representations and promises to YouTube that are set out in the ToS

14  Agreement.

15       26.     Among other things, Pirate Monitor and Csupó promised to provide YouTube

16  with "accurate and complete" identification information for their YouTube accounts. They

17  represented and warranted to YouTube that if they uploaded any content to the YouTube service,

18  they would "own or have the necessary licenses, rights, consents, and permissions to publish

19  Content [they] submit." They also promised that any "content [they] submit to the Service [will]

20  not contain third party copyrighted material, or material that is subject to other third party

21  proprietary rights, unless [they have] permission from the rightful owner of the material or [they

22  are] otherwise legally entitled to post the material." And they granted YouTube a copyright

23  license to the videos they submitted, representing that they had the required rights to do so.

24       27.     To deceive YouTube, and in violation of the ToS Agreement, Pirate Monitor and

25  Csupó, or the agents acting on their behalf and under their direction and control, provided bogus

26  account registration information. Rather than properly identifying themselves as the account

27  creator, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction

28

and control, used alternative account names and contact information designed to mask the relationship of the account creators and the accounts to Pirate Monitor and Csupó.

28.    Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, created and used at least the following YouTube accounts (or "channels") between August 23 and November 13, 2019:

| Account Name | Associated Email Address | Account Creation Date |
|---|---|---|
| ransom nova2 | ransomnova2@gmail.com | August 23, 2019 |
| ransom nova3 | ransomnova3@gmail.com | September 3, 2019 |
| ransom nova | ransomnova4@gmail.com | September 25, 2019 |
| ransom nova6 | ransomnova6@gmail.com | September 28, 2019 |
| ransom nova | ransomnova7@gmail.com | September 28, 2019 |
| ransom nova | ransomnova8@gmail.com | October 7, 2019 |
| ransom nova9 | ransomnova9@gmail.com | October 7, 2019 |
| ransom nova10 | ransomnova10@gmail.com | October 7, 2019 |
| ransom nova11 | ransomnova11@gmail.com | October 7, 2019 |
| ransom nova12 | ransomnova12@gmail.com | October 7, 2019 |
| ransom nova13 | ransomnova13@gmail.com | October 8, 2019 |
| ransom nova14 | ransomnova14@gmail.com | October 8, 2019 |
| ransom nova15 | ransomnova15@gmail.com | October 8, 2019 |
| Massive Films | ransomnova18@gmail.com | November 4, 2019 |
| Movie Mania | ransomnova19@gmail.com | November 5, 2019 |
| Movie Fun | ransomnova20@gmail.com | November 6, 2019 |
| Movie Festival | ransomnova21@gmail.com | November 8, 2019 |
| Entertainment Movie Channel | ransomnova22@gmail.com | November 8, 2019 |
| Ultimate Entertainment | ransomnova23@gmail.com | November 9, 2019 |

| Avengers | ransomnova25@gmail.com | November 10, 2019 |
| Fantastic | ransomnova26@gmail.com | November 10, 2019 |
| Amazing Channel | ransomnova27@gmail.com | November 10, 2019 |
| Avenger film | ransomnova29@gmail.com | November 13, 2019 |

29.     Most of the account names that Pirate Monitor or its agents selected for these accounts were variants on the name "Ransom Nova." Variations of the name "Ransom Nova" also appear in the email addresses that Pirate Monitor or its agents supplied in the account registration process. YouTube refers to these accounts hereafter as the "Ransom Nova accounts."

30.     The person(s) who created the Ransom Nova accounts did so using a computing device connected to the YouTube service via Internet Protocol ("IP") addresses indicating that they were in Pakistan at the time the accounts were created.

31.     From at least August 24, 2019 through at least November 13, 2019, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, used the Ransom Nova accounts to upload at least 1,960 videos to YouTube. At the time of the uploads, the Ransom Nova accounts were connected to the YouTube service from a computing device using IP addresses again indicating that they were in Pakistan.

32.     Using the Ransom Nova accounts, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control uploaded hundreds of video clips from the Hungarian film *Csak szex és más semi* ("*Csak szex*"), one of the copyrighted works that Pirate Monitor LTD claimed to own in the Complaint and accused YouTube of infringing in this action.

33.     Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, also used the Ransom Nova accounts to upload hundreds of video clips from the Hungarian film *Zimmer Feri* to YouTube. *Zimmer Feri* is a prequel to *Zimmer Feri 2*, another work that Pirate Monitor claimed to own in the Complaint and accused YouTube of infringing in this action.

34.     Each time Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, uploaded a video to the YouTube service through the Ransom Nova accounts, they were required to and did reconfirm that they were abiding by the ToS Agreement; in relevant part, they represented and warranted to YouTube each time that they owned or had the rights to upload and license the material contained in the videos and that the videos they uploaded did not infringe any third party's copyrights.

**Pirate Monitor Demanded Removal Of The Nearly 2000 Video Clips It
Had Previously Uploaded Through the Ransom Nova Accounts,
Charging That They Infringed Copyrights**

35.     Between October 29 and November 15, 2019, Pirate Monitor and Csupó sent YouTube hundreds of takedown notices under the DMCA for the same videos they had uploaded or had directed to be uploaded through the Ransom Nova accounts. The DMCA takedown notices were sent in the name of an entity calling itself "Pirate Monitor LLC," using a Google account opened in the name of Gábor Csupó with the email address usintellectualpropertyllc@gmail.com. Csupó electronically signed each of the takedown notices.

36.     In those DMCA takedown notices, Pirate Monitor and Csupó represented to YouTube under penalty of perjury that "Mega Film" was the copyright owner of the videos that were the subject of the notices, and that they were Mega Film's authorized representatives. Pirate Monitor and Csupó also represented in the notices that the targeted video clips included material from the films *Czak Szex* and *Zimmer Feri* that infringed Mega Film's copyrights—i.e., that the use was not "authorized by Mega Film, its agents or the law." The notices were all virtually identical save for targeting different video clips uploaded through varying Ransom Nova accounts.

37.     At the time YouTube received these DMCA takedown notices from Pirate Monitor and Csupó, it was not aware of the connection between Pirate Monitor and Csupó on the one hand and the Ransom Nova accounts on the other. YouTube did not know that the parties insisting that the videos were infringing and should be removed were the same parties that had

1  uploaded or directed the upload of the videos in the first place and who had represented in that

2  process that the videos were not infringing.

3      38.     In reliance on the representations from Pirate Monitor and Csupó in the takedown

4  notices that were made to YouTube via the DMCA's statutorily prescribed mechanism, YouTube

5  processed approximately 1,800 separate notices from Pirate Monitor and Csupó and

6  expeditiously removed the targeted videos.

7              **Pirate Monitor And Csupó's Scheme Amounts Either To Fraud And
                Breach Of Contract Or A Violation Of Section 512(f) Of The DMCA**

8

9      39.     As set forth above, Pirate Monitor and Csupó uploaded, or authorized and

10  directed their agents to upload, nearly two thousand videos to YouTube, representing to

11  YouTube that the videos did not infringe copyrights, and then promptly sent DMCA takedown

12  notices for the same videos, representing to YouTube that the videos did infringe copyrights.

13  Without the benefit of discovery, it is unclear which of these conflicting representations about

14  the videos were truthful. But either way, Pirate Monitor and Csupó made material

15  misrepresentations on which YouTube relied.

16      40.     On the one hand, if Pirate Monitor and Csupó falsely represented to YouTube that

17  they had the authority to post the videos and that the videos did not infringe anyone's copyrights,

18  then Pirate Monitor and Csupó breached the ToS Agreement and perpetrated a fraud on

19  YouTube. Had Pirate Monitor and Csupó not made the representations to YouTube that they did,

20  YouTube would not have allowed them to create accounts on the service, and it would not have

21  allowed them to upload content to the service.

22      41.     On the other hand, if Pirate Monitor and Csupó accurately represented to

23  YouTube that they had the authority to post the videos and that the videos did not infringe any

24  third party's copyrights, then Pirate Monitor and Csupó made knowingly false statements when

25  they subsequently represented to YouTube in their DMCA takedown notices that those same

26  videos were infringing.

27

28

42.     These conflicting representations from Pirate Monitor and Csupó were no accident. Their serial uploads and DMCA takedown notices for the same videos were central to a scheme through which they hoped to gain access to YouTube's powerful copyright management tools, in particular Content ID.

43.     In May 2019, an entity calling itself Pirate Monitor LLC applied for access to use YouTube's copyright management tools. The application was made by Gabor Csupó, who supplied the email address usintellectualpropertyllc@gmail.com.

44.     YouTube denied this application in June 2019, explaining to Pirate Monitor and Csupó that access to YouTube's copyright management tools was predicated in part on demonstrating both a need for such access and a history of properly using the DMCA takedown notice process.

45.     Pirate Monitor and Csupó believed that they could demonstrate both the need for access, and a track record of valid DMCA takedown notices, by surreptitiously uploading a substantial volume of content through accounts seemingly unconnected to them, and then sending DMCA takedown notices for that same content. Three months after YouTube declined their copyright management tools application, Pirate Monitor and Csupó began the process of creating the Ransom Nova accounts and uploading videos through those accounts, in furtherance of their scheme.

**The Evidence To Date Without Discovery Of The Connection
Between Pirate Monitor, Csupó, And The Ransom Nova Accounts**

46.     Pirate Monitor and Csupó are in sole possession of the full information regarding their unlawful scheme, and have refused to provide any of it to YouTube in response to YouTube's specific discovery requests. By way of example, attached as Exhibit A is a true and correct copy of Pirate Monitor LTD's objections and responses to YouTube's Second Set of Document Requests in which it objects in full to every request, including those seeking information regarding *inter alia*, Ransom Nova and Pirate Monitor LLC.

47.     While withholding from YouTube all relevant information they possess, Pirate Monitor and Csupó have never denied that they and/or their agents were responsible for creating the Ransom Nova accounts. They have never denied that they and/or their agents uploaded through those accounts the very same videos that they then promptly claimed in DMCA takedown notices were infringing.

48.     YouTube already has overwhelming evidence that reveals Pirate Monitor and Csupó's deceptions and demonstrates that Pirate Monitor and Csupó either operated the Ransom Nova accounts directly or that the person(s) operating the Ransom Nova accounts were agents of Pirate Monitor and Csupó, acting at their direction and control and for their benefit.

49.     First, the video uploading activity conducted through the Ransom Nova accounts was not consistent with the behavior of users actually seeking to share videos with others through the YouTube service. Though the videos contained clips from the Hungarian movies *Csak szex* and *Zimmer Feri*, the user(s) uploading those videos selected nondescript titles for the clips, such as "Test1" or "Hot Clip." An uploader genuinely seeking an audience on YouTube for clips from those films would have selected titles that enabled users looking for clips from the films to find them. Additionally, almost all of the nearly two thousand video clips uploaded via the Ransom Nova accounts were the same length, 31 seconds, and they did not correspond to particular moments or scenes from the films. Further, the clips were not uploaded in any recognizable order, such as to track the films sequentially. It is evident from this unusual pattern that the person(s) who uploaded these clips to YouTube through the Ransom Nova accounts did not expect anyone to actually find and watch them. That is because the videos were not uploaded by a genuine YouTube user, but instead by or at the direction of Pirate Monitor and Csupó for the purpose of sending DMCA takedown notices for those clips.

50.     Second, Pirate Monitor and Csupó regularly sent DMCA takedown notices for videos uploaded through the Ransom Nova accounts within a very short time—no more than a few days—after the videos were uploaded. For example, 99 clips were uploaded through the "Ransom Nova" account, "Amazing Channel," on November 10, 2019. All 99 clips were the

subject of DMCA takedown notices four days later. When Pirate Monitor and Csupó sent their takedown notices, none of the videos targeted in those notices had an appreciable number of views on YouTube. In many cases, ***the videos targeted in Pirate Monitor and Csupó's takedown notices had not recorded even a single view on YouTube.*** In other words, Pirate Monitor and Csupó knew that the videos for which they sent takedown notices were on the YouTube service without having to actually view them. That is because Pirate Monitor and Csupó were responsible for having uploaded those videos in the first place.

51.     Third, there is powerful forensic evidence tying Pirate Monitor and Csupó to the Ransom Nova accounts. When Pirate Monitor and Csupó sent their takedown notices to YouTube—on behalf of Hungarian film company Mega Film—for videos uploaded through the Ransom Nova accounts, they had no reason to conceal their identities. They correctly identified themselves and invariably sent their takedown notices from a computer connected to the Internet via a unique Hungarian IP address: 217.65.XXX.XXX. On November 12, 2019, Pirate Monitor and Csupó were sending takedown notices to YouTube from that Hungarian IP address. At roughly the same time, someone logged into one of the Ransom Nova accounts—specifically the account created by RansomNova7@gmail.com—not from a Pakistani IP address, but from the same IP address in Hungary (217.65.XXX.XXX) that Pirate Monitor and Csupó were concurrently using to send the takedown notices. **In other words, RansomNova7 was sharing a computer and/or unique Internet connection with Pirate Monitor and Csupó in Hungary on the same day (and in fact, at almost the same time) that Pirate Monitor and Csupó were using that same computer and/or Internet connection to send takedown notices to YouTube**. That is because the person operating and responsible for the RansomNova7@gmail.com account either was Pirate Monitor or Csupó, or someone acting on their behalf.

52.     YouTube's investigation following the filing of this lawsuit has further revealed that the person or persons who created several of the Ransom Nova accounts on YouTube supplied the email address sarfrazjbd@gmail.com in connection with the accounts. That address

is registered to a person named Sarfraz Arshad Khan. Mr. Khan represents himself on the

Internet as a Pakistani resident and computer services freelancer and advertises having expertise

in data entry and promotion of content on YouTube. Mr. Khan also has a LinkedIn profile,

posted under the name "Ransom Nova," which states that he is a computer science student in

Pakistan. These facts make it extremely unlikely that Mr. Khan was acting on his own in setting

up and using the Ransom Nova accounts, but instead suggest that he was hired by Pirate Monitor

and Csupó to perform that work.

53.     Although Pirate Monitor has withheld all evidence, based on what YouTube

knows today, the only plausible conclusion is that the Ransom Nova accounts were created and

operated directly by Pirate Monitor and Csupó as part of the scheme alleged herein, or that they

were created and operated by agents, including Mr. Khan, acting at the direction and control of

Pirate Monitor and Csupó and for their benefit. Either way, Pirate Monitor and Csupó are

responsible for the acts performed through the Ransom Nova accounts.

**COUNTERCLAIM I: Against Pirate Monitor LTD,
Pirate Monitor LLC, And Gábor Csupó
Breach Of Contract**

54.     YouTube restates and realleges the preceding allegations of its Counterclaims.

55.      Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or

through their authorized agents who created the "Ransom Nova" accounts, agreed to be bound by

the ToS Agreement.

56.     The ToS Agreement constitutes a valid, binding contract between each of Pirate

Monitor LTD, Pirate Monitor LLC, and Csupó, and YouTube.

57.     YouTube has performed its obligations under the ToS Agreement, save for any

that have been excused, including by providing YouTube services to the parties who created the

"Ransom Nova" YouTube accounts.

58.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or

through their authorized agents who created the "Ransom Nova" accounts, breached the ToS

Agreement by, among other things:

i.      failing to provide complete and accurate identification information in the account creation process; and

ii.      uploading videos to YouTube that infringed third-party copyrights.

59.     These breaches have proximately caused damage to YouTube, including among other things, the cost of investigating and processing the subsequent DMCA takedown notices sent by Pirate Monitor and Csupó claiming that the content they uploaded was infringing.

60.     To the extent that Pirate Monitor LTD's claims in this action implicate content that Pirate Monitor itself uploaded (or is responsible for causing to be uploaded) to the YouTube service, the costs of defending the action as well as any liability also constitute damages proximately caused by Pirate Monitor's breaches of contract.

61.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó are additionally obligated under their ToS Agreements with YouTube to indemnify YouTube for claims arising out of or relating to their use of the YouTube service. In seeking defense costs and any potential liability in this action as damages for these contract breaches, YouTube expressly preserves its separate entitlement to contractual indemnity and is entitled to that indemnity to the extent Pirate Monitor LTD, Pirate Monitor LLC, and Csupó refuse to honor their indemnity obligation.

### COUNTERCLAIM II: Against Pirate Monitor LTD, Pirate Monitor LLC, And Gábor Csupó
### Fraud

62.     YouTube restates and realleges the preceding allegations of its Counterclaims.

63.      Between at least August 23 and at least November 13, 2019, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents, created at least 23 "Ransom Nova" YouTube accounts. Each time they created a new account, they made the representations and promises to YouTube that are set out in the ToS Agreement.

64.     Among other things, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents, promised to provide YouTube with "accurate and complete" identification information for their YouTube accounts. They promised YouTube that if they uploaded any content to the YouTube service, they would "own or have the

necessary licenses, rights, consents, and permissions to publish Content [they] submit." They also promised that any "content [they] submit to the Service [will] not contain third party copyrighted material, or material that is subject to other third party proprietary rights, unless [they have] permission from the rightful owner of the material or [they are] otherwise legally entitled to post the material." And they granted YouTube a copyright license to any videos they submitted, representing that they had the required rights to do so.

65.     Each time Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents uploaded a video to the YouTube service, they reaffirmed their agreement to the ToS Agreement, and made those same promises and representations.

66.     But Pirate Monitor LTD, Pirate Monitor LLC, and Csupó had no intention of honoring the promises in the ToS Agreement either at the time they created their accounts or when they uploaded videos to the service. Rather, they intended to use the service to upload material that infringed third-party copyrights.

67.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó themselves or through their authorized agents also represented to YouTube through the ToS Agreement at the time they created the Ransom Nova accounts and again in the video upload process that they had the authority to post the videos that they did, and that the videos did not infringe any third party's copyrights. These representations were made, in materially identical form, each time videos were uploaded through the Ransom Nova accounts. The representations were false, and Pirate Monitor LTD, Pirate Monitor LLC, and Csupó knew that the representations were false.

68.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó made those representations or caused their authorized agents to make them with the intention of inducing YouTube to accept and allow to be uploaded the content that Pirate Monitor LTD, Pirate Monitor LLC, and Csupó wanted uploaded to the YouTube service.

69.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó made the false promises and misrepresentations they did because they knew that YouTube would not allow them to create

1  accounts or allow them to upload content through those accounts if they did not make those false

2  promises and misrepresentations. That, in turn, would have frustrated their scheme to send mass

3  takedown notices and establish the track record they hoped would gain them access to

4  YouTube's copyright management tools.

5      70.    YouTube relied on Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's false

6  promises and misrepresentations by allowing them to create accounts and by accepting content

7  uploaded through those accounts to the YouTube service. YouTube would not have allowed the

8  creation of the accounts or accepted the content but for Pirate Monitor LTD, Pirate Monitor LLC,

9  and Csupó's false promises and misrepresentations.

10     71.    YouTube's reliance was justifiable. It had no reason to believe Pirate Monitor

11 LTD, Pirate Monitor LLC, and Csupó would make promises they had no intention of performing

12 or misrepresent the nature of the content they were uploading.

13     72.    Because they hid their intention not to honor their promises in the ToS

14 Agreement, and because of the misrepresentations they made in the ToS Agreement, Pirate

15 Monitor LTD, Pirate Monitor LLC, and Csupó were able to create at least 23 accounts and

16 upload at least 1,960 videos to YouTube, and soon thereafter sent DMCA takedown notices for

17 those same videos.

18     73.    As a proximate result of Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's

19 promises made without intention to perform and misrepresentations, YouTube has been damaged

20 in an amount to be proven at trial, but including among other things, the cost of processing at

21 least 1,800 DMCA takedown notices for the content Pirate Monitor LTD, Pirate Monitor LLC,

22 and Csupó uploaded, and the cost of investigating and remediating their misconduct.

23     74.    To the extent that Pirate Monitor LTD's claims in this action implicate content

24 that Pirate Monitor LTD itself uploaded to the YouTube service, the costs of defending the

25 action as well as any liability also constitute damages proximately caused by Pirate Monitor

26 LTD's promises without intention to perform and false representations.

27

28

75.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's conduct was undertaken with the intent to injure YouTube, and with a willful and conscious disregard of YouTube's rights, and constitutes fraud and malice under California Civil Code Section 3294. As a result, YouTube is entitled to an award of punitive damages against Pirate Monitor LTD, Pirate Monitor LLC, and Csupó in an amount sufficient to punish them and deter them from future misconduct.

**COUNTERCLAIM III: Against Pirate Monitor LTD,
Pirate Monitor LLC, And Gábor Csupó
(In the alternative to Counterclaims I & II)
Violation of 17 U.S.C § 512(f)**

76.    YouTube pleads Counterclaim III as an alternative to Counterclaims I & II, and incorporates the preceding allegations of Paragraphs 1 to 53 herein.

77.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents who created the "Ransom Nova" accounts, repeatedly represented to YouTube in the ToS Agreement and in the upload process that they had the authority to post the videos that they did, and that the videos did not infringe any third party's copyrights. Those representations were true.

78.    From October 29, 2019 through November 15, 2019, Pirate Monitor and Csupó sent approximately 1,800 DMCA takedown notices to YouTube for content that they themselves had uploaded to YouTube. Each of those notices was sent by "Pirate Monitor LLC" signed by Csupó.

79.    In their DMCA takedown notices, Pirate Monitor and Csupó expressly represented to YouTube that the videos identified in the notices infringed the copyrights of a party they were authorized to represent (Mega Film). They further declared that the information in the takedown notices was accurate, and declared under penalty of perjury that they were the owner, or an agent authorized to act on behalf of the owner, of an exclusive right that was allegedly infringed.

80.    Pirate Monitor and Csupó's representations in those DMCA takedown notices regarding infringement were knowingly false. As Pirate Monitor and Csupó knew, the videos

they identified as infringing in their DMCA takedown notices were not infringing their copyrights or those of copyright owners that they represented. In fact, through their authorized agents who created the "Ransom Nova" accounts, Pirate Monitor and Csupó themselves had uploaded those same videos.

81.   Each time they sent DMCA takedown notices to YouTube for videos they had uploaded, Pirate Monitor and Csupó knowingly and materially misrepresented that material or activity on YouTube was infringing.

82.   YouTube, the service provider that received these DMCA takedown notices, relied upon the misrepresentations made by Pirate Monitor LLC and Csupó therein by removing or disabling access to the material they falsely claimed was infringing. YouTube's reliance was reasonable, given that the notices at issue were made in the form prescribed by the DMCA, 17 U.S.C. § 512(c)(3).

83.   YouTube was injured by Pirate Monitor and Csupó's misrepresentations in their DMCA notices. But for those misrepresentations, YouTube would not have had to incur the costs of processing approximately 1,800 DMCA notices and removing the videos identified in those notices. Further, as a result of Pirate Monitor and Csupó's misrepresentations, YouTube had to expend substantial additional sums on an investigation in an effort to detect and thwart their deceptive behavior.

84.   Pirate Monitor LTD, Pirate Monitor LLC, and Csupó have yet to admit their role in the scheme detailed herein, much less forsworn similar misconduct in the future. The sheer number of material misrepresentations they made in DMCA takedown notices demonstrates that they have little fear of the threat of monetary liability under Section 512(f). Further, as the Complaint in this action demonstrates, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó still harbor the same motive to obtain access to Content ID as they did when they first hatched their plan.

85.   Pirate Monitor LTD, Pirate Monitor LLC, and Csupó have demonstrated their willingness to conceal their identities in furtherance of their goals. Having been caught by

1  YouTube, they now can learn from their mistakes to evade detection in the future by, *inter alia*,

2  selecting new account names, masking their IP addresses, using new and different agents to

3  upload videos, and sending new false DMCA takedown notices for different videos that their

4  new agents upload. Because YouTube relies on the sworn representations made by those that

5  send facially valid copyright removal requests, there is no guarantee it can detect and prevent

6  such fraudulent behavior in the future, nor should it be forced to expend substantial sums to try

7  to do so. Further, YouTube has no ready means of calculating the harm that such

8  misrepresentations would cause to YouTube or its users in terms of lost goodwill, lost audiences,

9  and lost opportunities. To prevent such irreparable harm, injunctive relief barring Pirate Monitor

10  LTD, Pirate Monitor LLC, and Csupó from future misrepresentations in DMCA takedown

11  notices is warranted.

12                                    **PRAYER FOR RELIEF**

13        Wherefore, YouTube respectfully requests that the Court:

14              a.      Award damages against Pirate Monitor LTD, Pirate Monitor LLC, and

15        Gábor Csupó sufficient to compensate YouTube for the harm caused by their

16        conduct;

17              b.      Award punitive damages against Pirate Monitor LTD, Pirate Monitor

18        LLC, and Gábor Csupó for their fraudulent conduct;

19              c.      Issue an injunction barring Pirate Monitor LTD, Pirate Monitor LLC, and

20        Gábor Csupó and all those in active concert with them from submitting notices of

21        alleged infringement to YouTube that misrepresent that material on the YouTube

22        service is infringing copyrights held or claimed to be held by Pirate Monitor LTD,

23        Pirate Monitor LLC, and Gábor Csupó or anyone they claim to represent.

24              d.      Award YouTube the costs of this action along with attorneys' fees

25        pursuant to 17 U.S.C. § 512(f) against Pirate Monitor LTD, Pirate Monitor LLC,

26        and Gábor Csupó; and

27

28

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED          -22-          CASE NO. 3:20-CV-04423-JD
COUNTERCLAIMS

1              e.      Award YouTube such other and further relief as the Court may deem just

2       and proper.

3

4  Dated:  February 19, 2021                 Respectfully submitted

5                           WILSON SONSINI GOODRICH & ROSATI
                            Professional Corporation

6

7                           By:      */s/ David H. Kramer*

8                           Attorneys for Defendants and Counterclaimants
                           YOUTUBE, LLC and GOOGLE LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

George A. Zelcs (*pro hac vice*)
  gzelcs@koreintillery.com
Randall P. Ewing, Jr. (*pro hac vice*)
  rewing@koreintillery.com
Ryan Z. Cortazar (*pro hac vice*)
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe (*pro hac vice*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
  jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone: (415) 293-6800
Facsimile: (415) 293-6899

*Attorneys for Maria Schneider and
Pirate Monitor, LTD*

Philip C. Korologos (*pro hac vice*)
  pkorologos@bsfllp.com
Joanna C. Wright (*pro hac vice*)
  jwright@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Telephone:  (212) 446-2300
Facsimile: (212) 446-2350

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> YOUTUBE, LLC; and GOOGLE LLC; <br><br> Defendants. | CASE NO. 5:20-cv-4423 <br><br> **PLAINTIFF PIRATE MONITOR LTD'S OBJECTIONS AND RESPONSES TO YOUTUBE AND GOOGLE'S SECOND SET OF DOCUMENT REQUESTS TO PLAINTIFF AND COUNTERCLAIM DEFENDANT PIRATE MONITOR LTD** |

1         Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Pirate Monitor LTD

2 (together "Plaintiff" or "Pirate Monitor") submits the following responses and objections to

3 Defendants YouTube, LLC ("YouTube") and Google LLC ("Google") (collectively "Defendants")

4 Second Set of Document Requests to Plaintiff Pirate Monitor LTD, dated January 13, 2020 (the

5 "Requests"), in the above-captioned action (the "Action").

6         By these Responses, Pirate Monitor does not intend to, and does not, (1) waive any objection

7 as to the admissibility of evidence or the competency of, relevancy of, materiality of, or privilege

8 attaching to any information disclosed in these responses, or (2) waive the right to object to other

9 discovery requests or undertaking involving or reflecting the subject matter of the Requests or these

10 Responses. These Responses do not constitute, nor should they be construed as, admissions with

11 respect to the relevancy or admissibility of any evidence or document identified herein or the truth or

12 accuracy of any statement, characterization, or other information contained in such document. Pirate

13 Monitor expressly does not concede the relevance or materiality of any of these Responses or the

14 subject matter they refer to.

15         Pirate Monitor's discovery and preparation for trial of this matter is not complete as of the

16 date of these Responses and are continuing. Pirate Monitor anticipates that discovery and preparation

17 for trial will reveal additional information not presently known to it, but upon which it may rely. These

18 Responses to the Requests are based upon information currently known to or believed to be true by

19 Pirate Monitor. Pirate Monitor reserves the right to modify or supplement these Responses upon

20 completion of discovery and preparation for trial of this matter, and to use at trial, or in any motion

21 or deposition, any documents, facts, or supporting evidence of any sort later developed or discovered.

22         Pirate Monitor reserves the right to amend or revise these Responses, including based on any

23 responses or objections submitted by Defendants to any of Pirate Monitor's discovery requests. Pirate

24 Monitor also asserts that any discovery obligations should be mutual between parties, so that if any

25 of Pirate Monitor's objections are overridden, Defendants should be subject to the same scope of

26 discovery, including definitions and instructions for discovery compliance.

27

28

PIRATE MONITOR'S OBJECTIONS &         2         CASE NO. 5:20-CV-4423
RESPONSES TO DEFENDANTS'
SECOND SET OF DOCUMENT REQUESTS

1    Pirate Monitor expects that the parties will negotiate a "search term protocol," which will
2    govern the search for documents in this litigation, including the search terms and parameters,
3    custodians, repositories and relevant time frame. Pirate Monitor will locate documents consistent with
4    this protocol, which will be subject to further review for responsiveness.

5                                    **GENERAL OBJECTIONS**

6        1.    Pirate Monitor objects to the Requests to the extent they impose obligations in
7    addition to those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, any
8    court governing discovery in this case, or any discovery protocol agreed upon by the parties.

9        2.    Pirate Monitor objects to the extent that Defendants' Requests purport to seek
10   discovery of every conceivable document, or "any" or "all" documents, relating to a particular request.
11   Pirate Monitor intends to negotiate reasonable document search parameters with Defendants.

12       3.    Pirate Monitor objects to each Request to the extent it purports to seek information
13   protected by the attorney-client privilege or the work-product doctrine, and Pirate Monitor will not
14   provide any privileged and/or protected information. Any disclosure of privileged information would
15   be inadvertent and should not be deemed a waiver of any applicable privileges.

16       4.    Pirate Monitor objects to each Request to the extent that it contains words and/or
17   phrases that are not defined, thereby rendering the Request overboard, vague, and ambiguous.

18       5.    Pirate Monitor objects to the Requests to the extent that they seek information not
19   within Pirate Monitor's possession, custody, or control.

20       6.    Pirate Monitor objects to the Requests to the extent that they purport to impose a
21   burden on Pirate Monitor to provide documents or information already in Defendants' possession,
22   custody, or control, and/or which are publicly available, otherwise equally available to all parties, or
23   available to Defendants from a less burdensome, more efficient, more convenient, or less expensive
24   source than they are available to Pirate Monitor, or through a more convenient, more efficient, less
25   burdensome, or less expensive means than the Requests.

26

27

28   PIRATE MONITOR'S OBJECTIONS &         3          CASE NO. 5:20-CV-4423
     RESPONSES TO DEFENDANTS'
     SECOND SET OF DOCUMENT REQUESTS

1   7.  Any objection to any of the Requests is not an admission that Pirate Monitor has any

2 information or documents responsive to a particular Request.

3   8.  If a response indicates that Pirate Monitor will produce documents, Pirate Monitor

4 does not represent that any responsive documents are in its possession, custody, or control, but rather

5 that production will be made if any such documents are located after a reasonable search.

6       **<u>OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS</u>**

7   1.  Pirate Monitor objects to the extent that Defendants' Definitions and Instructions

8 seek information covered by privilege(s), including the attorney-client and attorney work product

9 privileges. *See, e.g.*, Defendants' Definition No. 1.

10   2.  Pirate Monitor objects to the definition of "Pirate Monitor," "You," and "Your," as

11 vague, overbroad, unduly burdensome, disproportionate to the needs of this litigation.  Pirate Monitor

12 will construe these terms to refer to Pirate Monitor LTD and any agent or principal acting on behalf

13 of Pirate Monitor LTD.

14   3.  Pirate Monitor objects to the instruction to provide all documents in the possession,

15 custody, or control of anyone other than Pirate Monitor. Consistent with its obligations under the

16 Federal Rules and applicable law, Pirate Monitor will undertake reasonable efforts to produce

17 responsive documents within its possession, custody, or control.

18   4.  Pirate Monitor objects to the failure to include an instruction as to the relevant time

19 period for the Requests. Pirate Monitor will apply reasonable date restrictions to its searches for

20 responsive documents, consistent with its obligations under the Federal Rules and applicable law.

21       **<u>SPECIFIC OBJECTIONS AND RESPONSES</u>**

22    The General Objections and Objections to Definitions and Instructions set forth above are

23 incorporated into the Specific Objections below, as if incorporated therein. Pirate Monitor reserves the

24 right to amend or revise its Specific Objections, including after meeting and conferring with Defendants

25 regarding any Request. A response to any request indicating that Pirate Monitor agrees to produce

26

27

28

1  documents is not an admission that documents responsive to the Request exist and does not waive any

2  objections to the use of any discovery produced in response to the Request.

3  **DOCUMENT REQUEST NO. 51:**

4      All documents and communications relating to Intellectual Property LLC.

5  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 51 on the grounds that it

6  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

7  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

8  parties' relative access to relevant information, the parties' resources, and because the burden and

9  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

10  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

11  herein.

12  **DOCUMENT REQUEST NO. 52:**

13      All communications between You and Intellectual Property LLC concerning YouTube or

14  Google, any matter set forth in the complaint, or any matter related to the conduct of this litigation.

15  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 52 on the grounds that it

16  is overbroad, duplicative of Request No. 51, seeks irrelevant information that is not reasonably calculated

17  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

18  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

19  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

20  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

21  of the objections stated herein.

22  **DOCUMENT REQUEST NO. 53:**

23      All documents and communications relating to Pex.

24  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 53 on the grounds that it

25  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

26  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

27

28

1   parties' relative access to relevant information, the parties' resources, and because the burden and

2   expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

3   Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

4   herein.

5   **DOCUMENT REQUEST NO. 54:**

6        All communications between You and Pex concerning YouTube or Google, any matter set

7   forth in the complaint, or any matter related to the conduct of this litigation.

8   **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 54 on the grounds that it

9   is overbroad, duplicative of Request No. 53, seeks irrelevant information that is not reasonably calculated

10  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

11  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

12  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

13  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

14  of the objections stated herein.

15  **DOCUMENT REQUEST NO. 55:**

16       All documents and communications relating to Pirate Monitor LLC.

17  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 55 on the grounds that it

18  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

19  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

20  parties' relative access to relevant information, the parties' resources, and because the burden and

21  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

22  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

23  herein.

24  **DOCUMENT REQUEST NO. 56:**

25       All communications between You and Pirate Monitor LLC concerning YouTube or Google,

26  any matter set forth in the complaint, or any matter related to the conduct of this litigation.

27

28  PIRATE MONITOR'S OBJECTIONS &               6                 CASE NO. 5:20-CV-4423
    RESPONSES TO DEFENDANTS'
    SECOND SET OF DOCUMENT REQUESTS

1  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 56 on the grounds that it

2  is overbroad, duplicative of Request No. 55, seeks irrelevant information that is not reasonably calculated

3  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

4  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

5  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

6  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

7  of the objections stated herein.

8  **DOCUMENT REQUEST NO. 57:**

9       All documents and communications relating to Sarfraz Arshad Khan.

10  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 57 on the grounds that it

11  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

12  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

13  parties' relative access to relevant information, the parties' resources, and because the burden and

14  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

15  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

16  herein.

17  **DOCUMENT REQUEST NO. 58:**

18       All communications between You and Sarfraz Arshad Khan concerning YouTube or Google,

19  any matter set forth in the complaint, or any matter related to the conduct of this litigation.

20  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 58 on the grounds that it

21  is overbroad, duplicative of Request No. 57, seeks irrelevant information that is not reasonably calculated

22  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

23  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

24  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

25  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

26  of the objections stated herein.

27

**DOCUMENT REQUEST NO. 59:**

All documents and communications relating to Zoltan Buzas.

**OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 59 on the grounds that it is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated herein.

**DOCUMENT REQUEST NO. 60:**

All communications between You and Zoltan Buzas concerning YouTube or Google, any matter set forth in the complaint, or any matter related to the conduct of this litigation.

**OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 60 on the grounds that it is overbroad, duplicative of Request No. 59, seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated herein.

**DOCUMENT REQUEST NO. 61:**

All documents and communications concerning Ransom Nova.

**OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 61 on the grounds that it is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

1  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

2  herein.

3  **DOCUMENT REQUEST NO. 62:**

4      All documents and communications concerning YouTube accounts created or used by

5  Ransom Nova.

6  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 62 on the grounds that it

7  is overbroad, duplicative of Request No. 61, seeks irrelevant information that is not reasonably calculated

8  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

9  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

10  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

11  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

12  of the objections stated herein.

13  **DOCUMENT REQUEST NO. 63:**

14      All documents concerning Your selection of works to be included as Works in Suit.

15  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 63 on the grounds that it

16  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

17  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

18  parties' relative access to relevant information, the parties' resources, and because the burden and

19  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

20  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

21  herein.

22

23  Dated: February 12, 2021                     Respectfully submitted,

24

25                                    /s/ Steven M. Berezney
                                  George A. Zelcs *(pro hac vice)*

26                                    Randall P. Ewing, Jr. *(pro hac vice)*
                                  Ryan Z. Cortazar *(pro hac vice)*

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
Steven M. Berezney, CA Bar #329923
Michael E. Klenov, CA Bar #277028
Carol O'Keefe (*pro hac vice*)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Phone: (415) 293-6800
Fax: (415) 293-6899

Philip C. Korologos (*pro hac vice*)
Joanna C. Wright (*pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Maria Schneider and*
*Pirate Monitor LTD*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2021, I caused the foregoing Plaintiff Pirate Monitor LTD's Objections and Responses to YOUTUBE and GOOGLE'S Second Set of Document Requests to Plaintiff Pirate Monitor LTD to be served on all opposing counsel of record by email at the addresses listed below:

Schneidervyoutube@wsgr.com

_____/s/ Steven M. Berezney_____

**CERTIFICATE OF SERVICE**

I, Deborah Grubbs, declare:

I am employed in Santa Clara County, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304-1050.

On this date, I served:

1. **NOTICE OF DEFENDANTS AND COUNTERCLAIMANTS YOUTUBE, LLC AND GOOGLE LLC'S NON-PARTY DOCUMENT SUBPOENA TO INTELLECTUAL PROPERTY LLC**

☒ By forwarding the document(s) by electronic transmission on this date to the Internet email address listed below:

   BSFYouTube@bsfllp.com and Ktyoutube@koreintillery.com

I am readily familiar with Wilson Sonsini Goodrich & Rosati's practice for collection and processing of documents for delivery according to instructions indicated above.  In the ordinary course of business, documents would be handled accordingly.

I declare under penalty of perjury under the laws of the United States of America and State of California that the foregoing is true and correct.  Executed at San Mateo, California on June 1, 2021.

_____
Deborah Grubbs

## **ATTACHMENT A**

Pursuant to Federal Rule of Civil Procedure 45, Defendants and Counterclaimants YouTube, LLC ("YouTube") and Google LLC ("Google") (collectively, "Counterclaimants") request that Intellectual Property LLC produce the following documents and things for inspection and copying by June 24, 2021 at the offices of Wilson Sonsini Goodrich & Rosati P.C., 222 Delaware Avenue, Suite 800, Wilmington, DE 19801; or by electronic mail to Maura L. Rees at mrees@wsgr.com; or at such other time and place as may be agreed.

## **DEFINITIONS**

1.    "IPLLC," "You," or "Your" means Intellectual Property LLC; USIPLLC; and their employees, agents, officers, representatives, contractors, lawyers, affiliates, or any person or entity acting on their behalf or direction or under their control.

2.    "Counterclaim Defendants" means and includes Pirate Monitor LTD, Pirate Monitor LLC, and/or Gábor Csupó.

3.    "DMCA" means the Digital Millennium Copyright Act, 17 U.S.C. §§ 101 *et seq*.

4.    "Takedown Notice" means a notice sent pursuant to 17 U.S.C. § 512(c)(3) notifying the recipient of asserted infringement.

5.    "Pirate Monitor LTD" means and includes Pirate Monitor LTD and/or (i) all of its affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations, and assigns; (ii) all of its present and former officers, directors, managers, employees, representatives, agents, accountants, investigators, independent contractors, and attorneys; (iii) any other person acting or purporting to act on its behalf or acting at its direction; or (iv) any other person otherwise subject to its control, which controls it, or is under common control with it.

6.      "Pirate Monitor LLC" means and includes Pirate Monitor LLC and/or (i) all of its affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations, and assigns; (ii) all of its present and former officers, directors, managers, employees, representatives, agents, accountants, investigators, independent contractors, and attorneys; (iii) any other person acting or purporting to act on its behalf or acting at its direction; or (iv) any other person otherwise subject to its control, which controls it, or is under common control with it.

7.      "Gábor Csupó" means and includes Gábor Csupó as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

8.      "Endre Holman" means and includes Endre Holman as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

9.      "Zoltán Búzás" means and includes Zoltán Búzás as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

10.      "PirateMonitor" means the software system that IPLLC uses to detect and/or monitor copyrighted works that appear on the internet.

11.      "Megafilm" means and includes Megafilm Kft. and/or (i) all of its affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations, and assigns; (ii) all of its present and former officers, directors, managers, employees, representatives, agents, accountants, investigators, independent contractors, and attorneys, including without limitation Gábor Kálomista; (iii) any other person acting or purporting to act on

its behalf or acting at its direction; or (iv) any other person otherwise subject to its control, which controls it, or is under common control with it.

12.   "Sarfraz Arshad Khan" or "Khan" means and includes Sarfraz Arshad Khan as well as his employees, contractors, agents, representatives, attorneys, or any person or entity acting on his behalf or direction or under his control.

13.   "Ransom Nova" means any person or persons who uploaded videos to YouTube or otherwise used YouTube's service using (i) the YouTube account or username "ransom nova"; (ii) a YouTube account or username consisting of variants of "ransom nova," including but not limited to "ransom nova11" and "ransomnova12"; and/or (iii) a YouTube account associated with one or more email addresses consisting of variants of ransomnova@gmail.com.

14.   "YouTube Copyright Protection Service" means any tool, software, program, or service offered by YouTube to enable copyright owners to identify or prevent the presence of their copyrighted content on the YouTube service, whether by employing descriptive search, audio fingerprinting, video fingerprinting, filtering, hashing, or other copyright protection technology, including without limitation all versions of the following tools and programs offered by YouTube: "Content Verification Program," "Copyright Match Tool," "Copyright Verification Tool," and "Content ID System."

15.   "Communications" means and includes communications in any form, including without limitation communications via Facebook Messenger or any other messaging service, application, or website.

16.   "Lawsuit" means *Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.).

17.   "Amended Counterclaims" means the amended counterclaims asserted in this Lawsuit, a copy of which is annexed hereto as **Exhibit 1**.

**INSTRUCTIONS**

1.      All responsive nonprivileged documents in the possession, custody, or control of IPLLC or its employees or contractors are to be produced. If, after exercising due diligence to secure the documents requested, you cannot produce all responsive documents, so state, produce to the extent possible, specify the reasons why you were unable to provide a full and complete response, and state what information and knowledge You do have concerning the unproduced portion.

2.      If You decline to produce any document or part thereof based on a claim of privilege or any other claim, please provide a privilege log in accordance with Federal Rule of Civil Procedure 26(b)(5).

3.      Pursuant to Federal Rule of Civil Procedure 45(e)(1)(B), you are obligated to produce all documents made available for inspection pursuant to this Subpoena as those documents are kept in the usual course of business, including their original form and sequence.

**DOCUMENT REQUESTS**

**DOCUMENT REQUEST NO. 1:**

Documents sufficient to identify IPLLC's current and former members, owners, shareholders, officers, directors, managers, employees, agents, and independent contractors and their positions.

**DOCUMENT REQUEST NO. 2:**

Documents reflecting IPLLC's observance of corporate formalities, including without limitation its Certificate of Formation, Operating Agreement, filings with the Delaware Department of State, capitalization, financial statements, and minutes of member meetings.

**DOCUMENT REQUEST NO. 3:**

All documents constituting, referring or relating to any agreements between You and any Counterclaim Defendant or between You and Megafilm.

**DOCUMENT REQUEST NO. 4:**

All documents that refer or relate to any Counterclaim Defendant, Megafilm and/or YouTube's Copyright Protection Services.

**DOCUMENT REQUEST NO. 5:**

All documents and Communications relating to DMCA Takedown Notices sent by You to YouTube, including without limitation Takedown Notices listing the email address usintellectualpropertyllc@gmail.com.

**DOCUMENT REQUEST NO. 6:**

All documents and Communications, relating to the videos that were the subject of DMCA Takedown Notices sent to YouTube listing the email address usintellectualpropertyllc@gmail.com.

**DOCUMENT REQUEST NO. 7:**

All Communications between You and Sarfraz Arshad Khan and/or Ransom Nova including but not limited to those regarding YouTube or Google, any matter set forth in the Amended Counterclaims, any matter related to this Lawsuit, any agreements between You and Khan and/or Ransom Nova, or any payments made by You to Khan and/or Ransom Nova.

**DOCUMENT REQUEST NO. 8:**

All documents and Communications concerning YouTube accounts created or used by Sarfraz Arshad Khan and/or Ransom Nova and any videos uploaded to such accounts.

**DOCUMENT REQUEST NO. 9:**

All Communications between You and Endre Holman and/or Zoltán Búzás concerning YouTube or Google, any matter set forth in the Amended Counterclaims, or any matter related to this Lawsuit.

**DOCUMENT REQUEST NO. 10:**

All documents and Communications concerning PirateMonitor and YouTube or Google, including but not limited to those regarding any matter set forth in the Amended Counterclaims, or any matter related to this Lawsuit.

# Exhibit 1

1    DAVID H. KRAMER, State Bar No. 168452
     MAURA L. REES, State Bar No. 191698
2    LAUREN GALLO WHITE, State Bar No.
     309075
3    WILSON SONSINI GOODRICH &
     ROSATI
4    Professional Corporation
     650 Page Mill Road
5    Palo Alto, CA 94304-1050
     Telephone: (650) 493-9300
6    Facsimile: (650) 565-5100
     Email: dkramer@wsgr.com
7           mrees@wsgr.com
            lwhite@wsgr.com
8

BRIAN M. WILLEN (admitted *Pro Hac
Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com

9    Attorneys for Defendants and Counterclaimants
     YOUTUBE, LLC and GOOGLE LLC

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13   MARIA SCHNEIDER and PIRATE MONITOR          )   CASE NO.:  3:20-cv-04423-JD
     LTD, individually and on behalf of all others )
14   similarly situated,                          )   **DEFENDANTS AND**
                                                   )   **COUNTERCLAIMANTS**
15                  Plaintiffs,                    )   **YOUTUBE, LLC AND GOOGLE**
                                                   )   **LLC'S AMENDED**
16           v.                                    )   **COUNTERCLAIMS**
                                                   )
17   YOUTUBE, LLC and GOOGLE LLC,                  )
                                                   )
18                  Defendants.                    )
                                                   )
19   _____          )
                                                   )
20                                                 )
     YOUTUBE, LLC and GOOGLE LLC,                  )
21                                                 )
                    Counterclaimants,              )
22                                                 )
             v.                                    )
23                                                 )
     PIRATE MONITOR LTD, PIRATE MONITOR            )
24   LLC and GÁBOR CSUPÓ,                           )
                                                   )
25                  Counterclaim Defendants.       )
                                                   )
26   _____          )

27

28

## COUNTERCLAIMS

Counterclaimants Google LLC and YouTube, LLC (collectively "YouTube") assert the following Counterclaims against Pirate Monitor LTD, Pirate Monitor LLC (except where otherwise indicated, Pirate Monitor LTD and Pirate Monitor LLC are referred herein together as "Pirate Monitor") and Gábor Csupó ("Csupó"), on personal knowledge as to YouTube's own actions and on information and belief as to the actions of others, as follows:

1.     Working together, Pirate Monitor and Csupó misused the YouTube service and engaged in a fraudulent scheme to obtain access to YouTube's copyright management systems. Using false identities and/or agents in an attempt to hide their involvement, Pirate Monitor and Csupó uploaded roughly two thousand videos to YouTube, each time representing that they had the rights to upload that content and that the content did not infringe any third party copyrights. Shortly thereafter, Pirate Monitor and Csupó invoked the notice-and-takedown provisions of the Digital Millennium Copyright Act ("DMCA") to demand that YouTube remove the very same videos that Pirate Monitor and Csupó had uploaded. In those notices, Pirate Monitor and Csupó represented that the videos were infringing their copyrights or those of copyright owners they claimed to represent.

2.     Pirate Monitor and Csupó violated the law. Either they lied to YouTube when they uploaded the videos in the first place, or lied when they demanded their removal. Their misrepresentations were intended to fool YouTube into believing that they could be trusted not to abuse YouTube's powerful copyright management tools, including Content ID. And their machinations render them liable to YouTube for breach of contract and fraud or, alternatively, violations of Section 512(f) of the DMCA.

## THE PARTIES

3.     **Counterclaim Plaintiff Google** is a Delaware limited liability company with its principal place of business in Mountain View, California. YouTube, a Google subsidiary, is a Delaware limited liability company with its principal place of business in San Bruno, California.

1   YouTube offers an online platform, including a website and mobile applications, that, among

2   other things, enables users to share videos they post with a global audience at no charge.

3          4.      **Counterclaim Defendant Pirate Monitor LTD**, a Plaintiff in this action, is a

4   limited company claiming a principal place of business at Intershore Chambers, 3rd Floor,

5   Geneva Place, Road Town, Tortola, VG1110 British Virgin Islands. Pirate Monitor LTD itself,

6   or through agents and related entities, has operations in Hungary and California, but has not

7   registered to do business in California. Pirate Monitor LTD claims in the Complaint to own the

8   copyrights to certain works through assignment from Hungarian movie producer Mega Film Kft

9   ("Mega Film"). Pirate Monitor LTD is a shell corporation set up principally if not exclusively for

10  purposes of pursuing this action and furthering the unlawful scheme described below.

11         5.      At the time of the filing of this pleading, despite filing this lawsuit against

12  YouTube more than seven months ago, Pirate Monitor LTD has failed to produce a single

13  document in response to YouTube's discovery requests that were served on October 12, 2020.

14  YouTube's requests seek, among other things, information regarding Pirate Monitor LTD's

15  corporate structure, identification of its agents and affiliates, its operations, its capitalization, and

16  its observance of corporate formalities. Pirate Monitor LTD has not even indicated if or when

17  document production will start. Pirate Monitor LTD is withholding the requested documentation

18  in a further effort to conceal the facts regarding the misconduct about which YouTube

19  complains, along with the identity of the individuals and entities involved.

20         6.      **Counterclaim Defendant Gábor Csupó** is an individual, a Hungarian film

21  director and a resident of California. Csupó is the managing director, sole stockholder, sole

22  decision maker, and alter ego of Pirate Monitor LTD. From what YouTube has been able to

23  piece together given Pirate Monitor LTD's refusal to provide any discovery, Pirate Monitor LTD

24  has no principals or employees other than Csupó. It is inadequately capitalized, disregards

25  corporate formalities, and commingles funds and other assets with Csupó. Csupó dominates and

26  controls Pirate Monitor LTD to such an extent that it has no separate corporate personality. So

27  thorough is Csupó's dominance of Pirate Monitor LTD that, if the actions of Pirate Monitor LTD

28

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED          -3-              CASE NO. 3:20-cv-04423-JD
COUNTERCLAIMS

alleged herein were treated as those of Pirate Monitor LTD alone, and not those of Csupó, it would lead to an inequitable result. Csupó created Pirate Monitor LTD after his personal liability for the acts alleged herein first arose, and his misuse of the corporate form is continuing. As a result, Csupó is responsible, and personally liable for, not only his own actions, but the acts of Pirate Monitor LTD as well.

7.      **Counterclaim Defendant Pirate Monitor LLC** represented itself to YouTube as a business entity, but YouTube has not found corporate registration information for a "Pirate Monitor LLC" anywhere in the world, and Pirate Monitor LTD has not provided any discovery on the question. Instead, it appears that Pirate Monitor LLC is merely an unincorporated d/b/a of Csupó. If Pirate Monitor LLC actually exists as a corporate entity at all, it is indistinguishable from Pirate Monitor LTD. Pirate Monitor LTD does not view Pirate Monitor LLC as an entity distinct from itself. In Paragraph 13 of its Complaint in this action, Pirate Monitor LTD alleges that it has applied for and been denied access to Content ID and that it has sent "successful takedown requests" to YouTube. But, according to YouTube's records, the only Pirate Monitor entity that has applied for Content ID or sent "successful takedown notices" to YouTube is the entity calling itself "Pirate Monitor LLC." By claiming Pirate Monitor LLC's actions as its own in the Complaint (in allegations that are central to its claim to represent a putative class), Pirate Monitor LTD has demonstrated that it believes itself to be, and holds itself out as, functionally the same entity as Pirate Monitor LLC.

8.      No matter what Pirate Monitor LLC's corporate status, Csupó is responsible for the acts of Pirate Monitor LLC. Insofar as Pirate Monitor LLC is an unincorporated d/b/a of Csupó, Pirate Monitor LLC's actions are Csupó's actions, and Csupó is personally liable for them. Alternatively, insofar as Pirate Monitor LLC actually exists as a corporate entity, Csupó is the alter ego of Pirate Monitor LLC. From what YouTube has been able to piece together given Pirate Monitor LTD's refusal to provide any discovery, Pirate Monitor LLC has no other principals, employees, or even operations. It is a shell corporation set up for purposes of furthering the scheme described herein. Under Csupó's sole control, Pirate Monitor LLC is

inadequately capitalized, disregards corporate formalities, and commingles funds and other assets with Csupó. Csupó dominates and controls Pirate Monitor LLC to such an extent that it has no separate corporate personality. So thorough is Csupó's dominance of Pirate Monitor LLC that if its actions alleged herein were treated as those of Pirate Monitor LLC alone, and not those of Csupó, it would lead to an inequitable result. As a result, Csupó is responsible and personally liable for the acts of Pirate Monitor LLC.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over the counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 1367.

10.      Pirate Monitor LTD is subject to this Court's personal jurisdiction because it has availed itself of the jurisdiction of this Court by filing the Complaint in this action and because it has minimum contacts with the State of California. The Court also has personal jurisdiction over Pirate Monitor LTD because it consented to such jurisdiction in the Terms of Service Agreement it entered into with YouTube and because it purposefully directed the misconduct described herein against YouTube in this District.

11.      Csupó is subject to this Court's personal jurisdiction because he is a resident of California and because he has minimum contacts with this State. The Court also has personal jurisdiction over Csupó because he is the alter ego of Plaintiff Pirate Monitor LTD and thus availed himself of this Court's jurisdiction by filing the Complaint in this action. The Court also has personal jurisdiction over Csupó because he consented to such jurisdiction in the Terms of Service Agreement he entered into with YouTube and because he purposefully directed the misconduct described herein against YouTube in this District.

12.      To the extent it is a corporate entity separate from Pirate Monitor LTD or Csupó, Pirate Monitor LLC is subject to this Court's personal jurisdiction because it has availed itself of the jurisdiction of this Court because it consented to such jurisdiction in the Terms of Service Agreement it entered into with YouTube, and because it purposefully directed the misconduct described herein against YouTube in this District.

13.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(a) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, because this Court has personal jurisdiction over Counterclaim Defendants, because Pirate Monitor LTD filed the Complaint in this district, and because Pirate Monitor LTD, Pirate Monitor LLC, and Csupó consented to venue in this District via the Terms of Service Agreements that they entered into with YouTube.

**The YouTube Service**

14.     Since its founding in 2005, YouTube has pursued the goal of providing a platform for users to share their video creations with the world. YouTube serves as an unparalleled medium for free marketing, exposure, and visibility for everyone from individuals to established corporate brands.

15.     YouTube also offers a worldwide audience the opportunity to access and watch an extraordinarily diverse library of original, creative expression.

16.     YouTube has never been a service devoted to promoting piracy or illegitimate uses of copyrighted works. Rather, YouTube is strongly committed to helping copyright owners protect against the unauthorized use of their works on the service, and it has implemented numerous industry-leading initiatives toward this end.

17.     While YouTube complies in all respects with safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), YouTube's efforts in helping copyright owners and content creators protect against unwanted use of their works goes far beyond what the law requires.

18.     For example, YouTube has invested over $100 million to develop Content ID, a best-in-class content identification system that uses digital fingerprinting technology to help identify copyrighted materials. Using Content ID, rightsholders and/or their agents can be automatically notified of user-uploaded videos that "match" what they claim are their copyrighted works and can choose in advance what they want to happen when those videos are

1   detected, including options to "monetize" the videos, (i.e. earn advertising revenue when users

2   watch the videos) or to "block" the videos from appearing altogether.

3         19.   Content ID and YouTube's other scaled copyright management tools empower

4   users to automatically, or at the touch of a button, remove content from YouTube or block it

5   from appearing in the first place. The tools thus have the potential to be used improperly to

6   censor videos that others have every right to post and share through YouTube. Further, the tools

7   enable users to claim ownership rights in others' content, and to siphon to themselves revenue

8   that rightly belongs to others.

9         20.   Because of the potential for abuse of these scaled tools, YouTube limits access to

10   them, seeking to ensure that those who use them will do so responsibly, and will not cause harm

11   to YouTube, its users, or to other copyright owners.

12                   **Users' Promises And Representations To YouTube**

13         21.   To create an account and post content on the YouTube service, users must

14   affirmatively accept the YouTube Terms of Service Agreement (the "ToS Agreement"). Parties

15   to the ToS Agreement consent to personal jurisdiction and exclusive venue for disputes arising

16   out of or relating to the YouTube service in the Courts of Santa Clara County, California.

17         22.   Under the applicable ToS Agreement in effect during all times relevant to these

18   counterclaims, a user creating a YouTube account promised to provide "accurate and complete"

19   identification information for the account to YouTube.

20         23.   Under the ToS Agreement in effect during all times relevant to these

21   counterclaims, users represent and warrant to YouTube that if they upload any content to the

22   YouTube service, they will "own or have the necessary licenses, rights, consents, and

23   permissions to publish Content [they] submit." Users also promise that any "content [they]

24   submit to the Service [will] not contain third party copyrighted material, or material that is

25   subject to other third party proprietary rights, unless [they have] permission from the rightful

26   owner of the material or [they are] otherwise legally entitled to post the material." And users

27

28

DEFENDANTS AND COUNTERCLAIMANTS
YOUTUBE, LLC AND GOOGLE LLC'S AMENDED          -7-          CASE NO. 3:20-cv-04423-JD
COUNTERCLAIMS

agree to grant YouTube a copyright license in and to any content they submit, representing that they have the required rights to do so.

24.     In addition to accepting the ToS Agreement and making the representations and promises it contains when creating an account, users must reaffirm their agreement to the ToS each time they upload material to the service. In that upload process, users are again expressly warned against submitting content that violates others' copyrights.

**Pirate Monitor And Csupó Uploaded Nearly 2000 Video Clips To YouTube Through "Ransom Nova" Accounts And Represented That They Did Not Infringe Anyone's Copyright**

25.     From August through November 2019, Pirate Monitor and Csupó created, or authorized and directed their agents to create, at least 23 accounts on YouTube. Each time they caused a new account to be created, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, affirmatively agreed to the YouTube ToS Agreement, and made the representations and promises to YouTube that are set out in the ToS Agreement.

26.     Among other things, Pirate Monitor and Csupó promised to provide YouTube with "accurate and complete" identification information for their YouTube accounts. They represented and warranted to YouTube that if they uploaded any content to the YouTube service, they would "own or have the necessary licenses, rights, consents, and permissions to publish Content [they] submit." They also promised that any "content [they] submit to the Service [will] not contain third party copyrighted material, or material that is subject to other third party proprietary rights, unless [they have] permission from the rightful owner of the material or [they are] otherwise legally entitled to post the material." And they granted YouTube a copyright license to the videos they submitted, representing that they had the required rights to do so.

27.     To deceive YouTube, and in violation of the ToS Agreement, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, provided bogus account registration information. Rather than properly identifying themselves as the account creator, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction

and control, used alternative account names and contact information designed to mask the relationship of the account creators and the accounts to Pirate Monitor and Csupó.

28.    Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, created and used at least the following YouTube accounts (or "channels") between August 23 and November 13, 2019:

| Account Name | Associated Email Address | Account Creation Date |
|---|---|---|
| ransom nova2 | ransomnova2@gmail.com | August 23, 2019 |
| ransom nova3 | ransomnova3@gmail.com | September 3, 2019 |
| ransom nova | ransomnova4@gmail.com | September 25, 2019 |
| ransom nova6 | ransomnova6@gmail.com | September 28, 2019 |
| ransom nova | ransomnova7@gmail.com | September 28, 2019 |
| ransom nova | ransomnova8@gmail.com | October 7, 2019 |
| ransom nova9 | ransomnova9@gmail.com | October 7, 2019 |
| ransom nova10 | ransomnova10@gmail.com | October 7, 2019 |
| ransom nova11 | ransomnova11@gmail.com | October 7, 2019 |
| ransom nova12 | ransomnova12@gmail.com | October 7, 2019 |
| ransom nova13 | ransomnova13@gmail.com | October 8, 2019 |
| ransom nova14 | ransomnova14@gmail.com | October 8, 2019 |
| ransom nova15 | ransomnova15@gmail.com | October 8, 2019 |
| Massive Films | ransomnova18@gmail.com | November 4, 2019 |
| Movie Mania | ransomnova19@gmail.com | November 5, 2019 |
| Movie Fun | ransomnova20@gmail.com | November 6, 2019 |
| Movie Festival | ransomnova21@gmail.com | November 8, 2019 |
| Entertainment Movie Channel | ransomnova22@gmail.com | November 8, 2019 |
| Ultimate Entertainment | ransomnova23@gmail.com | November 9, 2019 |

| Avengers | ransomnova25@gmail.com | November 10, 2019 |
|---|---|---|
| Fantastic | ransomnova26@gmail.com | November 10, 2019 |
| Amazing Channel | ransomnova27@gmail.com | November 10, 2019 |
| Avenger film | ransomnova29@gmail.com | November 13, 2019 |

29.     Most of the account names that Pirate Monitor or its agents selected for these accounts were variants on the name "Ransom Nova." Variations of the name "Ransom Nova" also appear in the email addresses that Pirate Monitor or its agents supplied in the account registration process. YouTube refers to these accounts hereafter as the "Ransom Nova accounts."

30.     The person(s) who created the Ransom Nova accounts did so using a computing device connected to the YouTube service via Internet Protocol ("IP") addresses indicating that they were in Pakistan at the time the accounts were created.

31.     From at least August 24, 2019 through at least November 13, 2019, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, used the Ransom Nova accounts to upload at least 1,960 videos to YouTube. At the time of the uploads, the Ransom Nova accounts were connected to the YouTube service from a computing device using IP addresses again indicating that they were in Pakistan.

32.     Using the Ransom Nova accounts, Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control uploaded hundreds of video clips from the Hungarian film *Csak szex és más semi* ("*Csak szex*"), one of the copyrighted works that Pirate Monitor LTD claimed to own in the Complaint and accused YouTube of infringing in this action.

33.     Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, also used the Ransom Nova accounts to upload hundreds of video clips from the Hungarian film *Zimmer Feri* to YouTube. *Zimmer Feri* is a prequel to *Zimmer Feri 2*, another work that Pirate Monitor claimed to own in the Complaint and accused YouTube of infringing in this action.

34.     Each time Pirate Monitor and Csupó, or the agents acting on their behalf and under their direction and control, uploaded a video to the YouTube service through the Ransom Nova accounts, they were required to and did reconfirm that they were abiding by the ToS Agreement; in relevant part, they represented and warranted to YouTube each time that they owned or had the rights to upload and license the material contained in the videos and that the videos they uploaded did not infringe any third party's copyrights.

**Pirate Monitor Demanded Removal Of The Nearly 2000 Video Clips It Had Previously Uploaded Through the Ransom Nova Accounts, Charging That They Infringed Copyrights**

35.     Between October 29 and November 15, 2019, Pirate Monitor and Csupó sent YouTube hundreds of takedown notices under the DMCA for the same videos they had uploaded or had directed to be uploaded through the Ransom Nova accounts. The DMCA takedown notices were sent in the name of an entity calling itself "Pirate Monitor LLC," using a Google account opened in the name of Gábor Csupó with the email address usintellectualpropertyllc@gmail.com. Csupó electronically signed each of the takedown notices.

36.     In those DMCA takedown notices, Pirate Monitor and Csupó represented to YouTube under penalty of perjury that "Mega Film" was the copyright owner of the videos that were the subject of the notices, and that they were Mega Film's authorized representatives. Pirate Monitor and Csupó also represented in the notices that the targeted video clips included material from the films *Czak Szex* and *Zimmer Feri* that infringed Mega Film's copyrights—i.e., that the use was not "authorized by Mega Film, its agents or the law." The notices were all virtually identical save for targeting different video clips uploaded through varying Ransom Nova accounts.

37.     At the time YouTube received these DMCA takedown notices from Pirate Monitor and Csupó, it was not aware of the connection between Pirate Monitor and Csupó on the one hand and the Ransom Nova accounts on the other. YouTube did not know that the parties insisting that the videos were infringing and should be removed were the same parties that had

1   uploaded or directed the upload of the videos in the first place and who had represented in that

2   process that the videos were not infringing.

3          38.     In reliance on the representations from Pirate Monitor and Csupó in the takedown

4   notices that were made to YouTube via the DMCA's statutorily prescribed mechanism, YouTube

5   processed approximately 1,800 separate notices from Pirate Monitor and Csupó and

6   expeditiously removed the targeted videos.

7               **Pirate Monitor And Csupó's Scheme Amounts Either To Fraud And
           Breach Of Contract Or A Violation Of Section 512(f) Of The DMCA**

8

9          39.     As set forth above, Pirate Monitor and Csupó uploaded, or authorized and

10   directed their agents to upload, nearly two thousand videos to YouTube, representing to

11   YouTube that the videos did not infringe copyrights, and then promptly sent DMCA takedown

12   notices for the same videos, representing to YouTube that the videos did infringe copyrights.

13   Without the benefit of discovery, it is unclear which of these conflicting representations about

14   the videos were truthful. But either way, Pirate Monitor and Csupó made material

15   misrepresentations on which YouTube relied.

16          40.     On the one hand, if Pirate Monitor and Csupó falsely represented to YouTube that

17   they had the authority to post the videos and that the videos did not infringe anyone's copyrights,

18   then Pirate Monitor and Csupó breached the ToS Agreement and perpetrated a fraud on

19   YouTube. Had Pirate Monitor and Csupó not made the representations to YouTube that they did,

20   YouTube would not have allowed them to create accounts on the service, and it would not have

21   allowed them to upload content to the service.

22          41.     On the other hand, if Pirate Monitor and Csupó accurately represented to

23   YouTube that they had the authority to post the videos and that the videos did not infringe any

24   third party's copyrights, then Pirate Monitor and Csupó made knowingly false statements when

25   they subsequently represented to YouTube in their DMCA takedown notices that those same

26   videos were infringing.

27

28

42.     These conflicting representations from Pirate Monitor and Csupó were no accident. Their serial uploads and DMCA takedown notices for the same videos were central to a scheme through which they hoped to gain access to YouTube's powerful copyright management tools, in particular Content ID.

43.     In May 2019, an entity calling itself Pirate Monitor LLC applied for access to use YouTube's copyright management tools. The application was made by Gabor Csupó, who supplied the email address usintellectualpropertyllc@gmail.com.

44.     YouTube denied this application in June 2019, explaining to Pirate Monitor and Csupó that access to YouTube's copyright management tools was predicated in part on demonstrating both a need for such access and a history of properly using the DMCA takedown notice process.

45.     Pirate Monitor and Csupó believed that they could demonstrate both the need for access, and a track record of valid DMCA takedown notices, by surreptitiously uploading a substantial volume of content through accounts seemingly unconnected to them, and then sending DMCA takedown notices for that same content. Three months after YouTube declined their copyright management tools application, Pirate Monitor and Csupó began the process of creating the Ransom Nova accounts and uploading videos through those accounts, in furtherance of their scheme.

**The Evidence To Date Without Discovery Of The Connection
Between Pirate Monitor, Csupó, And The Ransom Nova Accounts**

46.     Pirate Monitor and Csupó are in sole possession of the full information regarding their unlawful scheme, and have refused to provide any of it to YouTube in response to YouTube's specific discovery requests. By way of example, attached as Exhibit A is a true and correct copy of Pirate Monitor LTD's objections and responses to YouTube's Second Set of Document Requests in which it objects in full to every request, including those seeking information regarding *inter alia*, Ransom Nova and Pirate Monitor LLC.

47.     While withholding from YouTube all relevant information they possess, Pirate Monitor and Csupó have never denied that they and/or their agents were responsible for creating the Ransom Nova accounts. They have never denied that they and/or their agents uploaded through those accounts the very same videos that they then promptly claimed in DMCA takedown notices were infringing.

48.     YouTube already has overwhelming evidence that reveals Pirate Monitor and Csupó's deceptions and demonstrates that Pirate Monitor and Csupó either operated the Ransom Nova accounts directly or that the person(s) operating the Ransom Nova accounts were agents of Pirate Monitor and Csupó, acting at their direction and control and for their benefit.

49.     First, the video uploading activity conducted through the Ransom Nova accounts was not consistent with the behavior of users actually seeking to share videos with others through the YouTube service. Though the videos contained clips from the Hungarian movies *Csak szex* and *Zimmer Feri*, the user(s) uploading those videos selected nondescript titles for the clips, such as "Test1" or "Hot Clip." An uploader genuinely seeking an audience on YouTube for clips from those films would have selected titles that enabled users looking for clips from the films to find them. Additionally, almost all of the nearly two thousand video clips uploaded via the Ransom Nova accounts were the same length, 31 seconds, and they did not correspond to particular moments or scenes from the films. Further, the clips were not uploaded in any recognizable order, such as to track the films sequentially. It is evident from this unusual pattern that the person(s) who uploaded these clips to YouTube through the Ransom Nova accounts did not expect anyone to actually find and watch them. That is because the videos were not uploaded by a genuine YouTube user, but instead by or at the direction of Pirate Monitor and Csupó for the purpose of sending DMCA takedown notices for those clips.

50.     Second, Pirate Monitor and Csupó regularly sent DMCA takedown notices for videos uploaded through the Ransom Nova accounts within a very short time—no more than a few days—after the videos were uploaded. For example, 99 clips were uploaded through the "Ransom Nova" account, "Amazing Channel," on November 10, 2019. All 99 clips were the

subject of DMCA takedown notices four days later. When Pirate Monitor and Csupó sent their takedown notices, none of the videos targeted in those notices had an appreciable number of views on YouTube. In many cases, *the videos targeted in Pirate Monitor and Csupó's takedown notices had not recorded even a single view on YouTube.* In other words, Pirate Monitor and Csupó knew that the videos for which they sent takedown notices were on the YouTube service without having to actually view them. That is because Pirate Monitor and Csupó were responsible for having uploaded those videos in the first place.

51.     Third, there is powerful forensic evidence tying Pirate Monitor and Csupó to the Ransom Nova accounts. When Pirate Monitor and Csupó sent their takedown notices to YouTube—on behalf of Hungarian film company Mega Film—for videos uploaded through the Ransom Nova accounts, they had no reason to conceal their identities. They correctly identified themselves and invariably sent their takedown notices from a computer connected to the Internet via a unique Hungarian IP address: 217.65.XXX.XXX. On November 12, 2019, Pirate Monitor and Csupó were sending takedown notices to YouTube from that Hungarian IP address. At roughly the same time, someone logged into one of the Ransom Nova accounts—specifically the account created by RansomNova7@gmail.com—not from a Pakistani IP address, but from the same IP address in Hungary (217.65.XXX.XXX) that Pirate Monitor and Csupó were concurrently using to send the takedown notices. **In other words, RansomNova7 was sharing a computer and/or unique Internet connection with Pirate Monitor and Csupó in Hungary on the same day (and in fact, at almost the same time) that Pirate Monitor and Csupó were using that same computer and/or Internet connection to send takedown notices to YouTube**. That is because the person operating and responsible for the RansomNova7@gmail.com account either was Pirate Monitor or Csupó, or someone acting on their behalf.

52.     YouTube's investigation following the filing of this lawsuit has further revealed that the person or persons who created several of the Ransom Nova accounts on YouTube supplied the email address sarfrazjbd@gmail.com in connection with the accounts. That address

1  is registered to a person named Sarfraz Arshad Khan. Mr. Khan represents himself on the

2  Internet as a Pakistani resident and computer services freelancer and advertises having expertise

3  in data entry and promotion of content on YouTube. Mr. Khan also has a LinkedIn profile,

4  posted under the name "Ransom Nova," which states that he is a computer science student in

5  Pakistan. These facts make it extremely unlikely that Mr. Khan was acting on his own in setting

6  up and using the Ransom Nova accounts, but instead suggest that he was hired by Pirate Monitor

7  and Csupó to perform that work.

8       53.    Although Pirate Monitor has withheld all evidence, based on what YouTube

9  knows today, the only plausible conclusion is that the Ransom Nova accounts were created and

10  operated directly by Pirate Monitor and Csupó as part of the scheme alleged herein, or that they

11  were created and operated by agents, including Mr. Khan, acting at the direction and control of

12  Pirate Monitor and Csupó and for their benefit. Either way, Pirate Monitor and Csupó are

13  responsible for the acts performed through the Ransom Nova accounts.

**COUNTERCLAIM I: Against Pirate Monitor LTD,**
**Pirate Monitor LLC, And Gábor Csupó**
**Breach Of Contract**

16       54.    YouTube restates and realleges the preceding allegations of its Counterclaims.

17       55.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or

18  through their authorized agents who created the "Ransom Nova" accounts, agreed to be bound by

19  the ToS Agreement.

20       56.    The ToS Agreement constitutes a valid, binding contract between each of Pirate

21  Monitor LTD, Pirate Monitor LLC, and Csupó, and YouTube.

22       57.    YouTube has performed its obligations under the ToS Agreement, save for any

23  that have been excused, including by providing YouTube services to the parties who created the

24  "Ransom Nova" YouTube accounts.

25       58.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or

26  through their authorized agents who created the "Ransom Nova" accounts, breached the ToS

27  Agreement by, among other things:

28

i.       failing to provide complete and accurate identification information in the account creation process; and

ii.      uploading videos to YouTube that infringed third-party copyrights.

59.     These breaches have proximately caused damage to YouTube, including among other things, the cost of investigating and processing the subsequent DMCA takedown notices sent by Pirate Monitor and Csupó claiming that the content they uploaded was infringing.

60.     To the extent that Pirate Monitor LTD's claims in this action implicate content that Pirate Monitor itself uploaded (or is responsible for causing to be uploaded) to the YouTube service, the costs of defending the action as well as any liability also constitute damages proximately caused by Pirate Monitor's breaches of contract.

61.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó are additionally obligated under their ToS Agreements with YouTube to indemnify YouTube for claims arising out of or relating to their use of the YouTube service. In seeking defense costs and any potential liability in this action as damages for these contract breaches, YouTube expressly preserves its separate entitlement to contractual indemnity and is entitled to that indemnity to the extent Pirate Monitor LTD, Pirate Monitor LLC, and Csupó refuse to honor their indemnity obligation.

**COUNTERCLAIM II: Against Pirate Monitor LTD,
Pirate Monitor LLC, And Gábor Csupó
Fraud**

62.     YouTube restates and realleges the preceding allegations of its Counterclaims.

63.     Between at least August 23 and at least November 13, 2019, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents, created at least 23 "Ransom Nova" YouTube accounts. Each time they created a new account, they made the representations and promises to YouTube that are set out in the ToS Agreement.

64.     Among other things, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents, promised to provide YouTube with "accurate and complete" identification information for their YouTube accounts. They promised YouTube that if they uploaded any content to the YouTube service, they would "own or have the

necessary licenses, rights, consents, and permissions to publish Content [they] submit." They also promised that any "content [they] submit to the Service [will] not contain third party copyrighted material, or material that is subject to other third party proprietary rights, unless [they have] permission from the rightful owner of the material or [they are] otherwise legally entitled to post the material." And they granted YouTube a copyright license to any videos they submitted, representing that they had the required rights to do so.

65.     Each time Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents uploaded a video to the YouTube service, they reaffirmed their agreement to the ToS Agreement, and made those same promises and representations.

66.     But Pirate Monitor LTD, Pirate Monitor LLC, and Csupó had no intention of honoring the promises in the ToS Agreement either at the time they created their accounts or when they uploaded videos to the service. Rather, they intended to use the service to upload material that infringed third-party copyrights.

67.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó themselves or through their authorized agents also represented to YouTube through the ToS Agreement at the time they created the Ransom Nova accounts and again in the video upload process that they had the authority to post the videos that they did, and that the videos did not infringe any third party's copyrights. These representations were made, in materially identical form, each time videos were uploaded through the Ransom Nova accounts. The representations were false, and Pirate Monitor LTD, Pirate Monitor LLC, and Csupó knew that the representations were false.

68.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó made those representations or caused their authorized agents to make them with the intention of inducing YouTube to accept and allow to be uploaded the content that Pirate Monitor LTD, Pirate Monitor LLC, and Csupó wanted uploaded to the YouTube service.

69.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó made the false promises and misrepresentations they did because they knew that YouTube would not allow them to create

accounts or allow them to upload content through those accounts if they did not make those false promises and misrepresentations. That, in turn, would have frustrated their scheme to send mass takedown notices and establish the track record they hoped would gain them access to YouTube's copyright management tools.

70.     YouTube relied on Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's false promises and misrepresentations by allowing them to create accounts and by accepting content uploaded through those accounts to the YouTube service. YouTube would not have allowed the creation of the accounts or accepted the content but for Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's false promises and misrepresentations.

71.     YouTube's reliance was justifiable. It had no reason to believe Pirate Monitor LTD, Pirate Monitor LLC, and Csupó would make promises they had no intention of performing or misrepresent the nature of the content they were uploading.

72.     Because they hid their intention not to honor their promises in the ToS Agreement, and because of the misrepresentations they made in the ToS Agreement, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó were able to create at least 23 accounts and upload at least 1,960 videos to YouTube, and soon thereafter sent DMCA takedown notices for those same videos.

73.     As a proximate result of Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's promises made without intention to perform and misrepresentations, YouTube has been damaged in an amount to be proven at trial, but including among other things, the cost of processing at least 1,800 DMCA takedown notices for the content Pirate Monitor LTD, Pirate Monitor LLC, and Csupó uploaded, and the cost of investigating and remediating their misconduct.

74.     To the extent that Pirate Monitor LTD's claims in this action implicate content that Pirate Monitor LTD itself uploaded to the YouTube service, the costs of defending the action as well as any liability also constitute damages proximately caused by Pirate Monitor LTD's promises without intention to perform and false representations.

75.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó's conduct was undertaken with the intent to injure YouTube, and with a willful and conscious disregard of YouTube's rights, and constitutes fraud and malice under California Civil Code Section 3294. As a result, YouTube is entitled to an award of punitive damages against Pirate Monitor LTD, Pirate Monitor LLC, and Csupó in an amount sufficient to punish them and deter them from future misconduct.

**COUNTERCLAIM III: Against Pirate Monitor LTD,**
**Pirate Monitor LLC, And Gábor Csupó**
**(In the alternative to Counterclaims I & II)**
**Violation of 17 U.S.C § 512(f)**

76.     YouTube pleads Counterclaim III as an alternative to Counterclaims I & II, and incorporates the preceding allegations of Paragraphs 1 to 53 herein.

77.     Pirate Monitor LTD, Pirate Monitor LLC, and Csupó directly themselves, and/or through their authorized agents who created the "Ransom Nova" accounts, repeatedly represented to YouTube in the ToS Agreement and in the upload process that they had the authority to post the videos that they did, and that the videos did not infringe any third party's copyrights. Those representations were true.

78.     From October 29, 2019 through November 15, 2019, Pirate Monitor and Csupó sent approximately 1,800 DMCA takedown notices to YouTube for content that they themselves had uploaded to YouTube. Each of those notices was sent by "Pirate Monitor LLC" signed by Csupó.

79.     In their DMCA takedown notices, Pirate Monitor and Csupó expressly represented to YouTube that the videos identified in the notices infringed the copyrights of a party they were authorized to represent (Mega Film). They further declared that the information in the takedown notices was accurate, and declared under penalty of perjury that they were the owner, or an agent authorized to act on behalf of the owner, of an exclusive right that was allegedly infringed.

80.     Pirate Monitor and Csupó's representations in those DMCA takedown notices regarding infringement were knowingly false. As Pirate Monitor and Csupó knew, the videos

they identified as infringing in their DMCA takedown notices were not infringing their

copyrights or those of copyright owners that they represented. In fact, through their authorized

agents who created the "Ransom Nova" accounts, Pirate Monitor and Csupó themselves had

uploaded those same videos.

81.    Each time they sent DMCA takedown notices to YouTube for videos they had

uploaded, Pirate Monitor and Csupó knowingly and materially misrepresented that material or

activity on YouTube was infringing.

82.    YouTube, the service provider that received these DMCA takedown notices,

relied upon the misrepresentations made by Pirate Monitor LLC and Csupó therein by removing

or disabling access to the material they falsely claimed was infringing. YouTube's reliance was

reasonable, given that the notices at issue were made in the form prescribed by the DMCA, 17

U.S.C. § 512(c)(3).

83.    YouTube was injured by Pirate Monitor and Csupó's misrepresentations in their

DMCA notices. But for those misrepresentations, YouTube would not have had to incur the costs

of processing approximately 1,800 DMCA notices and removing the videos identified in those

notices. Further, as a result of Pirate Monitor and Csupó's misrepresentations, YouTube had to

expend substantial additional sums on an investigation in an effort to detect and thwart their

deceptive behavior.

84.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó have yet to admit their role

in the scheme detailed herein, much less forsworn similar misconduct in the future. The sheer

number of material misrepresentations they made in DMCA takedown notices demonstrates that

they have little fear of the threat of monetary liability under Section 512(f). Further, as the

Complaint in this action demonstrates, Pirate Monitor LTD, Pirate Monitor LLC, and Csupó still

harbor the same motive to obtain access to Content ID as they did when they first hatched their

plan.

85.    Pirate Monitor LTD, Pirate Monitor LLC, and Csupó have demonstrated their

willingness to conceal their identities in furtherance of their goals. Having been caught by

YouTube, they now can learn from their mistakes to evade detection in the future by, *inter alia*, selecting new account names, masking their IP addresses, using new and different agents to upload videos, and sending new false DMCA takedown notices for different videos that their new agents upload. Because YouTube relies on the sworn representations made by those that send facially valid copyright removal requests, there is no guarantee it can detect and prevent such fraudulent behavior in the future, nor should it be forced to expend substantial sums to try to do so. Further, YouTube has no ready means of calculating the harm that such misrepresentations would cause to YouTube or its users in terms of lost goodwill, lost audiences, and lost opportunities. To prevent such irreparable harm, injunctive relief barring Pirate Monitor LTD, Pirate Monitor LLC, and Csupó from future misrepresentations in DMCA takedown notices is warranted.

**PRAYER FOR RELIEF**

Wherefore, YouTube respectfully requests that the Court:

      a.     Award damages against Pirate Monitor LTD, Pirate Monitor LLC, and Gábor Csupó sufficient to compensate YouTube for the harm caused by their conduct;

      b.     Award punitive damages against Pirate Monitor LTD, Pirate Monitor LLC, and Gábor Csupó for their fraudulent conduct;

      c.     Issue an injunction barring Pirate Monitor LTD, Pirate Monitor LLC, and Gábor Csupó and all those in active concert with them from submitting notices of alleged infringement to YouTube that misrepresent that material on the YouTube service is infringing copyrights held or claimed to be held by Pirate Monitor LTD, Pirate Monitor LLC, and Gábor Csupó or anyone they claim to represent.

      d.     Award YouTube the costs of this action along with attorneys' fees pursuant to 17 U.S.C. § 512(f) against Pirate Monitor LTD, Pirate Monitor LLC, and Gábor Csupó; and

1

        e.      Award YouTube such other and further relief as the Court may deem just

2

and proper.

3

Dated:  February 19, 2021                    Respectfully submitted

4

5

                                   WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

6

                                   By:  _____*/s/ David H. Kramer*_____

7

8

                                   Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

George A. Zelcs *(pro hac vice)*
  gzelcs@koreintillery.com
Randall P. Ewing, Jr. *(pro hac vice)*
  rewing@koreintillery.com
Ryan Z. Cortazar *(pro hac vice)*
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery *(pro hac vice)*
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe *(pro hac vice)*
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653      Philip C. Korologos *(pro hac vice)*
  jischiller@bsfllp.com                      pkorologos@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**           Joanna C. Wright *(pro hac vice)*
44 Montgomery St., 41st Floor               jwright@bsfllp.com
San Francisco, CA  94104                  **BOIES SCHILLER FLEXNER LLP**
Telephone: (415) 293-6800                 55 Hudson Yards, 20th Floor
Facsimile: (415) 293-6899                 New York, NY  10001
                                          Telephone:  (212) 446-2300
*Attorneys for Maria Schneider and*          Facsimile: (212) 446-2350
*Pirate Monitor, LTD*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated; | CASE NO. 5:20-cv-4423 |
| Plaintiffs, | **PLAINTIFF PIRATE MONITOR LTD'S OBJECTIONS AND RESPONSES TO YOUTUBE AND GOOGLE'S SECOND SET OF DOCUMENT REQUESTS TO PLAINTIFF AND COUNTERCLAIM DEFENDANT PIRATE MONITOR LTD** |
| vs. | |
| YOUTUBE, LLC; and GOOGLE LLC; | |
| Defendants. | |

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Pirate Monitor LTD (together "Plaintiff" or "Pirate Monitor") submits the following responses and objections to Defendants YouTube, LLC ("YouTube") and Google LLC ("Google") (collectively "Defendants") Second Set of Document Requests to Plaintiff Pirate Monitor LTD, dated January 13, 2020 (the "Requests"), in the above-captioned action (the "Action").

By these Responses, Pirate Monitor does not intend to, and does not, (1) waive any objection as to the admissibility of evidence or the competency of, relevancy of, materiality of, or privilege attaching to any information disclosed in these responses, or (2) waive the right to object to other discovery requests or undertaking involving or reflecting the subject matter of the Requests or these Responses. These Responses do not constitute, nor should they be construed as, admissions with respect to the relevancy or admissibility of any evidence or document identified herein or the truth or accuracy of any statement, characterization, or other information contained in such document. Pirate Monitor expressly does not concede the relevance or materiality of any of these Responses or the subject matter they refer to.

Pirate Monitor's discovery and preparation for trial of this matter is not complete as of the date of these Responses and are continuing. Pirate Monitor anticipates that discovery and preparation for trial will reveal additional information not presently known to it, but upon which it may rely. These Responses to the Requests are based upon information currently known to or believed to be true by Pirate Monitor. Pirate Monitor reserves the right to modify or supplement these Responses upon completion of discovery and preparation for trial of this matter, and to use at trial, or in any motion or deposition, any documents, facts, or supporting evidence of any sort later developed or discovered.

Pirate Monitor reserves the right to amend or revise these Responses, including based on any responses or objections submitted by Defendants to any of Pirate Monitor's discovery requests. Pirate Monitor also asserts that any discovery obligations should be mutual between parties, so that if any of Pirate Monitor's objections are overridden, Defendants should be subject to the same scope of discovery, including definitions and instructions for discovery compliance.

Pirate Monitor expects that the parties will negotiate a "search term protocol," which will govern the search for documents in this litigation, including the search terms and parameters, custodians, repositories and relevant time frame. Pirate Monitor will locate documents consistent with this protocol, which will be subject to further review for responsiveness.

### GENERAL OBJECTIONS

1.      Pirate Monitor objects to the Requests to the extent they impose obligations in addition to those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, any court governing discovery in this case, or any discovery protocol agreed upon by the parties.

2.      Pirate Monitor objects to the extent that Defendants' Requests purport to seek discovery of every conceivable document, or "any" or "all" documents, relating to a particular request. Pirate Monitor intends to negotiate reasonable document search parameters with Defendants.

3.      Pirate Monitor objects to each Request to the extent it purports to seek information protected by the attorney-client privilege or the work-product doctrine, and Pirate Monitor will not provide any privileged and/or protected information. Any disclosure of privileged information would be inadvertent and should not be deemed a waiver of any applicable privileges.

4.      Pirate Monitor objects to each Request to the extent that it contains words and/or phrases that are not defined, thereby rendering the Request overboard, vague, and ambiguous.

5.      Pirate Monitor objects to the Requests to the extent that they seek information not within Pirate Monitor's possession, custody, or control.

6.      Pirate Monitor objects to the Requests to the extent that they purport to impose a burden on Pirate Monitor to provide documents or information already in Defendants' possession, custody, or control, and/or which are publicly available, otherwise equally available to all parties, or available to Defendants from a less burdensome, more efficient, more convenient, or less expensive source than they are available to Pirate Monitor, or through a more convenient, more efficient, less burdensome, or less expensive means than the Requests.

7.      Any objection to any of the Requests is not an admission that Pirate Monitor has any information or documents responsive to a particular Request.

8.      If a response indicates that Pirate Monitor will produce documents, Pirate Monitor does not represent that any responsive documents are in its possession, custody, or control, but rather that production will be made if any such documents are located after a reasonable search.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Pirate Monitor objects to the extent that Defendants' Definitions and Instructions seek information covered by privilege(s), including the attorney-client and attorney work product privileges. *See, e.g.*, Defendants' Definition No. 1.

2.      Pirate Monitor objects to the definition of "Pirate Monitor," "You," and "Your," as vague, overbroad, unduly burdensome, disproportionate to the needs of this litigation. Pirate Monitor will construe these terms to refer to Pirate Monitor LTD and any agent or principal acting on behalf of Pirate Monitor LTD.

3.      Pirate Monitor objects to the instruction to provide all documents in the possession, custody, or control of anyone other than Pirate Monitor. Consistent with its obligations under the Federal Rules and applicable law, Pirate Monitor will undertake reasonable efforts to produce responsive documents within its possession, custody, or control.

4.      Pirate Monitor objects to the failure to include an instruction as to the relevant time period for the Requests. Pirate Monitor will apply reasonable date restrictions to its searches for responsive documents, consistent with its obligations under the Federal Rules and applicable law.

## SPECIFIC OBJECTIONS AND RESPONSES

The General Objections and Objections to Definitions and Instructions set forth above are incorporated into the Specific Objections below, as if incorporated therein. Pirate Monitor reserves the right to amend or revise its Specific Objections, including after meeting and conferring with Defendants regarding any Request. A response to any request indicating that Pirate Monitor agrees to produce

1  documents is not an admission that documents responsive to the Request exist and does not waive any

2  objections to the use of any discovery produced in response to the Request.

3  **DOCUMENT REQUEST NO. 51:**

4         All documents and communications relating to Intellectual Property LLC.

5  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 51 on the grounds that it

6  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

7  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

8  parties' relative access to relevant information, the parties' resources, and because the burden and

9  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

10 Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

11 herein.

12 **DOCUMENT REQUEST NO. 52:**

13        All communications between You and Intellectual Property LLC concerning YouTube or

14 Google, any matter set forth in the complaint, or any matter related to the conduct of this litigation.

15 **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 52 on the grounds that it

16 is overbroad, duplicative of Request No. 51, seeks irrelevant information that is not reasonably calculated

17 to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

18 amount in controversy, the parties' relative access to relevant information, the parties' resources, and

19 because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

20 states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

21 of the objections stated herein.

22 **DOCUMENT REQUEST NO. 53:**

23        All documents and communications relating to Pex.

24 **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 53 on the grounds that it

25 is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

26 admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

27

28

1  parties' relative access to relevant information, the parties' resources, and because the burden and
2  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with
3  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated
4  herein.

5  **DOCUMENT REQUEST NO. 54:**

6         All communications between You and Pex concerning YouTube or Google, any matter set
7  forth in the complaint, or any matter related to the conduct of this litigation.

8  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 54 on the grounds that it
9  is overbroad, duplicative of Request No. 53, seeks irrelevant information that is not reasonably calculated
10  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the
11  amount in controversy, the parties' relative access to relevant information, the parties' resources, and
12  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor
13  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis
14  of the objections stated herein.

15  **DOCUMENT REQUEST NO. 55:**

16         All documents and communications relating to Pirate Monitor LLC.

17  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 55 on the grounds that it
18  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of
19  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the
20  parties' relative access to relevant information, the parties' resources, and because the burden and
21  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with
22  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated
23  herein.

24  **DOCUMENT REQUEST NO. 56:**

25         All communications between You and Pirate Monitor LLC concerning YouTube or Google,
26  any matter set forth in the complaint, or any matter related to the conduct of this litigation.

27

28

1   **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 56 on the grounds that it

2 is overbroad, duplicative of Request No. 55, seeks irrelevant information that is not reasonably calculated

3 to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

4 amount in controversy, the parties' relative access to relevant information, the parties' resources, and

5 because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

6 states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

7 of the objections stated herein.

8   **DOCUMENT REQUEST NO. 57:**

9      All documents and communications relating to Sarfraz Arshad Khan.

10   **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 57 on the grounds that it

11 is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

12 admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

13 parties' relative access to relevant information, the parties' resources, and because the burden and

14 expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

15 Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

16 herein.

17   **DOCUMENT REQUEST NO. 58:**

18      All communications between You and Sarfraz Arshad Khan concerning YouTube or Google,

19 any matter set forth in the complaint, or any matter related to the conduct of this litigation.

20   **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 58 on the grounds that it

21 is overbroad, duplicative of Request No. 57, seeks irrelevant information that is not reasonably calculated

22 to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

23 amount in controversy, the parties' relative access to relevant information, the parties' resources, and

24 because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

25 states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

26 of the objections stated herein.

27

1  **DOCUMENT REQUEST NO. 59:**

2      All documents and communications relating to Zoltan Buzas.

3  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 59 on the grounds that it

4  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

5  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

6  parties' relative access to relevant information, the parties' resources, and because the burden and

7  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

8  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

9  herein.

10  **DOCUMENT REQUEST NO. 60:**

11      All communications between You and Zoltan Buzas concerning YouTube or Google, any

12  matter set forth in the complaint, or any matter related to the conduct of this litigation.

13  **OBJECTIONS AND RESPONSE:**  Pirate Monitor objects to Request No. 60 on the grounds that it

14  is overbroad, duplicative of Request No. 59, seeks irrelevant information that is not reasonably calculated

15  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

16  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

17  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

18  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

19  of the objections stated herein.

20  **DOCUMENT REQUEST NO. 61:**

21      All documents and communications concerning Ransom Nova.

22  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 61 on the grounds that it

23  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

24  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

25  parties' relative access to relevant information, the parties' resources, and because the burden and

26  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

27

28

1  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

2  herein.

3  **DOCUMENT REQUEST NO. 62:**

4        All documents and communications concerning YouTube accounts created or used by

5  Ransom Nova.

6  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 62 on the grounds that it

7  is overbroad, duplicative of Request No. 61, seeks irrelevant information that is not reasonably calculated

8  to lead to the discovery of admissible evidence, and is not proportional to the needs of the case, the

9  amount in controversy, the parties' relative access to relevant information, the parties' resources, and

10  because the burden and expense of the proposed discovery outweighs its likely benefit. Pirate Monitor

11  states in accordance with Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis

12  of the objections stated herein.

13  **DOCUMENT REQUEST NO. 63:**

14        All documents concerning Your selection of works to be included as Works in Suit.

15  **OBJECTIONS AND RESPONSE:** Pirate Monitor objects to Request No. 63 on the grounds that it

16  is overbroad, seeks irrelevant information that is not reasonably calculated to lead to the discovery of

17  admissible evidence, and is not proportional to the needs of the case, the amount in controversy, the

18  parties' relative access to relevant information, the parties' resources, and because the burden and

19  expense of the proposed discovery outweighs its likely benefit. Pirate Monitor states in accordance with

20  Rule 34(b)(2)(C) that it intends to withhold responsive documents on the basis of the objections stated

21  herein.

22

23  Dated: February 12, 2021                    Respectfully submitted,

24                                              /s/ Steven M. Berezney

25                                              George A. Zelcs *(pro hac vice)*
                                                Randall P. Ewing, Jr. *(pro hac vice)*
26                                              Ryan Z. Cortazar *(pro hac vice)*

27

28  PIRATE MONITOR'S OBJECTIONS &            9            CASE NO. 5:20-CV-4423
    RESPONSES TO DEFENDANTS'
    SECOND SET OF DOCUMENT REQUESTS

**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
Steven M. Berezney, CA Bar #329923
Michael E. Klenov, CA Bar #277028
Carol O'Keefe (*pro hac vice*)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Phone: (415) 293-6800
Fax: (415) 293-6899

Philip C. Korologos (*pro hac vice*)
Joanna C. Wright (*pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Maria Schneider and
Pirate Monitor LTD*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2021, I caused the foregoing Plaintiff Pirate Monitor LTD's Objections and Responses to YOUTUBE and GOOGLE'S Second Set of Document Requests to Plaintiff Pirate Monitor LTD to be served on all opposing counsel of record by email at the addresses listed below:

Schneidervyoutube@wsgr.com

_____/s/ Steven M. Berezney_____

PIRATE MONITOR'S OBJECTIONS &
RESPONSES TO DEFENDANTS'
SECOND SET OF DOCUMENT REQUESTS

10

CASE NO. 5:20-CV-4423

## CERTIFICATE OF SERVICE

I, Deborah Grubbs, declare:

I am employed in Santa Clara County, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304-1050.

On this date, I served:

**1.    NOTICE OF DEFENDANTS AND COUNTERCLAIMANTS YOUTUBE, LLC AND GOOGLE LLC'S NON-PARTY DOCUMENT SUBPOENA TO INTELLECTUAL PROPERTY LLC**

☒    By forwarding the document(s) by electronic transmission on this date to the Internet email address listed below:

BSFYouTube@bsfllp.com and Ktyoutube@koreintillery.com

I am readily familiar with Wilson Sonsini Goodrich & Rosati's practice for collection and processing of documents for delivery according to instructions indicated above.  In the ordinary course of business, documents would be handled accordingly.

I declare under penalty of perjury under the laws of the United States of America and State of California that the foregoing is true and correct.  Executed at San Mateo, California on June 1, 2021.

_____
Deborah Grubbs

# Exhibit G

George A. Zelcs *(pro hac vice)*
    gzelcs@koreintillery.com
Randall P. Ewing, Jr. *(pro hac vice)*
    rewing@koreintillery.com
Ryan Z. Cortazar *(pro hac vice)*
    rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery *(pro hac vice)*
    stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
    sberezney@koreintillery.com
Michael E. Klenov, CA Bar #277028
    mklenov@koreintillery.com
Carol O'Keefe *(pro hac vice)*
    cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
    jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone:  (415) 293-6800
Facsimile: (415) 293-6899

Philip C. Korologos *(pro hac vice)*
    pkorologos@bsfllp.com
Joanna C. Wright *(pro hac vice)*
    jwright@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Telephone:  (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Intellectual Property LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER, individually and on behalf of all others similarly situated; | |
| Plaintiff, | CASE NO.  3:20-cv-4423-JD |
| vs. | **THIRD PARTY INTELLECTUAL PROPERTY LLC'S OBJECTIONS AND RESPONSES TO YOUTUBE AND GOOGLE'S NON-PARTY DOCUMENT SUBPOENA TO INTELLECTUAL PROPERTY LLC** |
| YOUTUBE, LLC; and GOOGLE LLC; | |
| Defendants. | |
| YOUTUBE, LLC and GOOGLE LLC; | |
| Counter-Plaintiffs, | |
| v. | |
| PIRATE MONITOR LTD., GÁBOR CSUPÓ, and PIRATE MONITOR LLC, | |
| Counter-Defendants. | |

Pursuant to Federal Rule of Civil Procedure 45, third-party Intellectual Property LLC ("IPLLC") submits the following responses and objections to Defendants YouTube, LLC ("YouTube") and Google LLC's ("Google") (collectively "Defendants" or "Counterclaimants") Non-Party Document Subpoena to Intellectual Property LLC, dated June 1, 2021 (the "Requests"), in the above-captioned action (the "Action").

By these Responses, IPLLC does not intend to, and does not, (1) waive any objection as to the admissibility of evidence or the competency of, relevancy of, materiality of, or privilege attaching to any information disclosed in these responses, or (2) waive the right to object to other discovery requests or undertakings involving or reflecting the subject matter of the Requests or these Responses. These Responses do not constitute, nor should they be construed as, admissions with respect to the relevancy or admissibility of any evidence or document identified herein or the truth or accuracy of any statement, characterization, or other information contained in such document. IPLLC expressly

1   does not concede the relevance or materiality of any of these Responses or the subject matter they

2   refer to.

3        These Responses to the Requests are based upon information currently known to or believed

4   to be true by IPLLC. IPLLC reserves the right to amend or revise these Responses.

5                              **GENERAL OBJECTIONS**

6        1.      IPLLC objects to the Requests to the extent they impose obligations in addition to

7   those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, any court order

8   governing discovery in this case, or any discovery protocol agreed upon by the parties.

9        2.      IPLLC objects to the extent that Defendants' Requests purport to seek discovery of

10  every conceivable document, or "any" or "all" documents, relating to a particular request.

11       3.      IPLLC objects to each Request to the extent it purports to seek information protected

12  by the attorney-client privilege or the work-product doctrine, and IPLLC will not provide any

13  privileged and/or protected information. Any disclosure of privileged information would be

14  inadvertent and should not be deemed a waiver of any applicable privileges.

15       4.      IPLLC objects to each Request to the extent that it contains words and/or phrases

16  that are not defined, thereby rendering the Request overboard, vague, and ambiguous.

17       5.      IPLLC objects to the Requests to the extent that they seek information not within

18  IPLLC's possession, custody, or control.

19       6.      IPLLC objects to the Requests to the extent that they purport to impose a burden on

20  IPLLC to provide documents or information already in Defendants' possession, custody, or control,

21  and/or which are publicly available, otherwise equally available to all parties, or available to

22  Defendants from a less burdensome, more efficient, more convenient, or less expensive source than

23  they are available to IPLLC, or through a more convenient, more efficient, less burdensome, or less

24  expensive means than the Requests.

25       7.      Any objection to any of the Requests is not an admission that IPLLC has any

26  information or documents responsive to a particular Request.

27

28  IPLLC'S OBJECTIONS & RESPONSES            3            CASE NO. 3:20-CV-4423
    TO DEFENDANTS' NON-PARTY SUBPOENA

8.      When a response indicates that IPLLC will produce documents, IPLLC does not represent that any responsive documents are in its possession, custody, or control, but rather that production will be made if any such documents are located after a reasonable search.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      IPLLC objects to the extent that Defendants' Definitions and Instructions seek information covered by privilege(s), including the attorney-client and attorney work product privileges. *See, e.g.*, Defendants' Definition Nos. 1, 5–9, 11–12 (definitions including attorneys).

2.      IPLLC objects to the extent that Defendants' Requests purport to seek discovery of every conceivable document, or "any" or "all" documents, relating to a particular request. IPLLC intends to negotiate reasonable document search parameters with Defendants.

3.      IPLLC objects to the definition of "IPLLC," "You," or Your" as overbroad and vague to the extent that it includes "any person or entity acting on their behalf."

4.      IPLLC objects to the definitions of "Pirate Monitor LTD," "Pirate Monitor LLC," "Gábor Csupó," "Endre Holman," "Zoltán Búzás," "Megafilm," and "Sarfraz Arshad Khan," as overbroad and vague to the extent that these definitions include "any other person acting or purporting to act on its behalf" or "any person or entity acting on his behalf."

5.      IPLLC objects to the instruction to provide all documents in the possession, custody, or control of anyone other than IPLLC. Consistent with its obligations under the Federal Rules and applicable law, IPLLC will undertake reasonable efforts to produce responsive documents within its possession, custody, or control.

6.      IPLLC objects to the failure to include an instruction as to the relevant time period for the Requests. IPLLC will apply reasonable date restrictions to its searches for responsive documents, consistent with its obligations under the Federal Rules and applicable law.

7.      IPLLC objects to Instruction Nos. 1 and 2 as unduly burdensome. IPLLC is a third-party to the underlying litigation and has not inserted itself into that litigation.

1

**SPECIFIC OBJECTIONS AND RESPONSES**

2      The General Objections and Objections to Definitions and Instructions set forth above are

3 incorporated into the Specific Objections below, as if incorporated therein. IPLLC reserves the right to

4 amend or revise its Specific Objections, including after meeting and conferring with Defendants

5 regarding any Request. A response to any request indicating that IPLLC agrees to produce documents is

6 not an admission that documents responsive to the Request exist and does not waive any objections to

7 the use of any discovery produced in response to the Request.

8 **DOCUMENT REQUEST NO. 1:**

9      Documents sufficient to identify IPLLC's current and former members, owners, shareholders,

10 officers, directors, managers, employees, agents, and independent contractors and their positions.

11 **OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 1 on the grounds that the request

12 is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy,

13 the parties' relative access to relevant information, the parties' resources, and because the burden and

14 expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to

15 take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

16      Subject to and without waiving theses objections, the General Objections, and the Objections

17 to Definitions and Instructions, in response to Request No. 1, IPLLC will perform a reasonable and

18 proportionate search for IPLLC documents in the possession of Gábor Csupó and will produce

19 responsive, non-privileged documents, if any, from the relevant time range agreed to by IPLLC and

20 Defendants.

21 **DOCUMENT REQUEST NO. 2:**

22      Documents reflecting IPLLC's observance of corporate formalities, including without

23 limitation its Certificate of Formation, Operating Agreement, filings with the Delaware Department

24 of State, capitalization, financial statements, and minutes of member meetings.

25 **OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 2 on the grounds that it is

26 overbroad, harassing, seeks publicly available information, and seeks evidence that is not relevant to any

27

28

party's claim or defense. IPLLC further objects to the phrase "observance of corporate formalities" as vague and ambiguous and because it calls for legal conclusions. IPLLC further objects that the request is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, because the burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

**DOCUMENT REQUEST NO. 3:**

All documents constituting, referring or relating to any agreements between You and any Counterclaim Defendant or between You and Megafilm.

**OBJECTIONS AND RESPONSE:** IPLLC objects to Request No. 3 on the grounds that it is overbroad and seeks evidence that is not relevant to any party's claim or defense. IPLLC further objects to the term "agreements" as vague and ambiguous and because it calls for legal conclusions. IPLLC further objects that the request is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, because the burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

Subject to and without waiving theses objections, the General Objections, and the Objections to Definitions and Instructions, in response to Request No. 3, IPLLC will perform a reasonable and proportionate search for IPLLC documents in the possession of Gábor Csupó and will produce relevant contracts between IPLLC and any Counterclaim Defendant or between IPLLC and Megafilm related to Counterclaimants' Amended Counterclaims.

**DOCUMENT REQUEST NO. 4:**

All documents that refer or relate to any Counterclaim Defendant, Megafilm and/or YouTube's Copyright Protection Services.

**OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 4 on the grounds that it is overbroad and seeks evidence that is not relevant to any party's claim or defense. IPLLC further objects that the request is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, because the burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

Subject to and without waiving theses objections, the General Objections, and the Objections to Definitions and Instructions, in response to Request No. 4, IPLLC will perform a reasonable and proportionate search for IPLLC documents in the possession of Gábor Csupó and will produce responsive, non-privileged documents regarding YouTube's Copyright Protection Services or Counterclaimants' Amended Counterclaims, if any, from the relevant time range agreed to by IPLLC and Defendants.

**DOCUMENT REQUEST NO. 5:**

All documents and Communications relating to DMCA Takedown Notices sent by You to YouTube, including without limitation Takedown Notices listing the email address usintellectualpropertyllc@gmail.com.

**OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 5 on the grounds that the request is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, because the burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action. IPLLC further objects that the Request seeks Takedown Notices that are already in Counterclaimants' possession.

Subject to and without waiving theses objections, the General Objections, and the Objections to Definitions and Instructions, in response to Request No. 5, IPLLC will perform a reasonable and

1  proportionate search for IPLLC documents in the possession of Gábor Csupó, and will produce

2  responsive, non-privileged documents, if any, from the relevant time range agreed to by IPLLC and

3  Defendants.

4  **DOCUMENT REQUEST NO. 6:**

5        All documents and Communications, relating to the videos that were the subject of DMCA

6  Takedown Notices sent to YouTube listing the email address usintellectualpropertyllc@gmail.com.

7  **OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 6 on the grounds that it is

8  overbroad and seeks evidence that is not relevant to any party's claim or defense. IPLLC further objects

9  that the request is unduly burdensome because it is not proportional to the needs of the case, the amount

10  in controversy, the parties' relative access to relevant information, the parties' resources, because the

11  burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have

12  failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to

13  this action. IPLLC also objects that the Request is vague and ambiguous. IPLLC is willing to meet and

14  confer with Counterclaimants to better understand what specifically is requested.

15  **DOCUMENT REQUEST NO. 7:**

16        Communications between You and Sarfraz Arshad Khan and/or Ransom Nova including but

17  not limited to those regarding YouTube or Google, any matter set forth in the Amended

18  Counterclaims, any matter related to this Lawsuit, any agreements between You and Khan and/or

19  Ransom Nova, or any payments made by You to Khan and/or Ransom Nova.

20  **OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 7 on the grounds that it is

21  overbroad and seeks evidence that is not relevant to any party's claim or defense. IPLLC further objects

22  that the request is unduly burdensome because it is not proportional to the needs of the case, the amount

23  in controversy, the parties' relative access to relevant information, the parties' resources, because the

24  burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have

25  failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to

26  this action.

27

1    Subject to and without waiving theses objections, the General Objections, and the Objections

2    to Definitions and Instructions, in response to Request No. 7, IPLLC will perform a reasonable and

3    proportionate search for IPLLC documents in the possession of Gábor Csupó, and will produce

4    responsive, non-privileged documents regarding Counterclaimants' Amended Counterclaims, if any,

5    from the relevant time range agreed to by IPLLC and Defendants.

6    **DOCUMENT REQUEST NO. 8:**

7    All documents and Communications concerning YouTube accounts created or used by

8    Sarfraz Arshad Khan and/or Ransom Nova and any videos uploaded to such accounts.

9    **OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 8 on the grounds that the request

10   is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy,

11   the parties' relative access to relevant information, the parties' resources, because the burden and expense

12   of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take

13   reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

14   Subject to and without waiving theses objections, the General Objections, and the Objections

15   to Definitions and Instructions, in response to Request No. 8, IPLLC will perform a reasonable and

16   proportionate search for IPLLC documents in the possession of Gábor Csupó, and will produce

17   responsive, non-privileged documents, if any, from the relevant time range agreed to by IPLLC and

18   Defendants.

19   **DOCUMENT REQUEST NO. 9:**

20   All Communications between You and Endre Holman and/or Zoltán Búzás concerning

21   YouTube or Google, any matter set forth in the Amended Counterclaims, or any matter related to this

22   Lawsuit.

23   **OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 9 on the grounds that it is

24   overbroad and seeks evidence that is not relevant to any party's claim or defense. IPLLC further objects

25   that the request is unduly burdensome because it is not proportional to the needs of the case, the amount

26   in controversy, the parties' relative access to relevant information, the parties' resources, because the

27

28

burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

Subject to and without waiving theses objections, the General Objections, and the Objections to Definitions and Instructions, in response to Request No. 9, IPLLC will perform a reasonable and proportionate search for IPLLC documents in the possession of Gábor Csupó, and will produce responsive, non-privileged documents regarding Counterclaimants' Amended Counterclaims, if any, from the relevant time range agreed to by IPLLC and Defendants.

**DOCUMENT REQUEST NO. 10:**

All documents and Communications concerning PirateMonitor and YouTube or Google, including but not limited to those regarding any matter set forth in the Amended Counterclaims, or any matter related to this Lawsuit.

**OBJECTIONS AND RESPONSE:**  IPLLC objects to Request No. 10 on the grounds that it is overbroad and seeks evidence that is not relevant to any party's claim or defense. IPLLC further objects that the request is unduly burdensome because it is not proportional to the needs of the case, the amount in controversy, the parties' relative access to relevant information, the parties' resources, because the burden and expense of the proposed discovery outweighs its likely benefit, and because Defendants have failed to take reasonable steps to avoid imposing undue burden or expense on IPLLC, a non-party to this action.

Subject to and without waiving theses objections, the General Objections, and the Objections to Definitions and Instructions, in response to Request No. 10, IPLLC will perform a reasonable and proportionate search for IPLLC documents in the possession of Gábor Csupó, and will produce responsive, non-privileged documents regarding Counterclaimants' Amended Counterclaims, if any, from the relevant time range agreed to by IPLLC and Defendants.

Dated: June 15, 2021

Respectfully submitted,

/s/ Steven M. Berezney
George A. Zelcs *(pro hac vice)*
Randall P. Ewing, Jr. *(pro hac vice)*
Ryan Z. Cortazar *(pro hac vice)*
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
Steven M. Berezney, CA Bar #329923
Carol O'Keefe *(pro hac vice)*
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Phone: (415) 293-6800
Fax: (415) 293-6899

Philip C. Korologos *(pro hac vice)*
Joanna C. Wright *(pro hac vice)*
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Intellectual Property LLC*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on June 15, 2021, I caused the foregoing Intellectual Property LLC's Objections and Responses to YOUTUBE and GOOGLE'S Non-Party Document Subpoena to be served on all opposing counsel of record by email at the addresses listed below:

  Schneidervyoutube@wsgr.com

          /s/ Steven M. Berezney